MEMORANDUM OPINION
 

 PER CURIAM.
 

 In these consolidated lawsuits, seventy-five residents of the District of Columbia, along with the District of Columbia itself, challenge as unconstitutional the denial of their right to elect representatives to the Congress of the United States. Plaintiffs argue that their exclusion from representation is unjust. They note that the citizens of the District pay federal taxes and defend the United States in times of war, yet are denied any vote in the Congress that levies those taxes and declares those wars. This, they continue, contravenes a central tenet of our nation’s ideals: that governments “derivfel their just powers from the consent of the governed.” THE DECLARATION OF INDEPENDENCE para. 2.
 

 None of the parties contests the justice of plaintiffs’ cause. President Clinton and the other defendants, however, maintain that the dictates of the Constitution and the decisions of the Supreme Court bar us from providing the relief plaintiffs seek. Any such relief, they say, must come through the political process.
 

 Plaintiffs’ grievances are serious, and we have given them the most serious consideration. In the end, however, we are constrained to agree with defendants that the remedies plaintiffs request are beyond this court’s authority to grant.
 

 I
 

 On June 30, 1998, D.C. resident Lois Adams and nineteen co-plaintiffs filed suit in
 
 Adams v. Clinton.
 
 Their complaint alleges that the failure to apportion congressional representatives to the District, and to permit District residents to vote in House and Senate elections, violates their constitutional rights to equal protection of the laws and to a republican form of gov
 
 *38
 
 ernment. They further contend that those same rights are violated by Congress’s exercise of exclusive jurisdiction over the District, and by its denial to plaintiffs of “a state government, insulated from Congressional interference in matters of local concern.”
 
 Adams
 
 Compl. H109. In connection with the latter claim, they seek an injunction directing the District of Columbia Financial Responsibility and Management Assistance Authority, commonly known as the “Control Board,”
 
 [1]
 
 to “take no further action” and to “disband itself.”
 
 Id.
 
 at 28. The
 
 Adams
 
 complaint names as defendants President William Jefferson Clinton, the Clerk and the Sergeant at Arms of the House of Representatives, and the Control Board.
 

 On September 14, 1998, District of Columbia resident Clifford Alexander, fifty-six other residents of the District, and the District itself filed suit in
 
 Alexander v. Daley.
 
 Like their counterparts in
 
 Adams,
 
 the
 
 Alexander
 
 plaintiffs allege that their inability to vote for representatives and senators violates their rights to equal protection and to a republican form of government. The
 
 Alexander
 
 plaintiffs also allege that the denial of congressional representation violates their right to due process and abridges their privileges and immunities as citizens of the United States. Finally, they contend that the denial of their right to vote violates Article I and the Seventeenth Amendment of the Constitution, which provide that the members of the House shall be chosen by “the People of the several States” and that senators shall come “from each State, elected by the people thereof.” U.S. CONST, art. I, § 2, cl. 1;
 
 id.
 
 amend. XVII, cl. 1. The
 
 Alexander
 
 complaint names as defendants Secretary of Commerce William M. Daley; the Clerk, the Sergeant at Arms, and the Chief Administrative Officer of the House of Representatives; the Secretary and the Doorkeeper/Sergeant at Arms of the Senate; and the United States.
 

 On November 3, 1998, a single-judge district court consolidated the two lawsuits.
 
 See Adams v. Clinton,
 
 Civ. No. 98-1665 (D.D.C. Nov. 3, 1998) (Oberdorfer, J.). On November 6, that court granted motions by both sets of plaintiffs to appoint a three-judge district court pursuant to 28 U.S.C. § 2284(a), which provides that “[a] district court of three judges shall be convened ... when an action is filed challenging the constitutionality of the apportionment of congressional districts.”
 
 See Adams v. Clinton,
 
 26 F.Supp.2d 156, 160 (D.D.C.1998) (Oberdorfer, J.). This court subsequently convened, disposed of certain preliminary motions,
 
 see Adams v. Clinton,
 
 40 F.Supp.2d 1, 5 (D.D.C.1999), and heard oral argument.
 

 Currently pending are motions to dismiss or for summary judgment on behalf of each of the parties. All parties agree that the consolidated lawsuits contain no genuine issue as to any material fact and that decision on the pending motions is appropriate. We first address whether all of the claims disputed in these motions are properly before this three-judge panel. We then address the standing of plaintiffs to pursue those claims that are properly before us. Finally, we examine the merits of those claims.
 

 II
 

 The parties have not asked us to revisit the original judge’s determination that this case falls within the confines of the three-judge court statute, and we will not do so insofar as the complaints allege the failure to apportion members of the House of Representatives to the District. We have, however, determined that this court should relinquish jurisdiction over the other claims raised in the complaints and pending motions. These include both complaints’ demands for representation in the Senate, which, because they do not “challeng[e] the constitutionality of the apportionment of congressional districts,”
 
 *39
 
 plainly fall outside the jurisdictional mandate of section 2284(a). They also include the
 
 Adams
 
 plaintiffs’ challenges to Congress’ continuing exercise of exclusive authority over matters of local concern, particularly their challenge to the existence of the Control Board. Although these claims involve some issues akin to those found in the representation claims, they do not directly challenge congressional apportionment and therefore also fall outside the language of section 2284(a).
 
 Cf. Public Serv. Comm’n v. Brashear Freight Lines,
 
 312 U.S. 621, 625, 61 S.Ct. 784, 85 L.Ed. 1083 (1941) (holding that three-judge court should not consider “questions not within the statutory purpose for which the two additional judges ha[ve] been called”).
 

 Not only do the aforementioned claims fall outside the scope of section 2284(a), but they are also not the type of claims over which three-judge courts commonly assert supplemental jurisdiction.
 
 See generally Allee v. Medrano,
 
 416 U.S. 802, 812, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (indicating that three-judge courts may assert ancillary jurisdiction over certain non-three-judge claims);
 
 Lake Carriers’ Ass’n v. MacMullan,
 
 406 U.S. 498, 504 n. 5, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (same). For example, it is not necessary to resolve the Senate and Control Board claims in order to provide a “final and authoritative decision of the controversy” among the parties involved in the apportionment claims.
 
 Public Serv. Comm’n,
 
 312 U.S. at 625 n. 5, 61 S.Ct. 784;
 
 see also Allee,
 
 416 U.S. at 812 n. 8, 94 S.Ct. 2191. Nor is this a case in which resolution of the non-three-judge claims would allowr us to dispose of the claims that provide the basis for our jurisdiction.
 
 See Allee,
 
 416 U.S. at 812 n. 8, 94 S.Ct. 2191;
 
 United States v. Georgia Pub. Serv. Comm’n,
 
 371 U.S. 285, 287-88, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963) (“Once [a three-judge court has been] convened the case can be disposed of below or here on any ground, whether or not it would have justified the calling of a three-judge court.”):
 
 see also Rosado v. Wyman,
 
 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) (stating that three-judge court must decide non-constitutional claims “in preference to deciding the original constitutional claim” for which court convened).
 

 Because the claims that do not directly challenge the apportionment of representatives do not implicate the concerns that have traditionally caused three-judge courts to exercise supplemental jurisdiction, it may be improper for us to exercise such jurisdiction over them.
 
 Cf. Perez v. Ledesma,
 
 401 U.S. 82, 86-87, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (holding that three-judge court convened to hear challenges to certain state laws did not have jurisdiction over related attack on similar local ordinance). Even if our jurisdiction over those claims were proper, however, we would retain the discretion not to exercise it.
 
 See Turner Broad, Sys., Inc. v. FCC,
 
 810 F.Supp. 1308, 1314 (D.D.C.1992) (three-judge court). As we noted at an earlier stage in these proceedings, the Supreme Court has indicated that “even when [a] three-judge court has jurisdiction over [an] ancillary claim, ‘the most appropriate course’ may be to remand it to [a] single district judge.”
 
 Adams,
 
 40 F.Supp.2d at 5 (quoting
 
 Hagans v. Lavine,
 
 415 U.S. 528, 544, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974));
 
 see also Diven v. Amalgamated Transit Union Int’l & Local 689,
 
 38 F.3d 598, 601 (D.C.Cir.1994).
 

 Remand of the non-apportionment claims is the appropriate course here. There is no doubt that resolution of the Senate and Control Board claims would take us far afield from the core of the original jurisdictional grant, and at the same time deprive the Court of Appeals of the opportunity to review our work.
 
 See
 
 28 U.S.C. § 1253 (providing that final judgment of three-judge district court is appealable directly to Supreme Court). To avoid reaching “constitutional questions we need not reach, asserting authority we may not have,”
 
 Adams,
 
 40 F.Supp.2d at 5, we will address here only those claims that challenge the constitutionality of an
 
 *40
 
 apportionment of congressional districts that fails to account for the District of Columbia and its residents. The balance of the claims are remanded for determination by the single district judge before whom they were originally filed.
 

 Ill
 

 Before reaching the merits of the claims for representation in the House, we must determine two further questions regarding our jurisdiction: whether plaintiffs’ challenge represents a nonjusticiable political question, and whether plaintiffs have the requisite standing to bring it.
 
 See Steel Co. v. Citizens for a Better Env’t,
 
 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (holding that Article III courts must consider jurisdictional questions before deciding merits of causes of action).
 

 A
 

 The defendant House officials contend that this case presents a nonjusticiable political question because there is “a textually demonstrable constitutional commitment of the issue to a coordinate political department.”
 
 Baker v. Carr,
 
 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Specifically, they assert that because Article I of the Constitution limits voting to residents of the fifty states, only congressional legislation or constitutional amendment can remedy plaintiffs’ exclusion from the franchise.
 

 We do not agree that the political question doctrine bars our consideration of this case. The Supreme Court has repeatedly declared that “[cjonstitutional challenges to apportionment are justiciable.”
 
 Franklin v. Massachusetts,
 
 505 U.S. 788, 801 & n. 2, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (plurality opinion of O’Connor, J.) (citing U.S.
 
 Department of Commerce v. Montana,
 
 503 U.S. 442, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992));
 
 accord Wesberry v. Sanders,
 
 376 U.S. 1, 6, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The resolution of this dispute is “textually committed” only if we assume before we begin that plaintiffs cannot prove what they allege: that District residents are among those qualified to vote for congressional representatives under Article I. That purely legal issue is one the courts are perfectly capable of resolving, and is similar to those the Supreme Court has repeatedly found appropriate for judicial resolution.
 
 See, e.g., Montana,
 
 503 U.S. at 458-59, 112 S.Ct. 1415 (“[Tjhe interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary. The political question doctrine presents no bar to our reaching the merits of this dispute ....”) (citations omitted);
 
 Baker,
 
 369 U.S. at 226, 82 S.Ct. 691.
 

 B
 

 Next, we consider plaintiffs’ standing to bring these consolidated actions. The Supreme Court has summarized the requirements for standing as follows:
 

 [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of .... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 

 Lujan v. Defenders of Wildlife,
 
 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotations omitted). For the purposes of standing analysis, we “assume the validity of a plaintiffs substantive claim.”
 
 Catholic Soc. Serv. v. Shalala,
 
 12 F.3d 1123, 1126 (D.C.Cir.1994);
 
 accord Warth v. Seldin,
 
 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (“[Standing in no way depends on the merits of the plaintiffs contention that particular conduct is illegal ....”);
 
 Claybrook v. Slater,
 
 111 F.3d 904, 907 (D.C.Cir.1997);
 
 United States House
 
 
 *41
 

 of Representatives v. United States Dep’t of Commerce,
 
 11 F.Supp.2d 76, 83 (D.D.C.1998) (three-judge court),
 
 appeal dismissed,
 
 525 U.S. 316, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).
 

 Defendants do not seriously dispute that plaintiffs’ lack of representation in the House satisfies the “injury in fact” requirement.
 
 See
 
 Tr. of Mot. Hr’g at 70. “No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.”
 
 Wesberry,
 
 376 U.S. at 17, 84 S.Ct. 526 (invalidating malapportioned congressional districts). Hence, if the residents of the District are entitled to such a voice — which we must presume for purposes of standing analysis — its denial plainly constitutes an “injury in fact.”
 
 See Department of Commerce v. United States House of Representatives,
 
 525 U.S. 316, 119 S.Ct. 765, 774, 142 L.Ed.2d 797 (1999) (holding that resident’s “expected loss of a Representative to the United States Congress” through reapportionment “undoubtedly satisfies the injury-in-fact requirement of Article III standing”);
 
 Michel v. Anderson,
 
 14 F.3d 623, 626 (D.C.Cir.1994) (noting that “[i]t is obvious that Georgia voters would have suffered an injury” if “the House were to prevent all congressmen from the State of Georgia from voting in the House”).
 

 Defendants focus instead on the second and third prerequisites of standing: the requirements of causation and redressability. That analysis in turn, focuses on the statutory process for apportionment of congressional districts. The Secretary of Commerce is required, within nine months of completing the decennial census, to report to the President the total population of each state for purposes of congressional apportionment.
 
 See
 
 13 U.S.C. § 141(b).
 
 [2]
 
 Upon receiving the report, the President must transmit to Congress “a statement showing the whole number of persons in each State ... and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives.” 2 U.S.C. § 2a(a). “Each State shall be entitled ... to the number of Representatives shown” in the President’s statement, and within fifteen days of receiving that statement, the Clerk of the House must “send to the executive of each State a certificate of the number of Representatives to which such State is entitled .... ”
 
 Id.
 
 § 2a(b); see
 
 Franklin,
 
 505 U.S. at 792, 112 S.Ct. 2767. The Secretary concedes that he has not included, and does not plan to include, a separate entry for the District of Columbia in his report to the President. Nor has he included, nor does he plan to include, the District’s population within that of any state.
 

 With respect to causation, the Secretary of Commerce and the Clerk of the House contend that they bear no individual responsibility for the exclusion of the District from the apportionment process because they are merely carrying out the constitutional requirement (repeated
 
 in haec verba
 
 in the statute) that representatives be apportioned “among the several States,”
 
 [3]
 
 and because the District of Columbia is not a state. This argument once again assumes that plaintiffs will not prevail on the merits. We, however, must assume here that plaintiffs will prevail, and hence that the District
 
 is
 
 a “state” for apportionment purposes and that the Constitution is not the cause of their electoral disability.
 

 The more difficult standing question is that of redressability. Secretary Daley contends that even if we may order him to include the District’s citizens within his
 
 *42
 
 report,
 
 [4]
 
 the President is not bound to accept that report. He further argues that we are without power to enjoin the President if he refuses to adhere to a declaration in plaintiffs’ favor. Making an analogous argument, the Clerk of the House contends that the Speech or Debate Clause
 
 [5]
 
 likewise prevents us from enjoining her should she decide not to comply with our declaration of the law. Defendants argue that, because the chain of causation may be broken in these two places, plaintiffs cannot satisfy the requirement of redressability.
 
 [6]
 

 We are guided in our resolution of this issue by the Supreme Court’s resolution of a similar dispute in
 
 Franklin v. Massachusetts,
 
 which arose out of a three-judge court proceeding pursuant to the same jurisdictional statute at issue here.
 
 See
 
 505 U.S. at 788, 112 S-Ct. 2767. In that case, Massachusetts and two of its residents challenged the method used by the then-Secretary of Commerce for allocating overseas military personnel among the states for apportionment purposes — a method that resulted in Massachusetts losing a seat in the House.
 
 See id.
 
 at 790, 112 S.Ct. 2767, The plaintiffs sued the President, the Secretary of Commerce, the Clerk of the House, and Census Bureau officials for violating the Administrative Procedure Act (APA) and the Constitution. As in this case, the defendants contended that the court could not grant injunctive relief against the President, and that absent such relief, a judgment against the remaining defendants would fail to redress the plaintiffs’ injury.
 
 See id.
 
 at 802-03, 112 S.Ct. 2767.
 

 Although divisions among the Justices make the Court’s opinion difficult to parse, it nonetheless appears that eight Justices rejected the contention that the
 
 Franklin
 
 plaintiffs lacked standing. Four Justices agreed with the defendants that, at a minimum, the prospect of an injunction against the President was “extraordinary, and should have raised judicial eyebrows.”
 
 Id.
 
 at 802, 112 S.Ct. 2767 (plurality opinion of O’Connor, J.). Those four concluded, however, that they could avoid deciding the propriety of granting relief against the President (or the House officials) because the plaintiffs’ injury was likely to be redressed by declaratory relief against the Secretary of Commerce alone.
 
 See id.
 
 at 803, 112 S.Ct. 2767. A judgment against the Secretary would be enough to cause her to send the correct numbers, the four Justices thought, and it was fair to assume that the President and the congressional officials would then follow the law as the Court articulated it:
 

 [A]s the Solicitor General has not contended to the contrary, we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination.
 

 Id.
 
 Accordingly, the four went on to consider the merits of plaintiffs’ constitutional argument, ultimately holding against them.
 
 See id.
 
 at 806, 112 S.Ct. 2767.
 

 
 *43
 
 Four more Justices concurred in the judgment against plaintiffs without addressing standing. They did, however, conclude that the President’s role in the apportionment process was strictly ministerial, and thus that the Secretary’s report could be challenged as “final agency action” under the APA.
 
 See id.
 
 at 807, 808-17, 112 S.Ct. 2767 (Stevens, J., concurring in part). “[T]he statute,” these four said, “does not contemplate the President’s changing the Secretary’s report.”
 
 Id.
 
 at 814, 112 S.Ct. 2767. Because these four Justices went on to consider (and deny) the merits of the plaintiffs’ claims, the sole Justice dissenting on the issue of standing concluded that they had necessarily found it to exist.
 
 See id.
 
 at 823-24 & n. 1, 112
 
 S.Ct. 2767
 
 (Scalia, J., concurring in part). Even if that was not necessarily so,
 
 [7]
 
 the view of these four regarding the President’s lack of discretion supports plaintiffs’ claim of redressability. Since, in the view of these four Justices, the President is without discretion to modify the Commerce Secretary’s report,
 
 [8]
 
 the ability of the court to enjoin the Secretary establishes the necessary redressability.
 

 Deriving a governing principle from the opinions of a fragmented Court is always problematic.
 
 [9]
 
 Nonetheless, we are bound to tiy to discern such a principle.
 
 Cf. Marks v. United States,
 
 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (“When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....”) (internal quotation omitted). In
 
 Franklin,
 
 eight Justices reached one common conclusion: that a judgment directing the Secretary of Commerce to report the population of the states in a specified way would directly affect the apportionment of the House, either because the President would voluntarily abide by it or because the President had no choice but to abide by it.
 

 Although
 
 Franklin
 
 is not identical to the case before us, it is sufficiently analogous to govern our determination of plaintiffs’ standing. This case involves the same apportionment statute as that at issue in
 
 Franklin.
 
 The Secretary of Commerce plays the same role here as the Secretary did there, and is equally amenable to suit. Here, as in
 
 Franklin,
 
 neither the President nor the House officials have suggested that they would refuse to follow a decision of this court (assuming, of course, that it were upheld on appeal) regarding the apportionment of congressional districts.
 
 [10]
 
 Hence, we can conclude that plaintiffs sat
 
 *44
 
 isfy the redressability prong of the standing inquiry and, as in
 
 Franklin,
 
 can do so without deciding whether the President or the Clerk is subject to suit.
 
 [11]
 

 The distinction the Executive Branch defendants draw between the two cases is not significant. They contend that unlike
 
 Franklin,
 
 which involved the Secretary’s policy decision regarding how the census should count military personnel living abroad, here the Secretary is merely carrying out what he perceives the Constitution to require. As defendants point out, the plurality opinion in
 
 Franklin
 
 observed that “[t]he Secretary certainly has an interest in defending her policy determinations concerning the census” and therefore “has an interest in litigating” the accuracy of reapportionment.
 
 Franklin,
 
 505 U.S. at 803, 112 S.Ct. 2767 (plurality opinion of O’Connor, J.). Because in this case Secretary Daley is not defending one of his own policy decisions, defendants contend that we cannot find he has sufficient stake in the outcome of these suits.
 

 Defendants’ argument amounts to a claim that the parties lack the “concrete adverseness” necessary to assure that there is an actual “case” or “controversy” within the meaning of Article III of the Constitution.
 
 See Gollust v. Mendell,
 
 501 U.S. 115, 125-26, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991) (quoting
 
 Baker,
 
 369 U.S. at 204, 82 S.Ct. 691);
 
 Diamond v. Charles,
 
 476 U.S. 54, 61-62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). That claim is not persuasive. Nothing in
 
 Franklin
 
 suggested that its standing analysis turned on the fact that the Secretary’s decision was based on her view of policy rather than law. Although Secretary Daley’s decision to exclude District residents is based on his interpretation of what the Constitution (and the statute that follows it verbatim) requires, his interest in and responsibility for defending that interpretation is at least as substantial as his interest in defending his policy judgments.
 
 See
 
 U.S. CONST, art. VI, cl. 3 (“[A]ll executive and judicial Officers, both of the United States and the several States, shall be bound by Oath or Affirmation, to support this Constitution .... ”). And as we have already concluded that plaintiffs have suffered constitutional “injury in fact” from the denial of their right to vote, the fact that the injury arises out of a dispute of law rather than policy does not deprive them of standing to sue.
 

 Before concluding our standing analysis, we must also consider the fact that the
 
 Adams
 
 plaintiffs, unlike their
 
 Alexander
 
 counterparts, did not name the Secretary of Commerce as a defendant. We do not regard this as fatal to applying
 
 Franklin
 
 to the
 
 Adams
 
 complaint. In
 
 Swan v. Clinton,
 
 this Circuit held that, when necessary to satisfy the redressability component of standing, a court may constructively amend a complaint to include prayers for relief against unnamed defendants in their official capacities who might otherwise be in a position to frustrate the implementation of a court order.
 
 See
 
 100 F.3d 973, 979-80
 
 &
 
 n. 3 (D.C.Cir.1996) (citing,
 
 inter alia, United States v. New York Tel. Co.,
 
 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). Here it is not even necessary to constructively amend the complaint to bring the additional defendant before the court, because the
 
 Alexander
 
 plaintiffs did sue the Secretary, and we have consolidated the two cases. The Secretary is therefore already before us, and his counsel has
 
 *45
 
 already raised all of the appropriate arguments on his behalf.
 

 Finally, we must address the question of whether the failure of both complaints to include Maryland election officials as defendants poses an insuperable obstacle to redressability, given that one proposed remedy is to permit plaintiffs to vote for representatives as if they were citizens of Maryland. Although there is no guarantee that Maryland officials would permit District residents to vote there even if we directed the Secretary to count them as Maryland citizens for purposes of apportionment, the fact that officials who are not parties to these cases are in a position to thwart one of many potential remedies does not defeat our jurisdiction.
 
 See id.
 
 at 980-81. Moreover, plaintiffs point out that if we were to find them to be Maryland citizens for purposes of congressional voting, a remedy could be crafted that would not necessarily rely on Maryland’s electoral machinery.
 
 See Alexander
 
 Pis.’ Consolidated Mem. in Opp’n to Defs.’ Mots, to Dismiss at 35 n. 18 [hereinafter
 
 Alexander
 
 Pis.’ Opp’n] (suggesting that votes of District residents be counted separately and added to Maryland totals); Tr. of Mot. Hr’g at 114-15.
 

 In sum, we conclude that the plaintiffs in these consolidated cases have standing to raise claims challenging the constitutionality of the exclusion of the District of Columbia from the apportionment of congressional districts.
 
 [12]
 

 IV
 

 We now turn to the merits of plaintiffs’ claims. In this Part, we consider the
 
 Alexander
 
 plaintiffs’ contention that their right to vote in congressional elections is guaranteed by Article I of the Constitution, as well as defendants’ opposing argument that the same Article precludes such a right. In Part V, we consider additional arguments, raised by both groups of plaintiffs, premised on other provisions of the Constitution.
 

 Article I, section 2, clause 1 of the Constitution provides:
 

 The House of Representatives shall be composed of Members chosen every second Year
 
 by the People of the several States,
 
 and the Electors in each
 
 Slate
 
 shall have the Qualifications requisite for Electors of the most numerous Branch of the
 
 State
 
 Legislature.
 

 U.S. CONST, art. I, § 2, cl. 1 (emphasis added). Although standing alone the phrase “people of the several States” could be read as meaning all the people of the “United States” and not simply those who are citizens of individual states, the Article's subsequent and repeated references to “statefs]” — beginning with the balance of the same clause quoted above — make clear that the former was not intended.
 
 See, e.g., id.
 
 (electors “in each State” shall have qualifications of electors of most numerous branch “of the State Legislature”);
 
 id.
 
 art. I, § 2, cl. 2 (each representative shall “be an Inhabitant of that State” in which he or she is chosen);
 
 id.
 
 art. 1, § 2, cl. 3 (representatives shall be “apportioned among the several States which may be included within this Union”);
 
 id.
 
 (“each State shall have at Least one Representative”);
 
 id.
 
 art. I, § 2, cl. 4 (the Executive Authority of the “State” shall fill vacancies);
 
 id.
 
 art. I, § 4, cl. 1 (the legislature of “each State” shall prescribe times, places, and manner of holding elections for representatives). Indeed, for this reason — and as the
 
 Alexander
 
 plaintiffs concede — residents of United States territories are not entitled to vote in federal
 
 *46
 
 elections, notwithstanding that they are United States citizens.
 
 [13]
 

 Plaintiffs accordingly do not dispute that to succeed they must be able to characterize themselves as citizens of a “state.”
 
 See Alexander
 
 Pis.’ Opp’n at 15;
 
 accord, Adams
 
 Pis.’ Opp’n to the Federal Defs.’ Mots, to Dismiss at 51 [hereinafter
 
 Adams
 
 Pis.’ Opp’n]. Instead, they contend that District residents can fairly be characterized as citizens of a “state,” as the term was intended in Article I, under either of two theories. First, they argue that the District of Columbia itself may be treated as a state through which its citizens may vote. Second, they contend that District citizens may vote in congressional elections through the State of Maryland, based on their “residual” citizenship in that state— the state from whose territory the current District was originally carved. In the following sections we consider the validity of each theory.
 

 A
 

 The
 
 Alexander
 
 plaintiffs’ first theory is that “the District itself may be treated as the ‘state’ through which its citizens may vote” under Article I. Mem. in Supp. of Mot. of Pis. Alexander et al. for Summ. J. at 48 [hereinafter
 
 Alexander
 
 Pis.’ Summ. J. Mem.]. As plaintiffs correctly note, the Supreme Court has on occasion interpreted the constitutional term “state” to include the District.
 
 See Loughran v. Loughran,
 
 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219 (1934) (holding that Full Faith and Credit clause binds “courts of the District ... equally with courts of the States”);
 
 cf. Callan v. Wilson,
 
 127 U.S. 540, 550, 8 S.Ct. 1301, 32 L.Ed. 223 (1888) (holding that right to trial by jury extends to residents of District).
 
 [14]
 
 As they concede, however, the Court also has interpreted the term “state” to exclude the District.
 
 See, e.g., Hepburn & Dundas v. Ellzey,
 
 6 U.S. (2 Cranch) 445, 452, 2 L.Ed. 332 (1805) (holding that diversity jurisdiction provision of Article III, section 2 does not cover cases in which one party is resident of District, because “the members of the American confederacy only are the states contemplated in the constitution”).
 

 The measure of “[w]hether the District of Columbia constitutes a ‘State or Territory’ within the meaning of any particular ... constitutional provision depends upon the character and aim of the specific provision involved.”
 
 [15]
 

 District of Columbia v. Carter,
 
 409 U.S. 418, 420, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).
 
 [16]
 
 The cases plaintiffs cite do not involve Article I, nor do they involve constitutional rights that textually appear to require citizenship
 
 *47
 
 (or residence) in a state.
 
 [17]
 
 Defendants argue that, by contrast, when dictating the composition of Congress, the Constitution leaves no doubt that only the residents of actual states are entitled to representation. An examination of the Constitution’s language and history, and of the relevant judicial precedents, persuades us that defendants are correct and that the District-as-state theory is untenable.
 

 1. We begin with the language of Article I, which makes clear just how deeply Congressional representation is tied to the structure of statehood. Indeed, as we explore each relevant constitutional provision, it becomes apparent how far afield from the common understandings of the relevant terms we would have to go to sustain plaintiffs’ theory.
 

 As previously noted, besides stating that the House shall be composed of members chosen by the people of the several states, clause I of Article I, section 2 requires that voters (“Electors”) in House elections “have the Qualifications requisite for the Electors of the most numerous branch of
 
 the State Legislature.”
 
 U.S. CONST, art. I, § 2, cl. 1 (emphasis added).
 
 [18]
 
 If the District were regarded as a state for purposes of this provision, what could the reference to “State Legislature^]” mean? The thirteen original states all had such legislatures, as do each of the present fifty. But for most of its history, the District of Columbia has had nothing that could even roughly be characterized as a legislature for the entire District.
 
 [19]
 
 Although plaintiffs point to the existence of the current elected city council,
 
 see Alexander
 
 Pis.’ Opp’n at 24, Congress did not pass the “home rule” statute creating that entity until 1973, and the Court of Appeals for this Circuit has indicated that such a body is not constitutionally required.
 
 [20]
 
 A right
 
 *48
 
 to vote that depends upon the existence of such an occasional institution can hardly have been what the Framers contemplated.
 

 Moreover, and more important, it is clear that the ultimate legislature the Constitution envisions for the District is not a city council, but rather Congress itself. The District Clause expressly grants Congress the power to “exercise exclusive Legislation in all Cases whatsoever” over the district that would become the seat of government. U.S. CONST, art. 1, § 8, cl. 17. Plaintiffs themselves argue that in the “absence” of a city council, Congress should be considered the state legislature for purposes of Article I.
 
 See Alexander
 
 Pis.’ Opp’n at 24. But Congress cannot be characterized as a “state legislature” without doing violence to the meaning of that term. Indeed, to characterize it as such would turn the Qualifications Clause into a circle without beginning or end. Under section 2, clause 1, House voters must have the qualifications requisite for voters of the most numerous branch of the state legislature. If that legislature were Congress itself, with the House as its most numerous branch, then the clause would say no more than that voters for. the House must have the qualifications requisite for voters for the House — a tautology without constitutional content.
 

 Including the District within the definition of “state” is also inconsistent with the provisions of clause 3 of Article I, section 2, the clause that directly addresses the issue of congressional apportionment. That clause provides that “Representatives ... shall be apportioned among
 
 the several States which may he included unthin this Union,
 
 according to their respective numbers.” U.S. CONST, art. I, § 2, cl. 3 (emphasis added).
 
 [21]
 
 That provision plainly contemplates true states and not the District, which neither was one of the original states nor has been “admitted by the Congress into this Union.”
 
 Id.
 
 art. IV. § 3, cl. 1. Indeed, the “Seat of Government” contemplated by the Constitution is subsequently described in Article I as a “District,” in contrast to the “particular States” whose cessions of territory were expected to create it.
 
 [22]
 
 And, as if to remove any doubt, clause 3 goes on to identify specifically those thirteen entities it regards as the immediate post-ratification states, and to assign each an initial apportionment of representatives until an “actual Enumeration” of “each Statefs]” “respective Numbers” can be accomplished.
 
 Id.
 
 art. I, § 2, cl. 3.
 
 [23]
 
 The District is not included
 
 *49
 
 within that initial apportionment.
 
 [24]
 

 The effort to define the District as a state generates still further incongruities with respect to the next clause of Article I, section 2. Clause 4 provides: “When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.”
 
 Id.
 
 art. I, § 2, cl. 4. But who or what is “the Executive Authority” of the District? Plaintiffs offer the current home-rule mayor as that authority,
 
 see Alexander
 
 Pis.’ Opp’n at 24, but we again are confronted by the relative recency of that position.
 
 See supra note
 
 19. And we also again have the problem that it is Congress that is the ultimate executive authority for the District.
 
 See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,
 
 458 U.S. 50, 76, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (“Congress’ power over the District of Columbia encompasses the full authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative.”). The possibility that the Framers intended Congress to fill its own vacancies seems far too much of a stretch, even if the constitutional fabric were more flexible than it appears to be.
 

 When we turn to the provisions of the Constitution that originally governed voting for the Senate, the complications of defining the District as a state become even more apparent. Although we are remanding the merits of plaintiffs’ claims for Senate representation to a single-judge court, the relationship between the House and Senate provisions nonetheless requires us to examine the latter in order to determine the Framers’ intentions with respect to the House.
 

 As originally provided under Article I, section 3, the Senate was to be “composed of two Senators from each State,” chosen not “by the People of the several States,” as in the case of the House, but rather
 
 “by the Legislature thereof.”
 
 U.S. CONST, art. I, § 3, cl. 1 (emphasis added). The impossibility of treating Congress as the legislature under that clause is manifest, as doing so would mean that Congress would itself choose the District’s senators. The scenario is further complicated by the fact that clause 2 of the same section provides that Senate vacancies will be filled not just by the state’s “Executive,” as with the House, but also by the state’s “Legislature” when not in recess.
 
 Id.
 
 art. I, § 3, cl. 2. Since, as noted above, Congress is ultimately both the Legislature and Executive for the District, plaintiffs’ theory would mean that Congress would fill vacancies in the District’s Senate seats— except when Congress is in recess, in which event Congress would also fill the vacancies.
 

 It is, of course, not surprising to conclude that the Framers did not contemplate allocating two senators to the District of Columbia. The Senate was expressly viewed as representing the states themselves,
 
 see
 
 THE FEDERALIST NOS. 10, 39, 58, 62 (James Madison) (Jacob E. Cooke ed., 1961), and the guarantee of two senators for each
 
 *50
 
 was an important element of the Great Compromise between the smaller and larger states that ensured ratification of the Constitution: the smaller states were guaranteed equal representation notwithstanding their smaller populations.
 
 See Reynolds v. Sims,
 
 377 U.S. 533, 574, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964);
 
 Wesberry,
 
 376 U.S. at 12-13, 84 S.Ct. 526;
 
 see also INS v. Chadha,
 
 462 U.S. 919, 950, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). But reaching this conclusion with respect to the Senate requires reaching a similar conclusion with respect to the House. The House provisions, after all, were “the other side of the compromise”: to satisfy the larger states, the House was to be popularly elected, and “in allocating Congressmen the number assigned to
 
 each State
 
 should be determined solely by the number of the State’s inhabitants.”
 
 Wesberry,
 
 376 U.S. at 13, 84 S.Ct. 526 (emphasis added). Treating the Senate and House differently with respect to the District would unhitch half that compromise from its historical and constitutional moorings.
 

 In 1913, the Seventeenth Amendment granted the people of “each State,” rather than their legislatures, the right to choose senators. U.S. CONST, amend. XVII, cl. 1. After that change, the provisions concerning qualifications and vacancies for the Senate essentially parallel those for the House.
 
 See id.
 
 (providing that “electors ... shall have the qualifications requisite for electors of the most numerous branch of the State legislatures”);
 
 id.
 
 cl. 2 (“When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: Provided, That the legislature of any State may empower the executive thereof to make temporary appointments ....”).
 
 But see id.
 
 cl. 1 (providing that senators shall be elected by people of “each State,” rather than “of the several states” as in provision for representatives in Article I, section 2, clause 1). Accordingly, no separate discussion of those provisions is necessary.
 

 2. We conclude from our analysis of the text that the Constitution does not contemplate that the District may serve as a state for purposes of the apportionment of congressional representatives. That textual evidence is supported by historical evidence concerning the general understanding at the time of the District’s creation.
 

 It is true, as plaintiffs note, that the voting rights of District residents received little express attention at the time of the Constitution’s drafting.
 
 See generally
 
 Peter Raven-Hansen,
 
 Congressional Representation for the District of Columbia: A Constitutional Analysis,
 
 12 HARV. J. ON LEGIS, 167, 172 (1975). As plaintiffs suggest, this lack of attention may have been due to the fact that the District’s geographic location had not yet been determined, and that even once selected, the territory had relatively few residents.
 
 See supra
 
 note 24.
 
 But see id.
 
 (noting that L’Enfant anticipated city of Washington growing to size of 800,000). It is also true, as our dissenting colleague argues, that the historical rationale for the District Clause — ensuring that Congress would not have to depend upon another sovereign for its protection — would not by itself require the exclusion of District residents from the congressional franchise.
 
 [25]
 

 
 *51
 
 Such evidence as does exist, however, indicates a contemporary understanding that residents of the District would not have a vote in the national Congress. At the New York ratifying convention,
 
 [26]
 
 for example, Thomas Tredwell argued that “[t]he plan of the
 
 federal city,
 
 sir, departs from every principle of freedom ... subjecting the inhabitants of that district to the exclusive legislation of Congress, in whose appointment they have no share or vote.” 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, at 402 (Jonathan Elliot ed., 2d ed. 1888),
 
 repainted in
 
 3 THE FOUNDERS’ CONSTITUTION 225 (Philip B. Kurland & Ralph Lerner eds., 1987).
 
 [27]
 
 On the same day at that convention, Alexander Hamilton proposed that the Constitution be amended to provide: “When the Number of Persons in the District or Territory to be laid out for the Seat of the Government of the United States ... amount to_[an unspecified number] ... Provision shall be made by Congress for having a District representation in that Body.” 5 THE PAPERS OF ALEXANDER HAMILTON 189-90 (Harold C. Syrett & Jacob E. Cooke eds., 1962). The proposed amendment failed.
 
 See id.
 

 Considerably more evidence of the contemporary understanding emerges from
 
 *52
 
 examination of the period immediately surrounding Congress’ assumption of exclusive jurisdiction over the land ceded for the District by Maryland and Virginia.
 
 [28]
 
 During that period, some residents of the District sought to dissuade Congress from passing the Organic Act of 1801,
 
 2
 
 Stat. 103 (1801), through which jurisdiction was to be assumed. They believed that, under the Constitution, once Congress assumed jurisdiction they would necessarily lose their vote and be “reduced to the mortifying situation, of being subject to laws made, or to be made, by we know not whom; by agents, not of our choice, in no degree responsible to us.” ENQUIRIES INTO THE NECESSITY OR EXPEDIENCY OF' ASSUMING EXCLUSIVE LEGISLATION OVER THE DISTRICT OF COLUMBIA 15 (1800) [hereinafter ENQUIRIES INTO THE NECESSITY] (available in Rare Book/Special Collections Reading Room, Library of Congress).
 
 [29]
 
 Members of Congress opposed to the Organic Act made the same argument.
 
 See, e.g.,
 
 10 ANNALS OF CONG. 992 (1801) (remarks of Rep. Smilie) (arguing that upon assumption of congressional jurisdiction, “the people of the District would be reduced to the state of subjects, and deprived of their political rights”). Even those who supported the Act appeared to agree that, under the Constitution, once Congress assumed jurisdiction the residents would automatically lose their right to vote.
 
 See, e.g., id.
 
 at 996 (remarks of Rep. Bird) (noting that although “the people [of the District] could not be represented in the General Government,” the “blame” was not “to the men who made the act of cession; not to those who accepted it,” but “to the men who framed the Constitutional provision, who peculiarly set apart this as a District under the national safeguard and Government”).
 
 [30]
 

 Others saw a constitutional amendment — rather than blocking Congress’ assumption of jurisdiction — as the best way to preserve the franchise for the District’s residents.
 
 See, e.g.,
 
 10 ANNALS OF CONG. 998-99 (1801) (remarks of Rep.
 
 *53
 
 Dennis) (“[I]f it should be necessary, the Constitution might be so altered as to give them a delegate to the General Legislature, when their numbers should become sufficient.”). In 1801, Augustus Woodward, a prominent lawyer who practiced in the District of Columbia, published a pamphlet decrying the area’s lack of congressional representation, calling it a violation of “an original principle of republicanism, to deny that all who are governed by the laws ought to participate in the formation of them.” AUGUSTUS WOODWARD, CONSIDERATIONS ON THE TERRITORY OF COLUMBIA 5-6 (1801) (available in Rare Book/Special Collections Reading Room, Library of Congress).
 
 [31]
 
 Woodward called for representation of the District in the Senate and the House, but recognized that “[i]t will require an amendment to the Constitution of the United States.”
 
 Id.
 
 at 6. Accordingly, he proposed one.
 
 See id.
 
 at 15.
 
 [32]
 

 Within a few years of the assumption of congressional jurisdiction, still others saw retrocession of the District to Maryland and Virginia as the only remedy for the “political slave[ry]” of nonrepresentation. 12 ANNALS OF CONG. 487 (1803) (remarks of Rep. Smilie);
 
 see id.
 
 (“Under our exercise of exclusive jurisdiction the citizens here are deprived of all political rights, nor can we confer them.... Why not then restore the people to their former condition?”). In 1803, a bill calling for retrocession was introduced in Congress.
 
 See id.
 
 at 487-506. Although the bill was defeated,
 
 see id.
 
 at 506, the residents of the former Virginia territory eventually succeeded in obtaining retrocession in 1846,
 
 see
 
 An Act to Retrocede the County of Alexandria, in the District of Columbia, to the State of Virginia, 9 Stat. 35 (1846).
 
 [33]
 

 Although the foregoing represents positive evidence of a contemporary understanding that District residents would not (and did not) have the right to vote in Congress, perhaps more important is the absence of evidence to the contrary. No political leaders, for example, assured the residents that they would have representation even without constitutional amendment or defeat of the Organic Act. Nor is there any indication that the residents of the new District were surprised when they found themselves without the vote after Congress assumed exclusive jurisdiction in 1801. Indeed, had it been understood that the former citizens of Maryland and Virginia had a right to continue voting for Congress, one would have expected a flood of newspaper articles and lawsuits decrying their unlawful disenfranchisement. Such a reaction, however, is not visible in the historical record.
 
 [34]
 

 
 *54
 
 3. Finally, we note that every other court to have considered the question— whether in dictum or in holding — has concluded that residents of the District do not have the right to vote for members of Congress. The early Supreme Court decisions are particularly relevant here, not only because they are binding upon us, but because they reflect the historical understanding of Chief Justice Marshall, who “wrote from close personal knowledge of the Founders and the foundation of our constitutional structure.”
 
 National Mut. Ins. Co. v. Tidewater Transfer Co.,
 
 337 U.S. 582, 587, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) [hereinafter Tidewater] (plurality opinion of Jackson, J.).
 

 In 1805, the Chief Justice considered whether the District of Columbia was a “state” within the meaning of the Judiciary Act of 1789, which effectuated Article Ill’s grant of diversity jurisdiction by giving circuit courts authority over cases “between a citizen of the state in which the suit is brought, and a citizen of another state.”
 
 Hepburn & Dundas,
 
 6 U.S. (2 Cranch) at 452 (citing, without citation, 1 Stat. 73, 78 (1789)). Plaintiffs contended there, as they do here, that the word “state” can mean more than simply one of the members of the union. Although Marshall agreed that was true, in his view “the act of congress obviously uses the word ‘state’ in reference to the term used in the constitution.”
 
 Id.
 
 Expressly relying on his understanding of the meaning of that term in the clauses that prescribe the composition of the House and the Senate, Marshall concluded that “state” could not encompass the District for purposes of Article III. “These clauses,” he said, referring to the clauses of Article I, “show that the word state is used in the constitution as designating a member of the union.”
 
 Id.
 
 at 452-53, 2 Cranch 445. Because the word “has been used plainly in this limited sense in the articles respecting the legislative and executive departments,” he concluded, “it must be understood as retaining th[at] sense” in the article concerning the judicial branch.
 
 Id.
 
 at 453, 2 Cranch 445.
 

 Marshall was not unaware of the unfairness his conclusion would engender. He felt constrained to reach it, however, notwithstanding that it was “extraordinary that the courts of the United States, which are open to aliens, and to the citizens of every state in the union,” should be closed to citizens of the United States who reside in the District.
 
 Id.
 
 at 453, 2 Cranch 445. Sixteen years later, Marshall reaffirmed
 
 Hepburn & Dundas’s
 
 conclusion in
 
 Corporation of New Orleans v. Winter,
 
 14 U.S. (1 Wheat.) 91, 4 L.Ed. 44 (1816).
 

 The dissent contends that Chief Justice Marshall’s position has since been undermined by
 
 Tidewater,
 
 in which the Supreme Court held it constitutional for Congress to open the federal courts to an action by a citizen of the District of Columbia against a citizen of one of the states. But in so doing, a plurality of the Court reconfirmed Marshall’s conclusion that the District was
 
 *55
 
 not a state within the meaning of Article Ill’s grant of jurisdiction to the federal courts, holding instead that Congress had lawfully expanded federal jurisdiction beyond the bounds of Article III by using its Article I power to legislate for the District.
 
 See Tidewater,
 
 337 U.S. at 600, 69 S.Ct. 1173 (plurality opinion of Jackson, J.). Although two other Justices opined that Marshall’s holding in
 
 Hepburn & Dundas
 
 should be reversed, even they limited their disagreement to Article Ill’s Diversity Clause, taking pains to distinguish between constitutional clauses “affecting civil rights of citizens,” such as that clause, and “the purely political clauses,” among which they counted “the requirements that members of the House of Representatives be chosen by the people of the several states.”
 
 Id.
 
 at 619-623, 69 S.Ct. 1173 (Rutledge, J., concurring).'
 

 In 1820, Marshall reviewed a claim that, because District residents were unrepresented in Congress, the national legislature lacked the power to impose a direct tax upon the District.
 
 See Loughborough v. Blake,
 
 18 U.S. (5 Wheat.) 317, 5 L.Ed. 98 (1820). If there were a Justice who would have been particularly sensitive to this reprise of the Revolutionary War battle cry of “no taxation without representation,” surely it would have been Marshall — who served as a company commander at Valley Forge.
 
 See
 
 JEAN EDWARD SMITH, JOHN MARSHALL: DEFINER OF A NATION 62-65 (1996). Nonetheless, speaking for a unanimous Court, Marshall held that Congress had the power to tax residents of the District of Columbia despite their lack of representation.
 
 See Loughborough,
 
 18 U.S. (5 Wheat.) at 317. The District, he said, “relinquished the right of representation, and has adopted the whole body of Congress for its legitimate government.”
 
 Id.
 
 at 324, 5 Wheat. 317. “Although in theory it might be more congenial to the spirit of our institutions to admit a representative from the district,” he declared, “certainly the Constitution does not consider their want of a representative in Congress as exempting it from equal taxation.”
 
 Id.
 
 at 324-25, 5 Wheat. 317.
 

 The opinions do not end with those of Chief Justice Marshall. In
 
 Heald v. District of Columbia,
 
 Justice Brandeis also faced a claim that a congressional tax on the District was unconstitutional “because it subjects the residents of the District to taxation without representation.” 259 U.S. 114, 124, 42 S.Ct. 434, 66 L.Ed. 852 (1922). Like Marshall, Brandéis recognized that “[rjesidents of the district lack the suffrage and have politically no voice in the expenditure of the money raised by taxation.”
 
 Id.
 
 Nonetheless, he concluded that “[t]here is no constitutional provision which so limits the power of Congress that taxes can be imposed only upon those who have political representation.”
 
 Id.: see also Palmore v. United States,
 
 411 U.S. 389, 395, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (citing, with approval,
 
 Hepburn & Dundas,
 
 6 U.S. (2 Cranch) at 445).
 

 The cry of “no taxation without representation” has reached the courts of this circuit as well. In
 
 Breakefield v. District of Columbia,
 
 the Court of Appeals considered a challenge to Congress’ imposition of an income tax upon District residents “notwithstanding that they then had and now have no elected representative in the Congress.” 442 F.2d 1227, 1228 (D.C.Cir. 1970). Petitioner acknowledged the existence of contrary precedent, namely the Supreme Court’s decisions in
 
 Loughbor-ough
 
 and
 
 Heald,
 
 but “questionled] both the original soundness” of those decisions “and their continuing vitality in the light of later Supreme Court pronouncements.”
 
 Id.
 
 at 1229. “[Petitioner] presents those contentions in the wrong forum,” the court said. “[I]t is for the Supreme Court, not us, to proclaim error in its past rulings, or their erosion by its adjudications since.”
 
 Id.
 
 at 1229-30. We are of the same view.
 

 4. In sum, we conclude that constitutional text, history, and judicial precedent bar us from accepting plaintiffs’ contention
 
 *56
 
 that the District of Columbia may be considered a state for purposes of congressional representation under Article I.
 

 Before proceeding to plaintiffs’ alternative argument, we pause over another advanced by the dissent. As noted at the outset of this Part, plaintiffs do not dispute that to succeed under Article I they must be able to characterize themselves as citizens of a state. Our dissenting colleague, however, does dispute that assumption, contending that the Article’s repeated use of the word “state” does not necessarily mean the Framers intended to apportion representatives
 
 only
 
 among states. As the dissent correctly points out, “the legal maxim
 
 expressio unius est exclusio alteri-us
 
 (‘the mention of one thing implies the exclusion of another’) is not always correct.”
 
 In re Sealed Case,
 
 181 F.3d 128, 132 (D.C.Cir.1999) (en banc). And we certainly should not resolve as important a question as that now before us by rote application of such a canon of construction.
 

 This, however, is not a case where “[t]he ‘exclusio’ is ... the result of inadvertence or accident.”
 
 Ford v. United States,
 
 273 U.S. 593, 612, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (internal quotation omitted). As we have discussed above, the overlapping and interconnected use of the term “state” in the relevant provisions of Article I, the historical evidence of contemporary understandings, and the opinions of our judicial forebears all reinforce how deeply Congressional representation is tied to the structure of statehood.
 
 [35]
 
 The Constitution’s repeated references to states cannot be understood, as the dissent urges, as merely the most practical method then available for holding elections. Rather, they are reflections of the Great Compromise forged to ensure the Constitution’s ratification. There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise.
 

 B
 

 As an alternative to the argument that the District may be considered a state under Article I, the
 
 Alexander
 
 plaintiffs contend that residents of the District should be permitted to vote in congressional elections through Maryland, based on a theory of “residual” citizenship in that state. This theory depends heavily on the fact that residents of the land ceded by Maryland apparently continued to vote in Maryland elections during the period between the Act of 1790, by which Congress accepted the cession, and the Organic Act of 1801, by which Congress assumed jurisdiction and provided for the government of the District. We discuss that history and its implications below.
 

 Although in the end we find that we cannot draw the same conclusion plaintiffs do from the historical record, we must begin by noting that there is a much greater obstacle to plaintiffs’ success on this theory: it has already been rejected in a decision binding upon this court. In
 
 Al-baugh v. Tawes,
 
 a three-judge district court considered a suit seeking a declaratory judgment “that the District of Columbia is a part of the State of Maryland for purposes of United States Senator elections.” 233 F.Supp. 576, 576 (D.Md.1964). Plaintiffs arguments were “based upon the fact that ... during the period between 1790 and the ‘Organic Act of 1801,’ residents of the territory ceded by the State of Maryland may have been allowed to vote as residents” of that state.
 
 Id.
 
 at 578. The court rejected plaintiffs’ claims, noting the Supreme Court’s decision in
 
 Reily v. Lamar
 
 that former residents of Maryland lost their state citizenship upon “the separation of the District of Columbia from the State of Maryland.”
 
 Id.
 
 (quoting
 
 Reily v. Lamar,
 
 6 U.S. (2 Cranch) 344, 356-57, 2 L.Ed. 300 (1805)).
 
 Albaugh
 
 concluded that “residents of the District of Columbia have no right to vote in Maryland elections
 
 *57
 
 generally, and specifically, in the selection of United States Senators.”
 
 Id.
 
 at 577.
 

 The Supreme Court affirmed the decision of the three-judge court.
 
 See Albaugh v. Tawes,
 
 379 U.S. 27, 85 S.Ct. 194, 13 L.Ed.2d 173 (1964) (per curiam). Although the Supreme Court’s affirmance was summary, the Court has reminded the lower courts that we are bound by such affirmances “until such time as the Court informs [us] that [we] are not.”
 
 Hicks v. Miranda,
 
 422 U.S. 332, 344-45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (quoting
 
 Doe v. Hodgson,
 
 478 F.2d 537, 539 (2d Cir.1973)). The jurisdictional statement submitted to the Supreme Court in
 
 Albaugh
 
 raised the principal theories we consider in this Part, and also raised the “privileges or immunities” claim considered in Part V.
 
 [36]
 

 Cf.
 
 ROBERT L. STERN ET AL„ SUPREME COURT PRACTICE 219-20 (7th ed.1993) (noting importance of evaluating issues raised in appeal papers);
 
 see also Illinois State Bd. v. Socialist Workers Party,
 
 440 U.S. 173, 182-83, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979);
 
 Mandel v. Bradley,
 
 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). Accordingly, the decision in
 
 Albaugh
 
 forecloses the conclusion that District residents may be allowed to vote in congressional elections through the State of Maryland. The Fourth Circuit has recently reached the same determination, in a case raising the same basic claim.
 
 [37]
 

 Even if
 
 Albaugh
 
 were not an impediment, however, we would still be unable to accept the “residual” citizenship theory advanced by plaintiffs. That theory fails because the Maryland citizenship of the District’s inhabitants was extinguished upon the completion of the transfer of the seat of the national government to the territory of the District. We set forth our analysis in the following subsections.
 

 1. The District Clause gave Congress the power to exercise exclusive legislation “over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States.” U.S. CONST, art. I, § 8, el. 17. In 1788, the General Assembly of Maryland had authorized and required its representatives to cede any district in the state for the national capital; Virginia did the same.
 
 [38]
 
 After protracted
 
 *58
 
 debate over sites offered by several states, Congress agreed upon a tract along the Potomac River; Maryland agreed to cede land along the eastern bank while Virginia agreed to cede land along the western.
 
 [39]
 
 Congress accepted the cessions by the Act of July 16, 1790, and established the first Monday of December 1800 as the date for the removal of the government to the District.
 
 [40]
 
 In 1791, Maryland ratified the cession, stating that “all that part of the said territory called Columbia which lies within the limits of this State shall be ... forever ceded and relinquished to the Congress and Government of the United States, and full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon.”
 
 [41]
 

 Congress’ acceptance of the cessions specified that the “seat of the government of the United States” would “be transferred to the district” on the “first Monday in December” of 1800. 1 Stat. 130, § 6. Until that time, Philadelphia was to serve as the seat of government.
 
 See id.
 
 § 5. During that interim, the acceptance statute provided that “the operation of the laws of the state [Maryland or Virginia, respectively] within such district shall not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide.”
 
 Id.
 
 § 1. Similarly, in making their cessions, both Maryland and Virginia stipulated that their jurisdiction “over the persons and property of individuals residing within the limits of the cession” would “not cease until” Congress did “by law provide for the government thereof, under their jurisdiction, in the manner provided by the [District Clause] of the Constitution.” 1791 Md. Acts ch. 45, § 2; 13 Va. Stat. at Large, ch. 32. at 43. On February 27, 1801, Congress passed the so-called “Organic Act,” providing for the government and the administration of justice in the District of Columbia.
 
 See
 
 2 Stat. 103.
 

 There is evidence that during the period prior to the transfer of the seat of government to the District, the residents of the area continued to vote for Congress in Maryland and Virginia.
 
 See
 
 WILLIAM TINDALL, ORIGIN AND GOVERNMENT OF THE DISTRICT OF COLUMBIA 17 (1909); Raven-Hansen,
 
 supra,
 
 at 173-74. Wlien the laws of those states ceased having force in the District, however, the states ceased treating District citizens as state citizens eligible to vote in their elections — an event that occurred no later than February of 1801.
 
 See Alexander
 
 Am. Compl. ¶ 97; TINDALL,
 
 supra,
 
 at 17; Raven-Hansen,
 
 supra,
 
 at 174. Since that date, District residents have been unable to vote in either Maryland or Virginia.
 

 2. The
 
 Alexander
 
 plaintiffs and several amici contend that the above-described history, and particularly the fact that residents of the area continued to vote
 
 *59
 
 in congressional elections into the year 1800, demonstrates that the Framers did not intend the cession of the states’ lands to deprive their residents of the right to vote. As citizens of Maryland and Virginia, plaintiffs argue, the residents of the District were originally part of the “People of the several States,” continued to vote even after the land was ceded to the national government, and hence “retain a residual citizenship in the state[s] from which the District was created.”
 
 Alexander P
 
 ls.’ Opp’n at 16. This “historical experience,” they contend, “confirms that otherwise stateless citizens may retain pri- or state affiliation for purposes of exercising their constitutional right to vote.”
 
 Alexander Pl
 
 s.’ Summ. J. Mem. at 51-52.
 

 We are unable to draw this conclusion from the history recounted above. Contrary to plaintiffs’ suggestion, the fact that residents of the Virginia and Maryland lands voted in those states into 1800 did not reflect an understanding that they would continue to do so after the District became the seat of government. Rather, it reflected the fact that during this period those lands were not yet the seat of government (Philadelphia was), but instead remained part of the ceding states. As the Circuit Court for the District of Columbia held in 1801, “Virginia did not part with her jurisdiction until congress could exer-rise it, which, by the [District Clause of the] constitution, could not be until the district became the seat of government.”
 
 United States v. Hammond,
 
 26 F. Cas. 96, 96 (C.C.D.C.1801). That, the court held, occurred on “the first Monday of December, 1800” by virtue of the Act of 1790.
 
 Id.
 

 [42]
 

 ,
 
 In
 
 Reily v. Lamar,
 
 Chief Justice Marshall reached a similar conclusion with respect to Maryland, although for the purposes of that case he found it “not material to inquire, whether the inhabitants of the city of Washington ceased to be citizens of Maryland on the 27th day of February 1801,” when the Organic Act took effect, “or on the first Monday of December 1800.” 6 U.S. (2 Crunch) 344, 357, 2 L.Ed. 300 (1805);
 
 see also Young v. Bank of Alexandria,
 
 8 U.S. (4 Cranch) 384, 396, 2 L.Ed. 655 (1808) (Marshall, C.J.) (“[UJnder the terms of the cession and acceptance of the district,.... the power of legislation remained in Virginia until it was exercised by congress.”). The precise date is likewise immaterial for our purposes.
 
 [43]
 

 In sum, during the interim period, the territory’s residents continued to vote not as “residual” citizens of Maryland, but as actual citizens of that state.
 
 [44]
 
 Only thereafter did they lose their state citizenship, and with it their right to vote.
 
 See
 
 Raven-Hansen,
 
 supra,
 
 at 174 (“District residents
 
 *60
 
 did not lose state citizenship until December, 1800”).
 
 [45]
 
 We thus conclude, in accord with the academic authority upon whom plaintiffs otherwise heavily rely, that this “decade of voting and representation provided no precedent for the representation of District citizens.” M
 
 [46]
 

 Nor is there any other evidence of an intent, or an understanding, that former residents of Maryland and Virginia would continue to vote in those states after the District was established.
 
 [47]
 
 To the contrary, both the Maryland and Virginia statutes ratifying the cession made clear that their former territory was “forever ceded and relinquished to the Congress and Government of the United States, and full and absolute right and exclusive jurisdiction, as well of soil as of persons residing Or to reside thereon.” 1791 Md. Acts ch. 45, § 2;
 
 accord
 
 13 Va. Stat. at Large, ch. 32, at 43. The early judicial cases also made clear that “[b]y the separation of the district of Columbia from the state of Maryland, the complainant ceased to be a citizen of that state.”
 
 Reily,
 
 6 U.S. (2 Cranch) at 357;
 
 accord Hammond,
 
 26 F. Cas. at 98;
 
 see also Custis v. Lane,
 
 17 Va. (3 Munf.) 579 (1813) (holding that District resident could no longer vote in Virginia
 
 *61
 
 because he was no longer “a citizen of Virginia, abiding, or inhabiting therein, but passed, with that territory, from the jurisdiction of this commonwealth, by the act of cession”). Once again, such evidence as there is indicates that the contemporary understanding was that the territory’s residents would lose their vote in their former states as soon as Congress assumed exclusive jurisdiction.'
 
 [48]
 
 And, after that occurred and the residents did lose their vote, altogether missing from the public record is any outpouring of complaints that the franchise was being unlawfully withheld.
 
 See supra
 
 note 34 and accompanying text.
 

 3. Intertwined with plaintiffs’ above argument, that the creation of the District
 
 was not
 
 constitutionally intended to withdraw the right to vote in Maryland, is another argument: namely, that it
 
 could not
 
 have had that effect. The original residents of the District were among the people of the states by virtue of their citizenship in Maryland, plaintiffs argue, and they therefore had an inalienable right to vote that could not be withdrawn. Moreover, plaintiffs contend that right continues to inhere in those who currently are residents of the District. Our dissenting colleague offers a variation on this theme. Although he concludes that District residents should be permitted to vote in the District rather than Maryland, his rationale is the same: residents of the District had the right to vote prior to 1801; this was a right they were entitled to bequeath to their “political posterity”; and this right could not be removed by Maryland’s act of cession or Congress’ assumption of jurisdiction.
 

 We cannot accept the argument that current residents of the District retain residual rights because other people, living 200 years earlier in the same place, had such rights. In the United States, personal rights generally do not “run with the land.” Even if it could be argued that the right to vote was a privilege that irrevocably vested from “the moment the United States Constitution was ratified” in “every citizen living in what were then the thirteen states of the union,” including the portions of Maryland and Virginia that would later become the District, Br. of the Committee for the Capital City at 1, the argument would not extend to the present plaintiffs. By virtue of the passage of 200 years, all of the plaintiffs — whether by birth or a combination of birth and their ancestors’ migration — arrived on the scene after the land already had become a district whose residents, by constitutional contemplation, lacked a vote in the national Congress. Whatever rights the original residents of the area may have had, none of them are alive to press them before this court.
 

 Moreover, upon close examination, this argument is not independent of the constitutional intent argument rejected above. At bottom, plaintiffs do not argue that notwithstanding the intent of the Constitution, the right to vote could not have been taken from District residents. They do not make that argument because their ultimate appeal is to the Constitution itself: they cannot argue both that the denial of their right to vote is unconstitutional, and that it is irrelevant whether the Constitution recognizes such a right. Instead, plaintiffs argue that the Constitution gave them the right to vote upon its ratification in 1789, and that it was the Organic Act of 1801 — not the Constitution — that purportedly took it away. As one group of amici put it, “It was ... the exercise of federal jurisdiction over the District — and not the text or intent of the Constitution itself— that denied D.C. residents their right to popular representation in the federal legis
 
 *62
 
 lature.” Mem. Amici Curiae for Professors James D.A. Boyle et al. at 16.
 

 This, however, merely returns us to ground previously plowed. We have already concluded that it
 
 is
 
 the Constitution itself that is the source of plaintiffs’ voting disability. Under Article I, voters for the House of Representatives must “have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.” U.S. CONST. art. I, § 2, cl. 1. Because those who live in the District lack state residency, they cannot qualify to vote in Maryland’s (or any other state’s) elections, and hence cannot vote for its representatives in the House.
 
 See
 
 MD. CONST. art. I, § l.
 
 [49]
 
 Thus, it was not the Organic Act or any other cession-related legislation that excluded District residents from the franchise, something we agree could not have been done by legislation alone.
 
 Cf Lucas v. Colorado,
 
 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) (holding that “an individual’s constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State’s electorate”).
 
 [50]
 
 Rather, exclusion was the consequence of the completion of the cession transaction — which transformed the territory from being part of a state, whose residents were entitled to vote under Arti-ele I, to being part of the seat of government, whose residents were not. Although Congress’ exercise of jurisdiction over the District through passage of the Organic Act was the last step in that process, it was a step expressly contemplated by the Constitution.
 
 See
 
 U.S. CONST. art. I, § 8, cl. 17.
 
 [51]
 

 4. We next consider an additional argument advanced in support of a right to vote in Maryland elections, this one based not only on the historical relationship between the District and Maryland, but also on the Supreme Court’s ruling that residents of a federal enclave must be permitted to vote in the state from which the enclave was created. In
 
 Evans v. Cornman,
 
 the Supreme Court struck down under the Fourteenth Amendment’s Equal Protection Clause a Maryland residency requirement that prevented persons living on the grounds of the National Institute of Health (NIH) from voting in state and federal elections. 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970). NIH had become a federal reservation in 1953, when Maryland ceded jurisdiction over the property to the United States.
 
 See id.
 
 at 420-21, 90 S.Ct. 1752. Fifteen years later, the state denied NIH residents the right to vote.
 

 
 *63
 
 The Court began its analysis by noting that:
 

 Appellees clearly live within the geographical boundaries of the State of Maryland, and they are treated as state residents in the census and in determining congressional apportionment. They are not residents of Maryland only if the NIH ceased to be a part of Maryland when the enclave was created. However, that “fiction of a state within a state” was specifically rejected by this Court in
 
 Howard v. Commissioners of sinking Fund of Louisville,
 
 344 U.S. 624, 627, 73 S.Ct. 465, 97 L.Ed. 617 (1953), and it cannot be resurrected here to deny ap-pellees the right to vote.
 

 Id.
 
 at 421-22, 90 S.Ct. 1752. It then proceeded to consider whether the state could deny plaintiffs the vote on the ground that they were neither substantially interested in nor affected by state electoral decisions.
 
 See id.
 
 at 422, 90 S.Ct. 1752. Maryland alleged that the plaintiffs were substantially less interested in state affairs than other Maryland residents because, under the Enclaves Clause, U.S. CONST, art. I, § 8, cl. 17, Congress had the power to exercise exclusive jurisdiction over the NIH.
 

 The Supreme Court rejected the state’s argument, noting that “the relationship between federal enclaves and the States in which they are located” had “changed considerably” over the years.
 
 Evans,
 
 398 U.S. at 423, 90 S.Ct. 1752. In particular, it noted that Congress had passed a series of statutes expressly permitting states to extend many of their laws to cover enclave residents, including their criminal, tax, unemployment, and workers’ compensation laws.
 
 See id.
 
 at 424, 90 S.Ct. 1752 (citing 18 U.S.C. § 13; 4 U.S.C. §§ 104-110; 26 U.S.C. § 3305(d); and 40 U.S.C. § 490). Moreover, it noted that plaintiffs were “required to register their automobiles in Maryland and obtain drivers’ permits and license plates from the State; they are subject to the process and jurisdiction of State courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools.”
 
 Id.
 
 All of this led the Court to conclude that
 

 In their day-to-day affairs, residents of the NIH grounds are just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as are their neighbors who live off the enclave. In nearly every election, federal, state, and local, for offices from the Presidency to the school board, and on the entire variety of other ballot propositions, appellees have a stake equal to that of other Maryland residents.
 

 Id.
 
 at 426, 90 S.Ct. 1752. Accordingly,
 
 Evans
 
 held that NIH residents were “entitled under the Fourteenth Amendment to protect that stake by exercising the equal right to vote.”
 
 Id.
 

 Plaintiffs here argue that since the residents of federal enclaves are entitled to vote under
 
 Evans,
 
 the residents of the District should be so entitled as well. There is some appeal to that argument, as Congress’s authority to govern enclaves is identical to its authority over the District, and is conferred by the same clause of the Constitution.
 
 See
 
 U.S. CONST, art. I, § 8 (“The Congress shall have Power .... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may, by Cession of particular States ... become the Seat of the Government .... and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings .... ”).
 
 [52]
 

 
 *64
 
 But the fact that Congress may have identical
 
 authority
 
 over both the District and the enclaves is not dispositive, because the ultimate result in
 
 Evans
 
 rested on- the fact that Congress had not
 
 exercised
 
 that authority over NIH.
 
 [53]
 
 As noted above, Congress had passed statutes permitting Maryland to exercise its own authority in the enclave, and Maryland had done so extensively. It was Maryland’s exercise of authority over the plaintiffs in that case— in areas as disparate as motor vehicle regulation, state court jurisdiction, and public education — -that gave them “a stake equal to that of other Maryland residents.”
 
 Evans,
 
 398 U.S. at 426, 90 S.Ct. 1752. The case before us is plainly not analogous in this respect. Congress has ceded none of its authority over the District back to Maryland, and Maryland has not purported to exercise any of its authority in the District.
 
 [54]
 

 Plaintiffs do not dispute this distinction, and as a consequence do not contend that they have a right to vote in elections for the Maryland state legislature. Instead, they argue that while the absence of the exercise of Maryland authority over District residents might mean they have an insufficient interest in elections to Maryland’s own legislature, “District citizens have an equally vital stake in elections to Congress” as other Maryland residents.
 
 Alexander
 
 Pis.,’ Summ. J. Mem. at 27. Finding District residents qualified to vote for Congress but not for the Maryland legislature, however, would turn Article I on its head. As we have noted, Article I, section 2 states that “the [congressional] Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.” U.S. CONST. art. I, § 2, cl. 1. Plaintiffs’ enclave theory, by contrast, would permit residents of the District to vote in Maryland’s congressional elections notwithstanding that they lack — even under an
 
 Evans
 
 theory — precisely those qualifications.
 

 Finally, and most important, adopting plaintiffs’ argument would require us to ignore the result in
 
 Albaugh,
 
 which barred District residents from voting in Maryland’s elections for the United States Senate.
 
 See
 
 discussion
 
 supra
 
 pp. 56-57. We do not have the authority to do so. Although there may be tension between
 
 Evans
 
 and Albaugh,
 
 [55]
 
 it is a tension that
 
 *65
 
 arises only if
 
 Evans
 
 is extended beyond its own holding in two ways: to a situation in which the ceding state no longer asserts any jurisdiction, and to a remedy limited to the right to vote in federal elections.
 
 Albaugh,
 
 on the other hand, is directly on point here without any extensions: it directly and expressly denies District residents a right to vote in Maryland’s federal elections.
 

 Plaintiffs contend that it is
 
 Evans,
 
 rather than
 
 Albaugh,
 
 that is the harbinger of the Supreme Court’s future course. Whether that is true, however, is not for us to judge. As the Supreme Court has repeatedly admonished the lower courts, “if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”
 
 Agostini v. Felton,
 
 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting
 
 Rodriguez de Quijas v. Shearson/American Express, Inc.,
 
 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). We must apply the law as it now stands and, until the Supreme Court instructs otherwise, that law is set forth in
 
 Albaugh.
 

 5. Plaintiffs rightly note that the cession of the lands of Virginia and Maryland “did not take away any of the individual constitutional rights guaranteed to District citizens.”
 
 Alexa,nder
 
 Pis.’ Summ. J. Mem. at 46. As the Supreme Court declared in
 
 O’Donoghue v. United States,
 
 “[t]he mere cession of the District of Columbia to the Federal government relinquished the authority of the states, but it did not take it out of the United States or from under the aegis of the Constitution.” 289 U.S. 516, 541, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) (quoting
 
 Downes v. Bidwell,
 
 182 U.S. 244, 260-61, 21 S.Ct. 770, 45 L.Ed. 1088 (1901)).
 
 [56]
 
 Yet, as the same opinion also noted, “when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative” in the District or territories, “but whether the provision relied on is applicable.”
 
 Id.
 
 at 542, 53 S.Ct. 740 (quoting
 
 Downes,
 
 182 U.S. at 292, 21 S.Ct. 770). For the reasons set forth above, we conclude that the constitutional provisions plaintiffs rely upon here — the clauses of Article T that provide for congressional voting — are not applicable to residents of the District of Columbia.
 

 V
 

 In this Part, we consider plaintiffs’ arguments based on provisions of the Constitution other than Article I. These include the Equal Protection, Privileges or Immunities, Due Process, and Republican Guarantee Clauses.
 

 A
 

 We first address the contention of the plaintiffs (and of our dissenting colleague) that the District’s lack of representation in the House deprives its residents of the equal protection of the laws.
 
 See Bolling v. Sharpe,
 
 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (applying equal protection analysis to federal government under Fifth Amendment’s Due Process Clause);
 
 see also Buckley v. Valeo,
 
 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d
 
 *66
 
 659 (1976) (“Equal protection analysis in the Fifth Amendment is the same as that under the Fourteenth Amendment.”). The plaintiffs allege that the lack of representation renders them unequal to the residents of the fifty states and of the federal enclaves.
 
 [57]
 
 And they further contend that because the right to vote is fundamental, such unequal treatment cannot be upheld unless it satisfies strict scrutiny — that is, unless it is “narrowly tailored to serve a compelling” government interest.
 
 Alexander P
 
 ls.’ Summ. J. Mem. at 56 (quoting
 
 Washington v. Glucksberg,
 
 521 U.S. 702, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997)). Because there is no compelling interest in denying District residents the vote, plaintiffs contend that the denial cannot satisfy strict scrutiny and hence must fall.
 
 [58]
 

 We do not disagree that defendants have failed to offer a compelling justification for denying District residents the right to vote in Congress. As the dissent argues, denial of the franchise is not necessary for the effective functioning of the seat of government.
 
 [59]
 
 The problem, however, is that strict scrutiny does not apply in this case. Although equal protection analysis scrutinizes the validity of classifications drawn by executive and legislative authorities,
 
 see, e.g., Parham v. Hughes,
 
 441 U.S. 347, 358, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979), the classification complained of here is not the product of presidential, congressional, or state action. Instead, as we have just concluded, the voting qualification of which plaintiffs complain is one drawn by the Constitution itself. The Equal Protection Clause does not protect the right of all citizens to vote, but rather the right “of all
 
 qualified
 
 citizens to vote.”
 
 Reynolds v. Sims,
 
 377 U.S. 533, 554, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (emphasis added). “[T]he right to vote in federal elections is conferred by Art. I, § 2, of the Constitution,”
 
 Harper v. Virginia Bd. of Elections,
 
 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and the right to equal protection cannot overcome the line explicitly drawn by that Article. For that reason, even the absence of a compelling ground for denying District citizens the right to vote cannot result in the judicial grant thereof.
 

 This point is expressly made by the very cases plaintiffs cite in support of their equal protection argument: those establishing the doctrine of “one person, one vote.” In those cases, the Supreme Court held that doctrine to require that, “as nearly as is practicable one man’s vote in a congressional election is to be worth as much as another’s.”
 
 Wesberry v. Sanders,
 
 376 U.S. 1, 7-8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964);
 
 see also Gray v. Sanders,
 
 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (applying same principle to state elections). Plaintiffs assert that, even if Article I were intended to deprive District residents of congressional representation — a result inconsistent with the one person, one vote principle- — -that deprivation cannot continue in light of the expansive application of the principle in modern equal protection analysis.
 

 But the one person, one vote cases themselves make clear that the structural provisions of the Constitution necessarily limit the principle’s application in federal
 
 *67
 
 elections. In
 
 Reynolds v. Sims,
 
 for example, the Court recognized that the allocation “to each of the 50 States, regardless of population” of two senators and at least one representative was inconsistent with one person, one vote. 377 U.S. at 571-72, 84 S.Ct. 1362. Nonetheless, the Court said, “The system of representation in the two Houses of the Federal Congress is one ingrained in our Constitution, as part of the law of the land.”
 
 Id.
 
 at 574, 84 S.Ct. 1362. Moreover, and particularly relevant here, the Court declared that “[t]he developing history and growth of our republic cannot cloud the fact that, at the time of the inception of the system of representation in the Federal Congress, a compromise between the larger and smaller states on this matter averted a deadlock in the Constitutional Convention which had threatened to abort the birth of our Nation.”
 
 Id.
 
 This, the Court said, rendered the composition of the House and Senate constitutionally compelled, and thus “inapposite and irrelevant to state legislative districting schemes.”
 
 Id.
 
 at 573, 84 S.Ct. 1362.
 

 In
 
 Gray v. Sanders,
 
 the Court had previously reached the same conclusion regarding the electoral college system used in presidential elections, which does not allocate voting strength in strict ■ proportion to population, but which is nonetheless mandated by Article II, section 1 and the Twelfth Amendment.
 
 See
 
 372 U.S. at 378, 83 S.Ct. 801.
 
 [60]
 
 And subsequently, in
 
 Department of Commerce v. Montana,
 
 503 U.S. 442, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992), the Court noted two additional (and one of the same) limitations upon the one person, one vote principle. That “general admonition,” the Court said, “is constrained by three requirements. The number of Representatives shall not exceed one for every 30,000 persons: each State shall have at least one Representative; and the district boundaries may not cross state lines.”
 
 Id.
 
 at 447-48, 112 S.Ct. 1415
 
 [61]
 
 ;
 
 see also Wisconsin v. City of New York,
 
 517 U.S. 1, 14-15, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996) (“[T]he Constitution itself, by guaranteeing a minimum of one representative for each State, made it virtually impossible in interstate apportionment to achieve the [one person, one vote] standard imposed by
 
 Wesberry.”).
 

 In sum, notwithstanding the force of the one person, one vote principle in our constitutional jurisprudence, that doctrine cannot serve as a vehicle for challenging the structure the Constitution itself imposes upon the Congress.
 
 See Breakefield v. District of Columbia,
 
 442 F.2d 1227, 1228 & n. 4 (D.C.Cir.1970) (rejecting contention that lack of representation rendered congressional tax on District unlawful under “one-man one-vote” decision in Wesberry). This analysis also forecloses plaintiffs’ contention that the disparity between their treatment and that of enclave residents violates equal protection.
 
 [62]
 
 As we held in
 
 *68
 
 Part IV.A, the inability of District residents to vote is a consequence of Article I. Similarly, as we discussed in Part IV.B.4, the contrasting ability of enclave residents to vote is not the consequence of legislative line drawing, but rather of the Supreme Court’s decision in
 
 Evans
 
 that enclave residents have a constitutional right to vote— a holding we are unable to extend to District residents both because of distinctions between the manner in which Congress has exercised its authority over the enclaves and the District, and because of the Supreme Court’s decision in
 
 Albaugh. See
 
 discussion
 
 supra
 
 Part IV.B.4. Hence, the differing treatment is the consequence not of legislative determinations but of constitutional distinctions. This court is without authority to scrutinize those distinctions to determine whether they are irrational, compelling, or anything in between.
 
 [63]
 

 B
 

 Plaintiffs also contend that the right to vote for members of Congress is a privilege of national citizenship. Although the Fourteenth Amendment’s Privileges or Immunities Clause
 
 [64]
 
 is phrased as a protection of such privileges against abridgement by the states,
 
 [65]
 
 plaintiffs further contend that its protections “are incorporated against the federal government by the fifth amendment in the same fashion as are the principlés of equal protection.”
 
 Alexander
 
 Pls.’ Opp’n at 11 (citing
 
 Bolling,
 
 347 U.S. at 500, 74 S.Ct. 693).
 
 [66]
 
 The denial of District residents’ right to vote, plaintiffs conclude, abridges this right of national citizenship in violation of the Constitution.
 

 We do not disagree that the “right to vote for national officers” is a “right[ ] and privilege[ ] of national citizenship.”
 
 Twining v. New Jersey,
 
 211 U.S. 78, 97, 29 S.Ct. 14, 53 L.Ed. 97 (1908) (citing
 
 Ex parte Yarbrough,
 
 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884));
 
 accord In re Quarles,
 
 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080 (1895). Nor do we dispute Justice Kennedy’s statements, in a concurrence repeatedly cited by plaintiffs, that this right arises out of the “relationship between the people of the Nation and their National Government, with which the States may not interfere.”
 
 U.S. Term Limits, Inc. v. Thornton,
 
 514 U.S. 779, 845, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring);
 
 see id.
 
 at 844, 115 S.Ct. 1842 (“[T]he federal right to vote ... do[es] not derive from the state power in the first instance but ... belong[s] to the voter in his or her capacity as a citizen
 
 *69
 
 of the United States.”).
 
 [67]
 
 Indeed, as we noted above, it is Article I, section 2 that confers “the right to vote in federal elections.”
 
 Harper,
 
 383 U.S. at 665, 86 S.Ct. 1079;
 
 accord, U.S. v. Classic,
 
 313 U.S. 299, 314-15, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). That, however, can hardly be the end of the inquiry, as even plaintiffs concede that residents of the territories do not have the right to vote in congressional elections, notwithstanding that they, too, are national (American) citizens.
 
 Cf. De La Rosa v. United States,
 
 32 F.3d 8 (1st Cir.1994);
 
 Attorney Gen. of Territory of Guam v. United States,
 
 738 F.2d 1017 (9th Cir.1984).
 
 [68]
 

 Rather, it is precisely because it is Article I that confers the federal right to vote that we must look to that Article to provide its content and define its boundaries. Article I grants that right only to those who “have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.” U.S. CONST, art. I, § 2, cl. I.
 
 [69]
 
 Furthermore, it apportions representatives only “among the several States which may be included within this Union.”
 
 Id.
 
 art. I, § 2, cl. 3. Thus, in Justice Kennedy’s own words, the “Constitution uses state boundaries to fix the size of congressional delegations.”
 
 U.S. Term Limits, Inc.,
 
 514 U.S. at 841, 115 S.Ct. 1842 (Kennedy, J., concurring).
 
 [70]
 
 Because we have previously concluded that the District cannot be characterized as a state for these purposes, and because therefore the
 
 *70
 
 constitutional provision that creates the federal right to vote does not include District residents within its terms, denial of the vote to those residents does not abridge their national privileges or immunities.
 

 In further support of the privileges or immunities argument, plaintiffs reason by-analogy to the arguments that prevailed in
 
 U.S. Term Limits, Inc.
 
 In that case, the Supreme Court struck down an Arkansas law that limited the state’s congressional representatives to a fixed number of terms. In so doing, the Court relied not on the Privileges or Immunities Clause, but on the two Qualifications Clauses that set forth the qualifications for members of Congress.
 
 See
 
 U.S. CONST. art. I, § 2, cl. 2;
 
 id.
 
 art. I, § 3, cl. 3.
 
 [71]
 
 Just as Arkansas “violated its citizens’ privileges of national citizenship when it attempted to restrict their right to vote for the congressional representatives of their choice,” plaintiffs argue, “[t]he defendants here violate the same constitutional privilege by denying the right of District residents to vote in Congressional elections.”
 
 Alexander
 
 Pis.’ Summ. J. Mem. at 41.
 

 For two reasons,
 
 U.S. Term Limits
 
 has no application to the instant controversy. First, the congressional Qualifications Clauses at issue in that case are the structural opposites of the voter Qualifications Clause at issue here. The former set forth specific lists of qualifications that members of Congress must satisfy.
 
 See supra
 
 note 71. The Court held those lists to be exclusive, striking down Arkansas’ term limits on the ground that the state was without authority to add to them.
 
 See U.S. Term Limits, Inc.,
 
 514 U.S. at 806, 115 S.Ct. 1842. By contrast, the voter Qualifications Clause, U.S. CONST. art. I, § 2, cl. 1, contains no such list, but rather merely incorporates the relevant state’s own set of voter qualifications.
 
 See U.S. Term Limits, Inc.,
 
 514 U.S. at 806, 115 S.Ct. 1842 (noting “explicit[ ] contrast[ ]” between “state control over the qualifications of electors [and] the lack of state control over the qualifications of the elected”).
 

 Second, and more fundamentally, the denial of District residents’ right to vote is not the consequence of the addition of any extra-constitutional qualification on voting, as in
 
 U.S. Term Limits.
 
 Rather, it is the result of applying precisely those qualifications contained in the Constitution itself.
 
 See supra
 
 Part IV. Accordingly, plaintiffs exclusion from the franchise violates neither the principles of
 
 U.S. Term Limits,
 
 nor the dictates of the Privileges or Immunities Clause.
 

 C
 

 Plaintiffs contend that the right to vote in congressional elections is also protected by the Due Process Clause of the Fifth Amendment, which provides that no person shall be “deprived of life, liberty, or property, without due process of law.” U.S. CONST, amend. V. Because the right to vote for one’s own legislators is one of those protected liberties, plaintiffs argue, its denial violates their right to both procedural and substantive due process.
 
 See Alexander
 
 Pls.’ Summ. J. Mem. at 27.
 

 Like the privileges or immunities argument, this contention founders upon its underlying assumption: that District residents have a right to vote in congressional elections. As we have repeatedly stated above, the Constitution does not grant that right except to individuals who qualify under Article I — which District residents do not. Nor can the Due Process Clause, any
 
 *71
 
 more than the Equal Protection Clause, be used to change elements of the composition of Congress that are dictated by the Constitution itself.
 
 Cf. Carliner v. Commissioner,
 
 412 F.2d 1090, 1090 (D.C.Cir.1969) (rejecting argument that Due Process Clause rendered District’s mayor-commissioner and city council unlawful “because the citizens of the District have not been given the opportunity by popular vote to elect” them).
 
 [72]
 

 D
 

 Plaintiffs’ final claim is based on the Republican Guarantee Clause of Article IV, which states: “The United States shall guarantee to every State in this Union a Republican Form of Government ....” U.S. CONST, art. IV, §4. Although recognizing that the Clause is phrased as a guarantee to the states, plaintiffs once again contend that the “Framers cannot have intended anything less for the citizens of the federal government.”
 
 Alexander
 
 Pis.’ Summ. J. Mem. at 43. Plaintiffs argue that the guarantee of a republican form of government is incompatible with their exclusion from representation in Congress.
 

 As the Supreme Court has noted, “[i]n most of the cases in which the Court has been asked to apply the [Guarantee] Clause, the Court has found the claims presented to be norrjusticiable under the ‘political question’ doctrine.”
 
 New York v. United States,
 
 505 U.S. 144, 184, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992);
 
 accord Baker v. Carr,
 
 369 U.S. 186, 218-27, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). But even if plaintiffs’ claim is justiciable,
 
 [73]
 
 it does not present a substantial federal question.
 
 [74]
 
 While we cannot be certain precisely what the Framers thought constituted a “Republican Form of Government,” we do know that they intended the District to be subject to the exclusive control of Congress,
 
 see
 
 U.S. CONST, art. I, § 8, cl. 17; that they reserved the power to elect congressional representatives exclusively to those qualified to vote in state elections,
 
 see id.
 
 art. 1, § 2, cl. 1; and that District residents are not so qualified,
 
 see
 
 discussion
 
 supra
 
 Part IV. Accordingly, we cannot adopt plaintiffs’ Republican Guarantee argument without concluding that Article IV of the Constitution was intended to repeal the provisions of Article I. That, of course, we cannot do.
 

 E
 

 Plaintiffs argue that, even if we cannot find that Article I guarantees their right to vote in congressional elections, we should harmonize that Article with the other provisions discussed in this Part, which, they contend, do protect such a right. We do not disagree that we should strive to read the Constitution in a way that harmonizes its various provisions. We believe, however, that we have done so in the only way the words and historical interpretation of that document permit. Although the provisions considered in this Part protect rights guaranteed by the Constitution, our reading of Article l precludes the conclusion that the right plaintiffs seek to vindicate is one of those. Because the provi
 
 *72
 
 sions of the Constitution that set forth the composition of Congress do not contemplate representation for District residents, we conclude that the denial of representation does not deny them equal protection, abridge their privileges or immunities, deprive them of liberty without due process, or violate the guarantee of a republican form of government.
 

 VI
 

 As we have noted, many courts have found a contradiction between the democratic ideals upon which this country was founded and the exclusion of District residents from congressional representation. All, however, have concluded that it is the Constitution and judicial precedent that create the contradiction.
 
 [75]
 
 Moreover, that precedent is of particularly strong pedigree. As Justice Jackson said in following Chief Justice Marshall’s opinion that the District was not a state within the meaning of Article III:
 

 Among his contemporaries at least, Chief Justice Marshall was not generally censured for undue literalness in interpreting the language of the Constitution to deny federal power and he wrote from close personal knowledge of the Founders and the foundation of our constitutional structure. Nor did he underestimate the equitable claims which his decision denied to residents of the District ....
 

 Tidewater,
 
 337 U.S. at 586-87, 69 S.Ct. 1173 (plurality opinion of Jackson, J.) (citing
 
 Hepburn & Dundas,
 
 6 U.S. (2 Cranch) at 453).
 

 Like our predecessors, we are not blind to the inequity of the situation plaintiffs seek to change. But longstanding judicial precedent, as well as the Constitution’s text and history, persuade us that this court lacks authority to grant plaintiffs the relief they seek. If they are to obtain it, they must plead their cause in other venues. Accordingly, plaintiffs’ motions for summary judgment are denied, and defendants’ motions to dismiss are granted with respect to those claims that challenge the constitutionality of the apportionment of the House of Representatives. The remaining claims are remanded to the single district judge before whom they were originally filed.
 

 An order accompanies this memorandum.
 

 PER CURIAM opinion for the Court filed by Judges GARLAND and KOLLAR-KOTELLY, in which Judge OBERDORFER joins as to Parts I, II, and III.
 

 OBERDORFER, District Judge, filed an opinion dissenting in part.
 

 OBERDORFER, District Judge, dissenting in part, and concurring in part
 
 [1]
 
 h
 

 We the People of the United States, in Order to
 
 ...
 
 secure the Blessings of Liberty to ourselves and our Posterity,
 
 
 *73
 

 do ordain and establish this Constitution for the United States of America.
 

 U.S. Const, preamble.
 

 In 1964, the Supreme Court first recognized that Article I of the Constitution requires States to honor a “one person, one vote” rule in their conduct of elections for the House of Representatives, saying that:
 

 No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people
 
 in a way
 
 that
 
 unnecessarily
 
 abridges this right.
 

 Wesberry v. Sanders,
 
 376 U.S. 1, 17-18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (emphasis added). More than 30 years after
 
 Wesberyij,
 
 and more than 200 years after ratification of the Constitution, plaintiffs charge, inter alia, that the Secretary of Commerce is obstructing several hundred thousand American citizens — the inhabitants of the District of Columbia — from their exercise of this “precious” right, and seek vindication of that right. An examination of the relevant facts and law yields, to me, the following conclusions:
 

 (1) Article I, section 2, of the Constitution states, in relevant part: “The House of Representatives shall be composed of Members chosen every second Year by the People of the several States ....” U.S. Const, art. I, § 2. Section 2 of the Fourteenth Amendment, which replaced but did not materially alter part of Article I, section 2, provides, in relevant part: “Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.”
 
 Id.
 
 amend. XIV.
 

 (2) During the years between when the Constitution took effect in 1789 and the federal government’s assumption of exclusive jurisdiction over the area that became the District of Columbia in 1801, inhabitants of that area were “People of the several States,” who, among other things, were apportioned as mandated, U.S. Const, art. 1, § 2, and were entitled to, and enjoyed, the right to vote for voting representation in the House of Representatives, either through Maryland or Virginia,
 
 see infra
 
 Part I.B.3.
 

 (3) The “People of the several States” who voted between 1789 and 1801 in the part of Maryland which became the District
 
 [2]
 
 thereby secured for themselves and their political posterity a constitutionally-protected right to be included in a cohort to which a Representative in Congress is apportioned and, if otherwise eligible, to vote for voting representation in the House of Representatives.
 

 (4) In 1791, Maryland had ratified its cession to the United States of the portion of its territory which is now the District of Columbia, specifically including “persons residing or to reside thereon,” but provided that it would continue to exercise jurisdiction until “Congress shall, by law, provide for the government thereof.” An Act Concerning the Territory of Columbia and the City of Washington, 1791 Md. Acts ch. 45, § 2,
 
 reprinted in
 
 1 D.C.Code Ann. 34, 35 (1991).
 

 (5) The District became the permanent Seat of Government in December 1800,
 
 see
 
 An Act for Establishing the Temporary and Permanent Seat of Government of the United States, 1 Stat. 130, ch. 28, § 6 (1790), and the cession was finally consummated by the Organic Act of 1801, 2 Stat. 103, ch. 15 (1801). At no time did either Maryland or the United States make any provision for either termination or continuation of the apportionment, or of the voting rights, of the “persons” ceded by Maryland to the United States. No provision in any cession instrument purported to
 
 *74
 
 take away the pre-existing right of those “persons” to be apportioned and to vote for voting representation in the House of Representatives. In any event, the decisions of the Supreme Court in
 
 O’Donoghue v. United States,
 
 289 U.S. 516, 540, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) (constitutional rights not lost at cession) and
 
 Lucas v. Forty-Fourth Gen. Assembly of Colorado,
 
 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) (constitutional voting rights of minority not waivable by majority), establish that neither the United States, nor any of its officers, could , constitutionally interfere with that right of “persons” ceded to the United States or their political posterity.
 

 (6) Nevertheless, ever since 1801, it has been assumed by some, but never authoritatively decided, that District inhabitants have no right to apportionment and to vote for voting representation in the House of Representatives.
 
 [3]
 
 On that assumption, the Secretary of Commerce intends to follow the practice of previous Secretaries to exclude inhabitants of the District of Columbia from his report to the President by which he performs his statutory duty to apportion the population of the several States and the membership of the House of Representatives,
 
 see
 
 13 U.S.C. § 141(b), thereby obstructing voting representation of District inhabitants in the House.
 

 (7)
 
 Wesberry
 
 teaches that in such circumstances it behooves the judiciary to test thoroughly any purported necessity for such a practice and the assumptions underlying it.
 
 Wesberry,
 
 376 U.S. at 17-18, 84 S.Ct. 526. As the Supreme Court subsequently declared: “that an unconstitutional action has been taken before does not render the action any less unconstitutional at a later date.”
 
 See Powell v. McCormack,
 
 395 U.S. 486, 546-47, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). After thoroughly considering the various arguments, I have found nothing that necessitates federal officials continuing the practice of obstructing the “precious” constitutional right of the inhabitants of the District of Columbia to vote for voting representation in the House of Representatives.
 
 See Wesberry,
 
 376 U.S. at 17-18, 84 S.Ct. 526.
 

 (8) In addition, the Equal Protection Clause of the Fourteenth Amendment, incorporated into the Bill of Rights’ Fifth Amendment and thereby made applicable to the national government,
 
 [4]
 
 requires a declaration that inhabitants of the District of Columbia have and should henceforth enjoy the same right to apportioned representation in the House of Representatives as that enjoyed by residents of other federal enclaves,
 
 [5]
 
 former residents of States who live abroad,
 
 [6]
 
 as well as residents of States.
 

 Accordingly, I would hold that both Article I and principles of equal protection require this Court to declare that qualified residents of the District have a constitutional right to vote for voting representation in the House of Representatives, and declare that 13 U.S.C. § 141(b), as con
 
 *75
 
 strued and applied by the Secretary of Commerce, unconstitutionally obstructs their enjoyment of that right.
 

 I
 

 Although the facts have been well stated by my colleagues, some repetition and addition are necessary to bring the issues into focus for purposes of this dissent.
 

 A
 

 Article I of the original Constitution specifies that “Representatives ... shall be apportioned among the several States” according to an “actual Enumeration” of persons made every ten years. U.S. Const, art. I, § 2, cl. 3. The Fourteenth Amendment has superceded in part, but not substantively altered, this requirement.
 
 Id.
 
 amend. XIV, § 2. Section 141(b) of Title 13 of the United States Code makes the Secretary of Commerce responsible for conducting the enumeration and providing the President with a “tabulation of total population by States ... as required for the apportionment of Representatives in Congress among the several States.” 13 U.S.C. § 141(b). The statute directs the President to transmit to the Congress “a statement showing the whole number of persons in each State ... as ascertained under ... each ... decennial census, and the number of Representatives to which each State would be entitled.” 2 U.S.C. § 2a(a). Finally, the Clerk of the House is responsible for sending the “executive of each State a certificate of the number of Representatives to which each such State is entitled.” 2 U.S.C. § 2a(b).
 

 On December 26, 1990, a predecessor of the incumbent Secretary sent to President George Bush “a statement showing the apportionment population for each State as of April 1, 1990, tabulated from the 1990 Decennial Census.” Statement of Undisputed Facts of Plaintiffs
 
 Alexander et al.
 
 with Supporting Declarations and Exhibits, Tab. 3. The statement included a determination of “the number of Representatives to which each State is entitled.”
 
 Id.
 
 The statement allocated to every State at least one Representative.
 
 Id.
 
 The statement did not report the population of the District of Columbia,
 
 [7]
 
 include the District’s population in the population of any State, or include its population in the total population used for apportionment purposes.
 
 Id.
 
 Nor did it allocate Representatives to the District.
 
 Id.
 
 The incumbent Secretary, a defendant here, intends to follow his predecessor’s practice, as evidenced by his opposition to plaintiffs’ motions. There being no allocation of Representatives, no transmittal by the President to the Clerk of the House, and no certificate by the Clerk to the District, the present practice of the Secretary obstructs inhabitants of the District from exercising their constitutional right to vote for voting representation in the House of Representatives. Meanwhile, the Secretary includes in his apportionment of persons and allocates representatives to residents of federal enclaves and Congress permits voting, even where there may be no apportionment, by persons residing overseas who formerly resided in a State.
 

 B
 

 Plaintiffs’ claims present constitutional questions, the resolution of which requires examination of a broad sweep of political and legal history, including particularly the
 
 *76
 
 circumstances preceding and surrounding the adoption of the Seat of Government clause in the Constitution, the Maryland cession of territory and “persons” to the United States to form the District, the exercise by District residents of their right to vote for voting representation in Congress between 1790 and 1800, the evolution of the District of Columbia as a political entity from 1790 through the present, the favorable judicial and legislative treatment accorded similar claims by residents of federal enclaves (other than the District of Columbia) and to United States citizens residing outside the United States — all viewed in the light of the evolving applications of the post-Civil War Amendments and Acts of Congress in the latter half of the Twentieth Century with respect to voting rights.
 

 1. The Seat of Government Clause
 

 Before the adoption of the Constitution, there was no fixed national seat of government. Congress met in a number of locations.
 
 [8]
 
 In 1783, while Congress was meeting in Philadelphia, hundreds of angry Revolutionary War veterans surrounded the State House and demanded compensation for their services.
 
 [9]
 
 Neither the city of Philadelphia nor the State of Pennsylvania acted to protect Congress from the disturbances.
 
 [10]
 
 At the Constitutional Convention in 1787,
 
 [11]
 
 mindful of this so-called Philadelphia Mutiny, the Framers sought to ensure that the national government would be free from interference by any State government and from dependence upon any State for protection.
 
 [12]
 
 As explained by James Iredell, at North Carolina’s 1789 ratifying convention:
 

 What would be the consequence if the seat of government of the United States, with all the archives of America, was in the power of any one particular state? Would not this be most unsafe and humiliating? Do we not all remember that, in the year 1783, a band of soldiers went and insulted the Congress? The sovereignty of the United States was treated with indignity. They applied for protection to the state they resided in, but could obtain none. It is to be hoped such a disgraceful scene will never happen again; but that, for the future, the national government will be able to protect itself.
 

 Elliot’s Debates at 219-20,
 
 reprinted in
 
 3 Philip B. Kurland & Ralph Lerner, The Founders’ Constitution 225 (1987). Similarly, James Madison, in The Federalist, published while New York was deciding on ratification, defended “[t]he indispensable
 
 *77
 
 necessity of complete authority at the seat of government” on the grounds that
 

 [w]ithout it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State ... for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence, equally dishonorable to the government and dissatis-factory to the other members of the Confederacy.
 

 The Federalist, No. 43, at 272 (James Madison) (Clinton Rossiter ed.1961).
 

 These considerations, particularly the pre-Convention experience with the shifting location of the Continental Congress and exigencies such as the Philadelphia Mutiny which provoked Congress to move from time to time, prompted the inclusion of the Seat of Government clause in Article I of the Constitution.
 
 [13]
 
 The clause provides:
 

 The Congress shall have the Power ... To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the acceptance of Congress, become the Seat of Government of the United States, and .to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Arsenals, dock-Yards and other needful buildings;
 

 U.S. Const, art. I, § 8, cl. 17. The Framers did not select a location for the Seat of Government, nor place any constraints on where that location should be, primarily to avoid offending either Philadelphia or New York, both of which might expect to be selected.
 
 [14]
 
 Instead, they left that potentially contentious decision to Congress.
 
 [15]
 

 Neither the Seat of Government clause, nor any other provision of the Constitution, expressly mentions voting by, or representation of, inhabitants of the yet-to-be-selected Seat of Government. Indeed, the delegates to the Convention discussed and adopted the Seat of Government clause, and the remainder of the Constitution, without any recorded debate on its implications for the voting, representation or any other rights of the inhabitants of federal enclaves, including the yet-to-be-selected Seat of Government.
 
 [16]
 

 2. Cession
 

 Between 1788 and 1801, Maryland and Virginia ceded, and the United States accepted, the area which became the Seat of Government. It is undisputed that none of the pertinent documents contain a word about the voting rights of the persons to be ceded.
 

 On December 23, 1788, Maryland offered Congress “any district in this state, not exceeding ten miles square, which the congress may fix upon and accept for the seat of government of the United States.” An Act to Cede to Congress a District of Ten Miles Square in This State for the Seat of the Government of the United
 
 *78
 
 States, 1788 Md. Acts ch. 46,
 
 reprinted in
 
 1 D.C.Code Ann. 33-34 (1991). On December 3, 1789, Virginia similarly offered “a tract of country not exceeding ten miles square, or any lesser quantity, to be located within the limits of the State ... as Congress may by law direct, shall be, and the same is hereby forever ceded and relinquished to the Congress and Government of the United States.” 13 Va. Stat. at Large, ch. 32,
 
 reprinted in
 
 1 D.C.Code Ann. 32-33 (1991). Virginia’s offer contained the proviso that “the jurisdiction of the laws of this commonwealth over the persons and property of individuals residing with the limits of the cession aforesaid, shall not cease or determine until Congress, having accepted the said cession, shall, by law, provide for the government thereof, under their jurisdiction.”
 
 Id.
 
 Meanwhile, a number of other sites made strong bids for selection as the permanent Seat of Government.
 
 [17]
 

 In July 1790, the first Congress of the United States, greatly influenced by President Washington, “accepted for the permanent seat of government of the United States” “a district of territory, not exceeding ten miles square,” to be located within the territories offered by Maryland and Virginia. 1 Stat. 130, ch. 28, § 6. This Act also provided that Philadelphia would serve as the temporary seat of government until December 1, 1800, at which time the seat of government would transfer to its permanent location within the “district” accepted by the Act.
 
 Id.
 
 §§ 5, 6. By the terms of this Act, the laws of Virginia and Maryland continued to operate within the District of Columbia “until the time fixed for the removal of the government thereto,
 
 and
 
 until Congress shall otherwise by law provide.”
 
 Id.
 
 § 1 (emphasis added).
 

 The boundaries of the permanent seat of government were fixed by Presidential proclamation of March 30, 1791.
 
 See Morris v. United States,
 
 174 U.S. 196, 200, 19 S.Ct. 649, 43 L.Ed. 946 (1899). Later that year, commissioners appointed by President Washington chose the names ‘Washington” for the federal city and “Columbia” for the federal district.
 
 [18]
 
 There was no District of Columbia political entity created at that time, although the municipal corporations of Alexandria and Georgetown continued to exist.
 

 On December 19, 1791, Maryland passed an act ratifying the cession. It provided that the portion of the Seat of Government “which lies within the limits of this State shall be ... forever ceded and relinquished to the Congress and the Government of the United States, and full and absolute right and exclusive jurisdiction,
 
 as well of soil as of persons residing or to reside thereon,”
 
 while retaining jurisdiction over “persons and property of individuals residing within the limits” of the territory it ceded until Congress assumed jurisdiction. An Act Concerning the Territory of Columbia and the City of Washington, 1791 Md. Acts ch. 45, § 2,
 
 reprinted in
 
 1 D.C.Code Ann. 34, 35 (1991).
 

 On the first Monday in December 1800, as provided by the 1790 Act, the District became the permanent Seat of Government of the United States. 1 Stat. 130, ch. 28, § 6. On February 27, 1801, Congress enacted the “Organic Act of 1801,” thereby assuming exclusive jurisdiction over the District. 2 Stat. 103, ch. 15. That Act divided the District into two counties— Washington and Alexandria; it also,
 
 inter alia,
 
 provided that the laws of the Maryland and Virginia would continue to apply to the respective parts of the District of Columbia which had been ceded by each state; established a federal court for the District of Columbia; established a marshal for the District; and provided that an attorney for the United States should be appointed for the District.
 
 Id.
 
 In 1800, the population of the ten-mile square area constituting the original Seat of Govern
 
 *79
 
 ment totaled approximately 8,000, of whom approximately 6,000 were white, and approximately 2,000 were black.
 
 [19]
 

 3. Voting in the District Between 1790 and 1800
 

 There is undisputed historical evidence, and I would find, that from 1790 through 1800, qualified residents in what was proclaimed in 1791 to be the District continued to vote in the elections of federal officers conducted in Maryland and Virginia, including Representatives in Congress, even though Maryland and Virginia had ceded the land to the federal government and the boundaries of the District had been drawn.
 
 [20]
 

 Following Congress’ enactment of the Organic Act in 1801, and the assumption of exclusive jurisdiction by the United States, Maryland and Virginia no longer permitted inhabitants of the District to vote in their local, state and federal elections.
 
 [21]
 
 At that time, there was no District government or voting apparatus and Congress made no provision for voting by inhabitants of the District. It was generally assumed that inhabitants of the District would no longer enjoy the right to vote for voting representation in the House of Representatives.
 
 [22]
 
 And, in fact, since then no inhabitant of the portion of the District ceded by Maryland has voted for voting representation in the House of Representatives.
 
 [23]
 

 
 *80
 
 4. Evolution of a District of Columbia Voting Apparatus
 

 In 1802, the District included five jurisdictions: the counties of Alexandria and Washington, the towns of Alexandria and Georgetown, and the City of Washington.
 
 [24]
 
 For the period from 1800 through 1871, however, there was no elected government for the District of Columbia as a whole.
 
 [25]
 

 In 1871, Congress first authorized a comprehensive local government for the District, consisting of a governor appointed by the President, and a unicameral 22-member house of delegates elected by the male citizens of the District. An Act to Provide a Government for the District of Columbia, 16 Stat. 419, ch. 62 (1871). That form of representative local government was short-lived; Congress abolished it in 1874. An Act for the Government of the District of Columbia, and for Other Purposes, 18 Stat. 116, ch. 337 (1874). From 1874 until 1967, three unelected Commissioners, appointed by the President, governed the District.
 
 Id.;
 
 An Act Providing a Permanent Form of Government for the District of Columbia, 20 Stat. 102, ch. 180 (1878).
 
 [26]
 
 In 1967, Congress replaced the Board of Commissioners with an appointed 9-member Council and an appointed Commissioner. Reorganization Plan- No. 3 of 1967, 32 F.R. 11669.
 

 It was not until the early 1960’s that the voting landscape in the District began to change. On March 29, 1961, the Twenty-third Amendment was ratified. It gave residents of the District of Columbia the right to appoint electors for the election of the President and Vice President of the United States.
 
 [27]
 
 In 1970, Congress authorized residents of the District to elect a non-voting delegate to the House of Representatives.
 
 See
 
 2 U.S.C. § 25a. As a corollary, in the wake of the Twenty-third Amendment and the 1970 provision for election of a non-voting delegate to the House, the District became equipped with a rudimentary voting system.
 

 In 1973, Congress further relaxed its “exclusive legislation” power over the District by passage of the Home Rule Act of 1973.
 
 [28]
 

 See
 
 District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93-198, 87 Stat. 774 (1973). By that Act, Congress granted District citizens the right to elect a Council authorized to enact local legislation, subject to Congress’ ultimate authority, provided the District with an elected Mayor, and further perfected the election appara
 
 *81
 
 tus earlier created to administer presidential and non-voting delegate elections.
 
 Id.
 
 Congress created the District government “to relieve Congress of the burden of legislating essentially local District matters.”
 
 Id.
 
 A few years earlier, the Court Reorganization Act of 1970 had created state-like courts of general jurisdiction whose appellate decisions are appealable directly to the Supreme Court by the same process that state court decisions are appealable.
 
 [29]
 
 In 1995, Congress established the Control Board, consisting of five members appointed by the President, to “eliminate budget deficits and management inefficiencies in the government of the District of Columbia.” Pub.L. No. 104-8, 109 Stat. 97 (1995).
 

 Meanwhile, the population of the District, which in 1800 had been less than one fifth of the smallest state, Delaware,
 
 [30]
 
 and less than a quarter of that contemplated by the Northwest Ordinance of 1787 for the admission of a new state,
 
 [31]
 
 had burgeoned by 1990 to over 600,000 — a number more than equal to the population of several states,
 
 see supra
 
 note 7.
 

 5. Evolution of Voting Rights Nationally
 

 Paralleling the evolution of the District of Columbia and a voting apparatus therein, was the evolution of voting rights nationally, “a continuing expansion of the scope of the right of suffrage in this country.”
 
 Reynolds v. Sims,
 
 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Voting nationally has evolved from 18th century suffrage limited to white, property-owning, tax-paying males, over the age of 21, to the virtual universal suffrage today enjoyed by all but minors, felons, and the people of the District of Columbia.
 
 See also
 
 Alexander Plaintiffs Memorandum in Support of Motion for Summary Judgment, Appendix A.
 

 II
 

 ARTICLE I
 

 The foregoing facts bring the following legal considerations into focus. In
 
 Wes-berry,
 
 the Supreme Court considered whether state laws creating congressional voting districts with widely disproportionate populations violated the voting rights of inhabitants of less populous districts guaranteed to them by Article I, section 2 of the Constitution. The Court concluded that the Constitution requires that districts be apportioned so as to satisfy as nearly as possible the maxim “one person, one vote.”
 
 Wesberry,
 
 376 U.S. at 18, 84 S.Ct. 526. The plain statement in
 
 Wesber-ry,
 
 bears repeating:
 

 No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that
 
 unnecessarily
 
 abridges that right.
 

 Wesberry,
 
 376 U.S. at 17-18, 84 S.Ct. 526 (emphasis added). For people in the District of Columbia, Congress is the ultimate “exclusive” legislature. The Secretary’s continued failure to include the people of the District of Columbia in apportionment contributes to their heretofore permanent disenfranchisement in their ultimate legis
 
 *82
 
 lature — Congress—because the place where they live, once part of the State of Maryland, is not now literally a State. Those who would interfere with the exercise of the “precious” right to vote have a heavy burden of persuasion and proof that their interference is “necessary.” To put it simply, the defendants have failed to persuade me that it is necessary for the Secretary to exclude the people of the District from apportionment and thus interfere with their voting for a Member of the House of Representatives.
 

 A
 

 It would seem to be axiomatic that interference with a person’s “precious” right to vote for a Member of Congress, such as that exercised by District inhabitants before 1801, and protected from dilution by the
 
 Wesberry
 
 doctrine, violates a constitutional right. In any event, the Supreme Court long ago determined, and has often reiterated, that such a right has a firm foundation in the Constitution.
 

 In a series of cases, beginning with
 
 Ex parte Yarbrough (The Ku-Klux Cases),
 
 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), the Supreme Court has held that the Constitution is the source of, and guarantees protection for, the right to vote for Members of the House of Representatives. In
 
 Yarbrough,
 
 the Court validated a statute making it a federal crime to interdict voting by force or intimidation because “the exercise of the right [to vote] [for minorities and for other citizens] is
 
 guaranteed by the constitution,
 
 and should be kept free and pure by congressional enactments whenever that is necessary.”
 
 Id.
 
 at 665, 4 S.Ct. 152 (emphasis added).
 
 Yarbrough
 
 clarified the Court’s earlier decision in
 
 Minor v. Happersett,
 
 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627 (1874). In
 
 Minor,
 
 the Court held that the Fourteenth Amendment’s privileges and immunities clause did not confer upon females a right to vote, stating that “the Constitution of the United States does not confer the right of suffrage upon any one.”
 
 Id.
 
 at 178. The
 
 Yarbrough
 
 Court explained that this statement did not mean that the Constitution conferred the right to vote upon “no one,” but only that it did not confer it upon anyone who happened to claim such a right.
 
 Yarbrough,
 
 110 U.S. at 664, 4 S.Ct. 152. Females were not a class upon whom the Constitution conferred the right to vote because, as the
 
 Minor
 
 court recognized, at the time of its adoption most states did not permit females to vote and because the very text of the Fourteenth Amendment suggested, in another context, that it contemplated only male voters.
 
 [32]
 

 Minor,
 
 88 U.S. at 172-74, 21 Wall. 162. Of particular significance for the political posterity of the pre-1801 voters, the
 
 Minor
 
 court cautioned that “[t]he right of suffrage, when granted, will be protected. He who has it can only be deprived of it by due process of law, but in order to claim the protection, he must first show that he has the right.”
 
 Minor,
 
 88 U.S. at 176, 21 Wall. 162.
 

 Since
 
 Yarbrough,
 
 the Supreme Court has never wavered from its conclusion there that voting in federal elections is a constitutionally-protected right. For example, in 1941, the Court held that qualified voters have a right to participate in congressional primary elections, stating that the right to vote in congressional elections “whatever its appropriate constitutional limitations, ... is a right established and guaranteed by the Constitution.”
 
 *83
 

 United States v. Classic,
 
 313 U.S. 299, 314, 320, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). In 1964, the Court started its analysis of the constitutionality of the apportionment of seats in a State legislature from the premise that “|u]ndeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections.”
 
 Reynolds,
 
 377 U.S. at 554, 84 S.Ct. 1362;
 
 see also Wesberry,
 
 376 U.S. at 17, 84 S.Ct. 526. A few years later, the Court reiterated that “the right to vote in federal elections is conferred by Art. I, § 2, of the Constitution.”
 
 Harper v. Virginia State Bd. of Elections,
 
 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). More recently, the Supreme Court, in concluding that States may not add to the qualifications for members of Congress that are enumerated in Article I, §§ 2 and 3, observed that “[e]lecting representatives to the National Legislature was a new right, arising from the Constitution itself.”
 
 U.S. Term Limits, Inc. v. Thornton,
 
 514 U.S. 779, 805, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995);
 
 see also Burdick v. Takushi,
 
 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (“It is beyond cavil that ‘voting is of the most fundamental significance under our constitutional structure.’ ”) (quoting
 
 Illinois State Bd. of Elections v. Socialist Workers Party,
 
 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)). Accordingly, I would conclude that the inhabitants of the District who voted for representation in the House of Representatives before 1801 were exercising a right to vote created and protected by the Constitution.
 

 B
 

 It is undisputed that the inhabitants of the District ceased to vote for a Member of the House of Representatives after the enactment of the Organic Act in 1801. Yet, neither the Organic Act nor any of the other statutes or instruments effecting cession purported, by their terms, to extinguish that right. The question remains whether that Act, or the cession transaction as a whole, nonetheless necessarily and otherwise lawfully terminated the pre-1801 voting rights of those persons ceded.
 

 The defendants rely heavily upon Chief Justice Marshall’s statement in
 
 Loughbor-ough v. Blake,
 
 5 Wheat. 317, 18 U.S. 317, 324, 5 L.Ed. 98 (1820), that the inhabitants of the District were “a part of the society ... which has voluntarily relinquished the right of representation, and has adopted the whole body of Congress for its legitimate government.” However, any reliance on
 
 Loughborough
 
 as controlling precedent is misplaced. The specific issue before the
 
 Loughborough
 
 Court was whether Congress had the power to impose a direct tax on residents of the District of Columbia,
 
 id.
 
 at 318, 5 Wheat. 317, even though the tax apportionment clause then in effect, like the voting apportionment clause, refers by its terms only to “States,” U.S. Const, art. I, § 2. The Court held that Congress’ “power to lay and collect taxes,”
 
 id.
 
 art. I, § 8, included such a power, particularly where it had the power of “exclusive legislation,” and that the directive in Article I, section 2, that “taxes shall be apportioned among the several states” did not restrict those powers,
 
 Loughborough,
 
 18 U.S. at 322-25, 5 Wheat. 317. The statement that District inhabitants “voluntarily relinquished the right to representation,” made in response to the argument that taxing the District violated the principle that there should be no taxation without representation, is, at best, dictum. The statement does not authoritatively establish that the District or its people waived any claim to a right to voting representation in Congress. As Chief Justice Marshall said about dicta in a related context the very next year:
 

 It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is
 
 *84
 
 obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.
 

 Cohens v. Virginia,
 
 19 U.S. 264, 399, 6 Wheat. 264, 5 L.Ed. 257 (1821).
 

 Even if the
 
 Loughborough
 
 dictum were an authoritative conclusion of law (which it was not), it would confirm by necessary inference the pre-1801 voting rights of the people ceded to the District; if they had no such pre-1801 rights they would have had nothing to “relinquishf ].”
 
 Loughborough,
 
 18 U.S. at 324, 5 Wheat. 317. More important, the Supreme Court has since held that “[a]n individual’s constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State’s electorate.”
 
 Lucas,
 
 377 U.S. at 736, 84 S.Ct. 1459. Although
 
 Lucas
 
 was a Fourteenth Amendment case, the principle it announced does not derive from the Fourteenth Amendment. Rather, the principle that voting rights are not defeasible by majority vote is intrinsic to the concept of a constitutional right.
 
 Cf. College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,
 
 527 U.S. 666, 119 S.Ct. 2219, 2229, 144 L.Ed.2d 605 (1999) (“[cjonstructive consent is not a doctrine commonly associated with the surrender of constitutional rights.”) (quoting
 
 Edelman v. Jordan,
 
 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Under the
 
 Lucas
 
 principle,
 
 a fortiori,
 
 even if Maryland’s cession and the United States’ acceptance ended the access of inhabitants of the ceded portion of that State to the Maryland voting apparatus, the cession could not eliminate the ongoing (albeit inchoate or dormant) constitutional right to voting representation of the District inhabitants ceded there from Maryland and their political posterity.
 

 That pre-cession constitutional rights, absent any lawful waiver, survived the cession is confirmed by Supreme Court opinions in related contexts. In 1901, the Supreme Court addressed the question of whether the provision in Article I, section 8, of the Constitution that states that “all duties, imposts and excises shall be uniform throughout the United States” barred Congress from imposing duties on products coming from the territory of Puerto Rico into the state of New York.
 
 Downes v. Bidwell,
 
 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). In analyzing this question, Justice Brown, announcing the judgment of the Court, revisited the Supreme Court’s decision in
 
 Loughbor-ough,
 
 where the Court had held that Congress could impose a direct tax on the people of the District even though the Article I, section 2 stated that “direct Taxes shall be apportioned among the several States.”
 
 Loughborough,
 
 18 U.S. at 322-325, 5 Wheat. 317. Justice Brown explained the decision in
 
 Loughborough
 
 as follows:
 

 This District had been a part of the states of Maryland and Virginia. It had been subject to the Constitution, and was a part of the United States.
 
 The Constitution had attached to it irrevocably.
 
 There are steps which can never be taken backward. The tie that bound the states of Maryland and Virginia to the Constitution could not be dissolved, without at least the consent of the Federal and state governments to a formal separation. The mere cession of the District of Columbia to the Federal government relinquished the authority of the states, but it did not take it out of the United States or from under the aegis of the Constitution. Neither party had ever consented to that construction of the cession. If, before the District was set off, Congress had passed an unconstitutional act affecting its inhabitants, it would have been void. If done after the District was created, it would have been equally void; in other words, Congress could not do indirectly, by carving out the District, what it could
 
 *85
 
 not do directly. The District still remained a part of the United States, protected by the Constitution. Indeed, it would have been a fanciful construction to hold that territory which had been once a part of the United States ceased to be such by being ceded directly to the Federal government.
 

 Downes,
 
 182 U.S. at 260-61, 21 S.Ct. 770 (Brown, J.) (emphasis added).
 

 In 1933, applying the theory espoused in
 
 Downes,
 
 the Supreme Court addressed the question of whether the federal judges in the District were entitled to Article III protection against reduction of their compensation.
 
 O’Donoghue,
 
 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356. The
 
 O’Dono-ghue
 
 Court concluded that the inhabitants of the District of Columbia possess “the right to have their cases arising under the Constitution heard and determined” by a genuine Article III court.
 
 Id.
 
 at 540, 53 S.Ct. 740. The Court explained its decision as follows:
 

 It is important to bear constantly in mind that the District was made up of portions of two of the original states of the Union, and was not taken out of the Union by the cession. Prior thereto its inhabitants were entitled to all the rights guaranties, and immunities of the Constitution, among which was the right to have their cases arising under the Constitution heard and determined by federal courts created under, and vested with the judicial power conferred by, article 3. We think it is not reasonable to assume that the cession stripped them of these rights, and that it was intended that at the very seat of the national government the people should be less fortified by the guaranty of an independent judiciary than in other parts of the Union.
 

 Id.
 

 From the foregoing, it is apparent that the cession transaction could not lawfully terminate or effectively waive the right of “persons” ceded, particularly the 1790-1800 voters, to voting representation in the House of Representatives. Nor could the cession preclude voting representation of the “persons to be” in the ceded area. The Constitution is no mere contract, subject to some kind of rule against perpetuit-ies, between particular individuals and the national government. On the contrary, it is a covenant in perpetuity which makes the United States a fiduciary responsible for protecting for all time the rights created in and by the people who originated the Constitution for the benefit of themselves and their “Posterity.” Constitution (Preamble). The people of the District of Columbia today are the political “posterity” of the People in the District who had, and exercised, a constitutional right to vote in congressional elections from 1790 through 1800. Under established constitutional principles, neither the then-People of the District nor their Posterity forfeited that constitutional right when the District became the Seat of Government, and neither Maryland, nor the United States or its officers, had the constitutional authority to forfeit that right for them.
 

 From another perspective, it is noteworthy that since 1820 when the
 
 Loughbor-ough
 
 Court made its observation about voting by people in the District of Columbia, the voting landscape nationwide and in the District has changed dramatically, as has the District and its demographics. There is no evidence that the
 
 Loughbor-ough
 
 court contemplated the time when that territory would be a body politic which was home for upwards of 500,000 people, equal to the population of at least three of the States. It is served by an elected executive authority in the form of a mayor, an elected council which was the functional equivalent of a unicameral legislature, as well as a well-tested set of qualifications and election apparatus for voting for council members, a non-voting delegate in Congress and presidential Electors. In considering the current weight to be accorded the
 
 Loughborough
 
 dictum, it is to be recalled that it was also Chief Justice Marshall who wrote:
 

 
 *86
 
 ... [W]e must never forget that it’s a constitution we are expounding.
 

 [It was] intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.
 

 McCulloch v. Maryland,
 
 17 U.S. 316, 407, 415, 4 Wheat. 316, 4 L.Ed. 579 (1819) (Marshall, C.J.);
 
 see also
 
 Byron R. White,
 
 Tribute to Honorable William J. Brennan, Jr.,
 
 100 Yale L.J. 1113, 1116 (1991) (Constitution is a document cast in “majestic, open-ended clauses”).
 

 C
 

 Given that the people living in the District from 1790-1800 had and exercised a constitutionally-protected right to vote for Congressional representation, and that that right was not, and could not have been, lost or waived in 1801 when the federal government assumed exclusive jurisdiction over the District, the question remains whether, under
 
 Wesberry,
 
 anything else necessitates defendants’ continuing to deny or interfere with the right of their political posterity to vote for voting representation in the House of Representatives. Looking at the literal text of Article I and any necessary inferences therefrom, the 23rd amendment, nonvoting by citizens in the territories, and the lapse of time since the inhabitants of the District last voted in 1800, my answer is “nothing else.”
 

 1. Plain Language
 

 The plain language of the Constitution does not necessitate denying the people of the District the right to voting representation in Congress. Neither the Seat of Government clause nor any other provision of Article I addresses, much less directly precludes, congressional representation for the people of the District. If the Framers intended to deny voting representation in Congress to the inhabitants of the Seat of Government, the Seat of Government clause was an appropriate place to say so. It does not.
 

 The Framers and the drafters of the Bill of Rights knew how to say “no” directly. The original constitution said “no” twenty-seven times.
 
 See, e.g.,
 
 U.S. Const, art. I, § 2, cl. 2
 
 (“No
 
 Person shall be a Representative who shall not ____”) (emphasis added);
 
 see also id.
 
 art. I, § 3, cl. 3
 
 (“No
 
 Person shall be a Senator who shall not ....”) (emphasis added);
 
 id.
 
 art. II, § 1, cl. 5
 
 (“No
 
 Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President ....”) (emphasis added).
 
 [33]
 
 Nowhere does the Seat of Government clause or any other provision of the Constitution expressly prohibit people in the District from voting for, and enjoying the service of, voting representatives in Congress.
 

 2. Inferences from the use of the word “State”
 

 The use of the word “State” in the various provisions of Article I concerning the
 
 *87
 
 election of members of the House of Representatives does not necessitate denying the people of the District the right to voting representation in Congress. The defendants maintain, in effect, that the use of the word “State” in these provisions creates a necessary inference that people not in a “State,” therefore, people in the District of Columbia, cannot choose or be a Representative.
 
 [34]
 
 In essence, the defendants would apply the maxim
 
 expressio unius est exclusio alterius
 
 — the expression of one thing is the exclusion of another — as the basis for interpreting the term “State.” The
 
 expressio unius
 
 maxim is “[a] non-binding rule of statutory interpretation, not a binding rule of law.”
 
 Martini v. Federal Nat’l Mortgage Ass’n,
 
 178 F.3d 1336, 1342 (D.C.Cir.1999). As the Court of Appeals for the District of Columbia Circuit recently explained, in rejecting the application of the maxim to construe a statute,
 

 “[t]he maxim’s force in particular situations” ... “depends entirely on context, whether or not the draftsmen’s mention of one thing ... does really necessarily, or at least reasonably, imply the preclusion of alternatives.” ... That in turn depends on “whether, looking at the structure of the statute and perhaps its legislative history, one can be confident that a normal draftsman when he expressed ‘the one thing’ would have likely considered the alternatives that are arguably precluded.”
 

 Id.
 
 at 1343 (quoting
 
 Shook v. District of Columbia Financial Responsibility and Management Assistance Auth.,
 
 132 F.3d 775, 782 (D.C.Cir.1998));
 
 see also In re Sealed Case,
 
 181 F.3d 128, 132, (D.C.Cir.
 
 1999) (en
 
 banc) (“The legal maxim expressio unius est exclusio alterius ... is not always correct.”). As the Supreme Court has explained, “The ‘exclusio’ is often the result of inadvertence or accident, and the maxim ought not to be applied, when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injustice.”
 
 Ford v. United States,
 
 273 U.S. 593, 612, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (internal quotations omitted);
 
 see also
 
 Einer Elhauge,
 
 Are Term Limits Undemocratic?,
 
 64 U. Chi. L.Rev. 83, 91 (1997) (“The underlying difficulty is that the failure to list other things may reflect simple inadvertence, a failure to consider those other things, or an inability to reach a consensus .... ”).
 

 The Supreme Court’s decisions reflect its recognition of the limited utility of the maxim; it generally chooses to justify an interpretation that would be consistent with the maxim on other or additional grounds.
 
 [35]
 
 For example, in
 
 Powell v.
 
 
 *88
 

 McCormack,
 
 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491, the House of Representatives adopted a resolution excluding Adam Clayton Powell, Jr. from membership because it found that he had wrongfully diverted House funds and made false reports on expenditures of foreign currency. These facts framed an issue of whether Congress had the power to exclude an individual elected to the House of Representatives for any reason other than those set forth in the text of the Qualifications Clause of the Constitution.
 
 [36]
 
 The Court concluded that “the Constitution does not vest in the Congress a discretionary power to deny membership by a majority vote” because the qualifications for office expressed in the Constitution were intended to be exclusive,
 
 ie.,
 
 no additional qualifications could be imposed by Congress.
 
 Id.
 
 at 548, 89 S.Ct. 1944. Although such an interpretation is consistent with the application of the
 
 expressio unius
 
 maxim, the Court did not mention it. Instead, the Court pointed to the Framers’ concern that a future Congress might fall into the error committed by Parliament in its 18th century harassment of its non-conformist member, John Wilkes.
 
 Id.
 
 at 527-31, 89 S.Ct. 1944. With Wilkes’ experience in mind, the
 
 Powell
 
 Court did not rest its interpretation of the Qualifications Clause on any maxim. Instead, it relied heavily upon the “relevant historical materials” and “the basic principles of our democratic system.”
 
 Id.
 
 at 522, 548, 89 S.Ct. 1944.
 

 Similarly, in
 
 Term Limits,
 
 514 U.S. 779, 115 S.Ct. 1842, the Supreme Court concluded that the Qualifications Clause barred States from imposing term limits on members of Congress. Again, although its interpretation of the clause was consistent with the application of the
 
 expressio unius
 
 maxim,
 
 [37]
 
 the Court based its conclusion on “the text and structure of the
 
 *89
 
 Constitution, the relevant historical materials, and, most importantly, the ‘basic principles of our democratic system.’ ”
 
 Id.
 
 at 806, 115 S.Ct. 1842 (quoting
 
 Powell,
 
 395 U.S. at 548, 89 S.Ct. 1944).
 

 In light of the interpretive principles articulated and applied by
 
 Powell
 
 and
 
 Term Limits,
 
 I believe that the issue before this Court should not be resolved simply by rote application of the
 
 expressio unius
 
 maxim. The question remains whether other considerations justify the negative inference from the use of the term “States” proposed by the defendants. An examination of the structure and purpose of Article I, the relevant historical materials, parallel constitutional provisions, and the basic principles of our democratic system, leads me to the conclusion that none do.
 

 a.
 
 Structure and Purpose of Article I
 

 There is nothing in the use of the word “States” in the provisions of Article I pertaining to the election of members of the House of Representatives that expressly precludes recognition of a right for the inhabitants of the District to vote for voting representation in Congress. More importantly, no policy purpose would be served by adopting such an interpretation. The primary purpose of the references to “States” in Article I is apparent when one considers that it was a priority of the Framers to set up a mechanism to create a
 
 national
 
 form of representative government. As Justice Kennedy observed in his concurring opinion in
 
 Term Limits:
 
 “the Constitution takes care both to preserve the States and to
 
 make use of their identities and structures at various points in organizing the federal union.” Id.
 
 at 840, 115 S.Ct. 1842 (Kennedy, J., concurring) (emphasis added). In 1787, the 13 original States were the obvious and, actually, only political subdivisions capable together of conducting national elections. Chief Justice Marshall made the point in respect to the discrete role of States and the people in the process employed to ratify the original Constitution:
 

 It is true, [the people] assembled in their several states — and
 
 where else should they ham assembled?
 
 [W]hen they act, they act in their states. But the measures they adopt do not, on that account, cease to be the measures of the people themselves, or become the measures of the state governments.
 

 McCulloch,
 
 17 U.S. at 403, 4 Wheat. 316 (emphasis added). It does not denigrate the “sovereignty” of States and their other roles, internally and vis-a-vis the national government, to recognize the very significant use of their “identities and structures” in the national election process.
 
 Term Limits,
 
 514 U.S. at 840, 115 S.Ct. 1842. Nor does such use of them in that process necessarily impute to the Framers an intention to confer on the States anything other than an essentially ministerial role in that process. Nor does it necessarily imply an intention to exclude the people of the District from that process.
 

 As the
 
 Term Limits
 
 Court further explained, “the Framers envisioned a uniform national system, rejecting the notion that the Nation was a collection of States, and instead creating a direct link between the National Government and the people of the United States.”
 
 Term Limits,
 
 514 U.S. at 803, 115 S.Ct. 1842. With this goal in mind, the majority of the references to “States” in Article I can best be understood as specifying and using the most practical mechanisms available in the 18th century by which the people scattered among the several States could select their national representatives.
 
 See also
 
 The Federalist No. 61, at 372 (Alexander Hamilton) (referring to Article I as “the provisions respecting elections”). So understood, their employment in the circumstances that obtained in the late 18th century should not preclude employment by the people of the District of the election apparatus only available to them since the 1960’s through which to regain representation in the House of Representatives
 
 *90
 
 enjoyed by their political forebears until 1801.
 

 The requirement that a Representative be an inhabitant of the State which he or she represents,
 
 see
 
 U.S. Const, art. I, § 2, is the only reference to States in the context of choosing Representatives that is not related to using the States as a mechanism for selecting Representatives. It seems obvious, however, that the primary, if not sole, purpose of that requirement was to see to it that each Representative live among the people represented. It should be obvious that this requirement was not aimed at denying the right of the people of the District to vote for voting representation in the House of Representatives. At most, it means that if the inhabitants of the District enjoyed representation by a member from the District, their Representative should reside there.
 

 The Supreme Court’s decisions in
 
 Powell
 
 and
 
 Term Limits
 
 do not undermine, indeed they tend to confirm, these interpretations. In both
 
 Powell
 
 and
 
 Term Limits,
 
 the Court was concerned with the question of whether additional qualifications beyond those expressly stated in the Qualifications Clauses of the Constitution could be imposed on a potential member of Congress. In both cases, the Court held that they could not, relying in large part on its understanding that the Framers’ intent in adopting those clauses was to ensure that the opportunity to serve as a Member of the House of Representatives should be open to as many as possible.
 
 Term Limits,
 
 514 U.S. at 794-95, 819, 115 S.Ct. 1842;
 
 Powell,
 
 395 U.S. at 547, 89 S.Ct. 1944. The precise question here is not whether to impose additional qualifications, but rather how to interpret the meaning and scope of one of those qualifications. In an important sense, including the people of the District (whose political forebears were people of one of the several States) and representation for them in the House of Representatives in the apportionment process will serve a constitutional purpose honored by the
 
 Powell
 
 and
 
 Term Limits
 
 courts that “election to the National Legislature should be open to all people of merit.”
 
 Term Limits,
 
 514 U.S. at 819, 115 S.Ct. 1842;
 
 see also Powell,
 
 395 U.S. at 547, 89 S.Ct. 1944.
 

 b.
 
 Historical Materials
 

 The relevant historical materials do not necessitate a conclusion that the Framers intended to deny to the inhabitants of the yet-to-be-selected Seat of Government the right to vote for voting representation in Congress through the use of the term “States” in Article I. On the contrary, the Framers had a clear purpose in creating a national Seat of Government subject to “exclusive legislation” by Congress and fully independent of any State,
 
 see supra
 
 Part I.B.l, a purpose not furthered by denying its inhabitants the right to vote for voting representation in the House of Representatives. Indeed, the only recorded discussions of, or references to, voting by the inhabitants of the District appear to have occurred after the Constitutional Convention, either during the ratification debates, at the time of the passage of the Organic Act in 1801, or in later Supreme Court opinions.
 

 (i)
 
 Seat of Government Clause
 

 It is undisputed that the Framers’ primary, if not only, policy purpose with respect to the Seat of Government clause, was to create a specific Seat of Government, instead of a roving one, subject to the exclusive legislative power of Congress, and free from dependence upon, and the interference from, any State.
 
 See supra
 
 Part I.B.l. There is no showing that adopting the negative inference proposed by the defendants and, thereby, denying the inhabitants of the District the right to vote for voting representation in the House of Representatives would further that policy purpose,
 
 [38]
 
 or that the Framers
 
 *91
 
 thought that it would.
 
 [39]
 

 (ii)
 
 James Madison
 

 In The Federalist Number 43, in discussing the Seat of Government, James Madison wrote:
 

 as [the federal district] is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they
 
 will have had their voice in the election of the government which is to exercise authority over them;
 
 as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.
 

 The Federalist No. 43, at 272-73 (James Madison) (emphasis added). It has been suggested that the “plain meaning” of Madison’s statement that the inhabitants of the District “will have had their voice” is that “only the first generation of District residents will have had a vote with respect to their destiny.” Stephen J. Markman, Statehood for the District of Columbia 39 (1988). Markman explains:
 

 [Madison] speaks in the future perfect tense, “they will have
 
 had
 
 their voice.” If he meant that District residents would have a continuing voice in the national government, the proper language would have been “they will have their voice.”
 

 Id.
 
 However, a more plausible reading, context considered, is that Madison’s statement is, at most, ambiguous on the question of District citizens’ right to vote for voting representation in Congress.
 

 Interpreting Madison’s statement that the inhabitants of the Seat of Government “will have had their voice in the election of the government which is to exert authority over them” as a concession that those inhabitants would permanently lose their voice in congressional elections is in substantial tension with — in fact, seems to contradict — the natural reading of other contributions to The Federalist by Madison. A basic principle of Madison’s conception of the House of Representatives was that, under the Constitution, the authority of the sitting Congress over the People derives from the most recent election and continues only until the next one.
 
 See
 
 The Federalist No. 52, at
 
 330
 
 (James Madison) (“the greater the power is, the shorter ought to be its duration”). Under Article I, the composition of the government which is to exercise authority over
 
 *92
 
 the District changes with each biennial federal election.' If District inhabitants are unable to participate in the election of each new Congress, they have not “had a voice” in the election of their government merely because they
 
 once
 
 had a voice in the election of a predecessor government. Thus, Madison’s statement is arguably consistent with the prospect that District inhabitants would have voted for the incumbent Congress or government and would expect to vote every two years thereafter for each of the successor Congresses or governments.
 

 Moreover, Madison also stated that
 
 “every imaginable objection
 
 seems to be obviated.” The Federalist No. 43, at 273 (emphasis added). It is difficult to reconcile that statement with an interpretation that inhabitants of the District would have only one last chance to elect representatives to a single session of the House of Representatives, while new Congresses, elected every two years, would continue to exercise authority over them
 
 ad infini-tum,
 
 without their being represented there. It is difficult to believe that Madison, his strong views about representative government and individual rights considered, could not imagine anyone objecting to such disenfranchisement. In point of fact, the District residents of the area ceded by Madison’s very own Virginia objected so vigorously and so long to their lack of voting representation in Congress that they ultimately persuaded Congress to cede that area back to Virginia.
 
 See supra
 
 note 23. Indeed, Madison’s conclusion that every objection would be obviated followed his statement that “the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting [the federal district].” Madison might well have been assuming that the Constitution required the ceding State to provide for the protection of the certain rights, including the right to vote for voting representation in the House of Representatives, if not by the ceding State, then by the United States as a state-imposed condition of the cession. Of course, Maryland did no such thing, further reducing the precedential force Madison’s ambiguous observation.
 

 The substantive problems flowing from interpreting Madison as recognizing that the inhabitants of the District would be denied their right to vote for voting representation in Congress are far more troubling than any purported grammatical awkwardness which may result from a contrary interpretation. Therefore, I conclude that Madison’s statement does not necessitate a conclusion that the Framers intended to deny the people of the District the right to vote for voting representation in the House of Representatives or that the references to “States” should be interpreted to have that effect.
 

 (in)
 
 Alexander Hamilton
 

 Alexander Hamilton, a vigorous proponent of the Constitution, unsuccessfully offered the following amendment during the New York ratifying convention:
 

 That When the Number of Persons in the District of Territory to be laid out for the Seat of the Government of the United States, shall according to the Rule for the Apportionment of Representatives and direct Taxes amount to _ such District shall cease to be parcel of the State granting the Same, and Provision shall be made by Congress for their having a District Representation in that Body.
 

 5 The Papers of Alexander Hamilton 189-90 (Harold C. Syrett & Jacob E. Cooke eds., 1962). Although the amendment, had it been ratified, would have ensured District inhabitants the future right to vote for voting representation in Congress, it does not follow that its failure of adoption necessitates denial of that right.
 

 So far as I have been able to determine from the parties’ submissions and other research, neither the records of the New York convention nor Hamilton’s papers reveal any rfemarks by Hamilton explaining his proposal.
 
 See
 
 Papers of Alexander
 
 *93
 
 Hamilton. One possible interpretation is that the amendment was designed to provide a formula for District representation because Article I would require such representation for the District once it was created. Another is that is that Hamilton believed that, absent his amendment, the District would remain part of the ceding State to the extent that its residents would vote through that State’s apparatus. Also, Hamilton’s proposal is consistent with the possibility that Hamilton believed that an amendment to the Constitution would be required to allow the people of the residents of the District to vote. Given the number of alternative explanations of this amendment, all of which are speculative, I would conclude that the mere existence of this proposed amendment is not significant evidence that the Framers intended to deny the people of the District the right to vote for voting representation in Congress or that the references to “States” were intended to have that effect.
 

 (iv)
 
 Thomas Tredwell
 

 Thomas Tredwell argued in the New York ratifying convention that inhabitants of the proposed Seat of Government would not and should not be able to participate in congressional elections:
 

 The plan of
 
 the federal city,
 
 sir, departs from every principal of freedom, as far as the distance of the two polar stars from each other; for,
 
 subjecting the inhabitants of that district to the exclusive legislation of Congress, in whose appointment they have no share or vote, is laying a foundation on which may be erected as complete a tyranny as can be found in the Eastern world.
 

 2 Elliot’s Debates at 402,
 
 reprinted in
 
 3 Kurland and Lerner,
 
 supra
 
 note 12, at 225 (emphasis added). However, Tredwell opposed not only the Seat of Government clause, but the entire Constitution. As such an opponent, his characterization of the Constitution’s effect on District inhabitants is “entitled to little weight.”
 
 Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203
 
 n. 24, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (“Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill, are entitled to little weight. This is especially so with regard to the statements of legislative opponents who in their zeal to defeat a bill understandably tend to overstate its reach.”) (internal citations, ellipsis and quotation marks omitted); William N. Eskridge, Jr.,
 
 Should the Supreme Court Read the Federalist but not Statutory Legislative History?,
 
 66 Geo. Wash. L.Rev. 1301, 13_ (1998) (“[Opponents’] strategic statements are worth little in understanding the provision if it is adopted, because their incentives are to exaggerate and distort the meaning and effect of the provision.”). Accordingly, Tredwell’s statements shed little, if any, light on the Framers’ intent with respect to the voting rights of the inhabitants of the District or the interpretation of the references to “States” in Article I.
 

 (v)
 
 Organic Act
 

 There were statements made at the time of the enactment of the Organic Act in 1801 which assume that its enactment would have the effect of terminating the right of inhabitants of the District to vote for voting representation in the House of Representatives.
 
 [40]
 
 I do not consider those statements to be persuasive evidence that the Framers’ of the Constitution intended such a outcome to result from their use of the term “States” or from the language of any other provision in the Constitution. The Organic Act debates occurred over fourteen years after the Constitutional Convention and over ten years after the First Congress selected the location of the Seat of Government. The views of individual participants in those debates, even if they could be attributed to the Sixth Congress as a whole, would be an unreliable indication of the understanding of the
 
 *94
 
 Pounders during the time before the location of the Seat of Government had been determined. Defendants do not suggest that those who made the statements participated in the Convention or were “au courant” in 1787. Moreover, given the modest size of the District’s population in 1801, the drafters of the Organic Act might well have assumed, without knowing, that the Framers had simply not considered providing affirmatively, yet not affirmatively precluding, for the District’s relatively few inhabitants. A member of Congress and two Senators representing 8,000 souls could have very awkward and disruptive of the power balance. Had populous New York or Philadelphia been chosen as the permanent Seat of Government, however — certainly a possibility in 1787,
 
 see supra
 
 Part I.B.l, — it seems unlikely that 1801 Congressmen would have seen the denial of voting representation for the District’s population as the Framers’ manifest design. These facts make it, in my view, unreasonable to assume that the views expressed at the time of the adoption of the Organic Act reliably reflect any decision by the Framers, which were have necessarily been formed without knowing whether the site of the Seat of Government would be New York, Philadelphia, or some other place, urban or rural.
 

 (vi)
 
 Loughborough
 

 Finally, there is Chief Justice Marshall’s 1820 statement in
 
 Loughborough
 
 that the inhabitants of the District were “a part of the society ... which has voluntarily relinquished the right of representation, and has adopted the whole body of Congress for its legitimate government.” 18 U.S. at 324, 5 Wheat. 317. Defendants rely very heavily upon the
 
 Loughborough
 
 statement because, among other things, Chief Justice Marshall was present at the creation. As Justice Jackson put it so elegantly, the Chief Justice “wrote from close personal knowledge of the Founders and the foundation of our constitutional structure .... ”
 
 National Mut. Ins. Co. v. Tidewater Transfer Co.,
 
 337 U.S. 582, 586-87, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). But the
 
 Loughborough
 
 dictum does not necessarily support defendants’ persistent contention that the Constitution
 
 ab initio
 
 precluded voting representation in Congress for inhabitants of the Seat of Government, wherever it might ultimately be. Rather the
 
 Loughborough
 
 dictum can better be read to mean what it says and clearly implies: Chief Justice Marshall believed that some time after the Constitution was ratified, the “part of the society” constituting inhabitants of the District “voluntarily relinquished” voting rights that they had previously enjoyed, including specifically, apportioned rights to representation in the House of Representatives. However, the
 
 Loughborough
 
 dictum cannot be reconciled with the present understanding of the nature of constitutional rights — including rights under the
 
 original
 
 Constitution. The parties have not cited (and my research has not disclosed) any documentary evidence that inhabitants of the District ever actually waived their voting rights individually or collectively, either before cession or after it. Finally, as previously discussed, the concept of relinquishment “by constructive consent is not a doctrine commonly associated with surrender of constitutional rights.”
 
 College Savings Bank,
 
 119 S.Ct. at 2229 (quoting
 
 Edelman,
 
 415 U.S. at 673, 94 S.Ct. 1347);
 
 Lucas,
 
 377 U.S. at 736, 84 S.Ct. 1459;
 
 see supra
 
 Part II.B. Accordingly, this dictum does not necessitate a conclusion that by using the word “States” in Article I or in drafting any other provisions of the Constitution in 1787 the Framers intended to deny to the inhabitants of the yet-to-be-selected Seat of Government the right to vote for voting representation in the House of Representatives.
 

 c. Parallel Constitutional Provisions
 

 The use of the term “State” in parallel provisions of the Constitution does not necessitate or justify the negative inference proposed by the defendants. To the contrary, as Supreme Court decisions make
 
 *95
 
 clear, the term “State” is not necessarily interpreted as meaning “and not the District of Columbia.”
 

 The defendants rely heavily on the Supreme Court’s decision in
 
 Hepburn & Dundas v. Ellzey,
 
 6 U.S. 445, 2 cranch 445, 2 L.Ed. 832 (1805). In
 
 Hepburn,
 
 the Supreme Court considered whether citizens of the District could bring suits in federal court. Section 11 of the Judiciary Act of 1789 gave federal courts jurisdiction to hear cases where “the suit is between the citizen of the State where the suit is brought, and a citizen of another State.” 1 Stat. 73, 78. The Court looked to Article III of the Constitution, which confers power on the federal courts to hear suits “between Citizens of different States,” to answer the question of whether the reference to “States” in the statute included the District. The
 
 Hepburn
 
 Court concluded that the reference to “States” in the Constitution, and therefore in the statute, did not include the District.
 
 Id.
 
 at 452-53, 2 Cranch 445. However, it did not consider whether the reference to States in Article III
 
 precluded
 
 jurisdiction over suits between citizens of the District and citizens of a State.
 

 In 1948, Congress enacted a statute that treated the District as a State so that its residents could maintain diversity suits in federal courts. 62 Stat. 869 (codified at 28 U.S.C. § 1832(d)). In 1949, the Supreme Court upheld that statute as an appropriate exercise of Congress’ power under the District Clause, even though Arricie III, § 2, clause 1, only refers to cases “between Citizens of different States.”
 
 Tidewater,
 
 337 U.S. 582, 69 S.Ct. 1173. There is no majority opinion. However, the
 
 Tidewater holding
 
 confirms what is now the law: the Constitution does not bar' Congress from conferring federal diversity jurisdiction in cases brought by a District resident even though that individual is not literally a citizen of a “State.” Accordingly, the use of the term “State” in the diversity jurisdiction clause of the Constitution cannot mean “and not of the District of Columbia.”
 

 Similarly, the Supreme Court has held that the Full Faith and Credit clause in Article IV of the Constitution, which provides that “Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State,” U.S. Const, art. IV, § 2, binds the courts of the District equally with the courts of the States.
 
 Loughran v. Loughran,
 
 292 U.S. 216, 228, 54 S.Ct. 684, 78 L.Ed. 1219 (1934).
 

 Further, if the references to “States” in Article I, § 2, necessarily exclude the people of the District, then the reference to “Citizens of each State” in Article IV, § 2, clause 1, would prohibit the enjoyment of an enforceable right to travel by District citizens. Article IV, § 2, clause 1, guarantees that “[t]he Citizens of each
 
 Stale
 
 shall be entitled to all Privileges and Immunities of Citizens in the Several States” (emphasis added). This provision of the Constitution protects a fundamental component of the right to travel, “the right of a citizen of one State ... to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State.”
 
 Saenz v. Roe,
 
 526 U.S. 489, 119 S.Ct. 1518, 1525, 148 L.Ed.2d 689 (1999). The privileges and immunities clause of Article IV “provides important protections for nonresidents who enter a State whether to obtain employment, to procure medical services, or even to engage in commercial shrimp fishing.”
 
 Id.
 
 at 1526 (internal citations omitted). It defies common sense to suppose that the clause implicitly requires the denial of an enforceable right to travel to Citizens of the District, leaving treatment of District citizens to the exclusive discretion of each State they visit. It is only slightly less implausible to imagine that the Framers meant to leave District citizens’ right to travel dependent upon the legislative grace of Congress. In any event, the implausibility of these two interpretations of the Arricie IV privileges and immunities
 
 *96
 
 clause — that it prohibits a right to travel for District citizens, or that it neither prohibits nor guarantees such a right — suggests that neither interpretation follows simply from the application of common sense to the plain language of the clause.
 

 Accordingly, the interpretations of the term “State” in other provisions of the Constitution support a conclusion that the references to “States” in Article I do not necessarily imply “and not the District of Columbia.”
 

 d. Democratic principles
 

 As reiterated by the Supreme Court in
 
 Term Limits
 
 and
 
 Powell,
 
 interpretation of the Constitution, particularly Article I, should be guided by the fundamental democratic principles upon which this nation was founded.
 
 Powell,
 
 395 U.S. at 547, 89 S.Ct. 1944;
 
 Term Limits,
 
 514 U.S. at 819-823, 115 S.Ct. 1842. Absent any persuasive evidence that the Framers’ intent in using the term “State” was to deny the inhabitants of the District the right to vote for voting representation in the House of Representatives, a consideration of fundamental democratic principles further supports the conclusion that the use of that term does not necessitate that result.
 

 A republican, that is representative, form of government, is a keystone in the Constitution’s structure, a keystone hewn directly from the Declaration of Independence; the denial of representation was one of the provocations that generated the Declaration and the War that implemented it.
 
 [41]
 
 Article I creates the republican form of the national government; Article IV guarantees that form to each state and its people.
 

 Recent Supreme Court analysis confirms the continuing vitality of these principles. As Justice Kennedy, writing for the Court, aptly described it:
 

 By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.
 

 Alden v. Maine,
 
 527 U.S. 706, 119 S.Ct. 2240, 2265, 144 L.Ed.2d 636 (1999) (internal quotations omitted). Thus, the people of each state are sovereign in that state; the people of the Nation are sovereign visa-vis the national government. As the Supreme Court has explained:
 

 [Representatives owe primary allegiance not to the people of a State, but to the people of the Nation. As Justice Story observed, each Member of Congress is “an officer of the union, deriving his powers and qualifications from the constitution, and neither created by, dependent upon, nor controllable by, the states.... Those officers owe their existence and functions to the united voice of the whole, not of a portion, of the people.”
 

 Term Limits,
 
 514 U.S. at 803, 115 S.Ct. 1842 (quoting 1 Story § 627). The Court emphasized that “the right to choose representatives belongs not to the States, but to the people.... Thus the Framers, in perhaps their most important contribution, conceived of a Federal Government directly responsible to the people, possessed of direct power over the people, and
 
 chosen directly, not by the States, but by the people.” Term Limits,
 
 514 U.S. at 820-21, 115 S.Ct. 1842 (emphasis added). The Court found the principle firmly grounded in Chief Justice Marshall’s oft-cited observation that
 

 [t]he government of the Union, then, ... is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exer
 
 *97
 
 cised directly on them, and for their benefit.
 

 Id.
 
 (quoting
 
 McCulloch,
 
 17 U.S. at 404-05, 4 Wheat. 316).
 

 Reciprocally, the authority of the national government operates directly upon the people, as distinguished from the states themselves.
 

 [T]he constitutional design secures the founding generation’s rejection of the concept of a central government that would act upon and through the States in favor of a system in which the State and Federal Governments would exercise concurrent authority over the people — who were, in Hamilton’s words, “the only proper objects of government.”
 

 Alden,
 
 119 S.Ct. at 2247 (quoting The Federalist No. 15, at 109) (Alexander Hamilton) (other internal quotations omitted);
 
 Term. Limits,
 
 514 U.S. at 803, 115 S.Ct. 1842 (“In adopting [the Constitution], the Framers envisioned a uniform national system, rejecting the notion that the Nation was merely a collection of States, and instead creating a direct link between the National Government and the people of the United States.”);
 
 New York v. United States,
 
 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (“[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States.”).
 

 The importance of voting by the people in a representative democracy, such as the Constitution established, is so obvious that it is difficult to articulate its provenance. Yet, there is no dispute that voting by the people and the existence of a representative democracy are inextricably linked. One simply cannot exist without the other. As the Supreme Court has repeatedly recognized, following the words of Alexander Hamilton, it is a “fundamental principle of our representative democracy ... that ‘the people should choose whom they please to govern them.’ ”
 
 Term Limits,
 
 514 U.S. at 795, 115 S.Ct. 1842 (quoting
 
 Powell,
 
 395 U.S. at 547, 89 S.Ct. 1944 (quoting 2 Elliot’s Debates 257)). As the
 
 Reynolds
 
 Court observed, “the right of suffrage is a fundamental matter in a free and democratic society” and “the right to vote freely for the candidate of one’s choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.” 377 U.S. at 555, 561, 84 S.Ct. 1362.
 

 Thus, the very structure of the national government, subjected by the Constitution to the ultimate sovereignty of the people, strongly negates the argument that either the Article I references to “States,” or the absence of any mention of voting for the people of the District in the District Clause, necessarily precludes voting by and representation of the people of the District. Accordingly, the democratic principles reflected in the structure of the government created pursuant to the Constitution weigh decisively against the negative inference proposed by the defendants — an inference that would result in the denial of the right to vote for voting representation in the legislature with exclusive authority over the District.
 

 For all of the above reasons, the literal references to the “States” in Article I do not necessitate denying to the people of the District the right to vote for voting representation in the House of Representatives.
 

 3. Twenty-Third Amendment
 

 Defendants also argue that the adoption of the Twenty-third Amendment, giving the people of the District to right to choose electors to participate in the elections of the President and Vice-President, necessarily means that a similar constitutional amendment would be required to provide the inhabitants of the District with the right to vote for voting representation in the House of Representatives. First, the defendants maintain the adoption of the amendment “conflrm[s] the understanding
 
 and intent
 
 of both Congress and the people of the ratifying States that the District of Columbia is not otherwise a ‘State’ for
 
 *98
 
 purposes of federal elections except as provided for by this Amendment.” Sec’y Opp. at 12-13;
 
 see also
 
 Memorandum of Points and Authorities in Support of the Motion to Dismiss of Defendants Robin H. Carle, Wilson Livingood and James M. Eagen III, and Opposition to Plaintiffs’ Motion for Summary Judgment in Alexander;
 
 et al. v. Daley, et al.
 
 at 23-24 (filed Dec. 18, 1998) (“House Officers Opp.”). However, the suggestion that the understanding of the people adopting a constitutional amendment in 1961 could confirm the 1787 understanding of the Framers of the Constitution appears to have no precedent in constitutional interpretation.
 

 Next, the defendants point to the legislative history of the amendment which includes the statement that it “would not authorize the District to have representation in the Senate or the House of Representatives.” H. Rep. No. 86-1698, at 2-3,
 
 reprinted in
 
 1960 U.S.C.C.A.N. 1459, 1462. Of course, no one is suggesting that the Twenty-third Amendment authorizes such representation.
 

 Finally, the defendants argue plaintiffs’ position must be rejected because “if plaintiffs’ argumént were correct, the 23rd Amendment would have been unnecessary.” House Officers Opp. at 24. The defendants invoke Chief Justice Marshall’s statement in
 
 Marbury v. Madison
 
 that “[i]t cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it.” 5 U.S. 137, 174, 1 Cranch 137, 2 L.Ed. 60 (1803). First, there is only a presumption, and not a rigid rule, against interpretations that yield superfluous constitutional provisions. For example, the Supreme Court has noted that Article I, section 8, clause 14, of the Constitution, which spells out Congress’ power “[t]o make Rules for the Government and Regulation of the land and naval Forces,” is “technically superfluous,”
 
 United States v. Stanley,
 
 483 U.S. 669, 682, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), in light of Article I, section 8, clause 18 — the Necessary and Proper Clause.
 
 See also
 
 Akhil Reed Amar,
 
 Constitutional Redundancies and Clarifying Clauses,
 
 33 Val. U.L.Rev. 1 (1998); Sanford Levinson,
 
 Accounting for Constitutional Change,
 
 8 Const. Commentary 409, 422-28 (1991). Second, the application of the presumption can, at best, only illuminate the meaning of the Twenty-third Amendment, not provisions of the original Constitution, such as Article I. The logic of the presumption is that the drafters of a document are unlikely to have included redundancies, but, of course, the drafters of Article I did not include the Twenty-third Amendment. In light of these considerations, the adoption of the 23rd amendment should not be relied upon in interpreting the original constitutional provisions at issue here. For the same reasons, the proposed, but never adopted, amendments pertaining to voting by District inhabitants shed no light on the issues before us.
 
 [42]
 

 4. Territories
 

 Two circuits have concluded that residents of the Territories have no right to participate in the election of the President
 
 *99
 
 or Vice President.
 
 See De La Rosa v. United States,
 
 32 F.3d 8 (1st Cir.1994) (per curiam),
 
 cert. denied,
 
 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995);
 
 Attorney General of Territory of Guam v. United States,
 
 738 F.2d 1017 (9th Cir.1984),
 
 cert. denied,
 
 469 U.S. 1209, 105 S.Ct. 1174, 84 L.Ed.2d 323 (1985). Assuming,
 
 arguendo,
 
 that citizens of territories also lack the right to vote in Congressional elections, that would not necessitate denying the people of the District the right to vote for voting representation in the House of Representatives. No territory or its inhabitants were ever part of the “several States”; nor did the inhabitants of our territories ever vote for representation in the House. Nor were the people in the territories, or their forbears, ever ceded there. In contrast, the inhabitants of the District today are the political posterity of the original people of the District, who were, until ceded to the United States, “people of the several States” who voted in federal elections until 1801. Citizens of the territories cannot claim a similar provenance. The foregoing considered, it simply does not follow that because people of the territories have never been entitled to voting representation in Congress that the people of the District must necessarily be denied renewal of their right to vote for voting representation in the House of Representatives.
 

 5. Lapse of Time
 

 The mere fact that nonvoting by the people of the District has been a continuous and unbroken practice since 1801 does not necessitate denying the people of the District today the right to vote for voting representation in the House of Representatives.
 
 [43]
 
 The Supreme Court has never hesitated to recognize constitutional rights, no matter when recognition is sought and no matter how long practices to the contrary have continued. Not so long ago, the Court observed, “That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date.”
 
 Powell,
 
 395 U.S. at 546-47, 89 S.Ct. 1944;
 
 cf. Puerto Rico v. Branstad,
 
 483 U.S. 219, 229, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987) (“Long continuation of decisional law or administrative practice incompatible with the Constitution’s requirements cannot overcome this Court’s responsibility to enforce those requirements.”).
 

 The Supreme Court has a long history of recognizing previously unrecognized constitutional rights. For example, its landmark decision in 1954 that racial segregation of public school students violated the Fourteenth Amendment,
 
 see Brown v. Board of Education,
 
 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), reversed its 1896 decision that “separate, but equal” was all the equal protection clause required,
 
 see Plessy v. Ferguson,
 
 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). In 1964, the Court adopted the one-person, one-vote maxim as the standard for state legislative apportionment,
 
 Reynolds,
 
 377 U.S. at 568, 84 S.Ct. 1362, even though, as Justice Frankfurter had pointed out in an earlier dissent in “[t]he notion that representation proportioned to the geographic spread of population,” had “never been generally practiced, today or in the past,”
 
 Baker v. Carr,
 
 369 U.S. 186, 301, 82 S.Ct. 691, 7 L.Ed.2d 663 (Frankfurter, J., dissenting). In 1986, the Court held that racially-based peremptory challenges violated the equal protection clause,
 
 see Batson v. Kentucky,
 
 476 U.S. 79, 100, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), reversing its 1965 decision holding that peremptory challenges were immune from equal protection scrutiny largely because such scrutiny “would entail a radical change in the nature and operation of the challenge,”
 
 Swain v. Alabama,
 
 380 U.S. 202, 221-22, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In
 
 Roe v. Wade,
 
 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court held that the right to privacy encompassed a woman’s right to seek an abortion, even though abortion
 
 *100
 
 had long been treated as a crime in many states. Poll taxes, grandfather clauses, and white primaries were once commonplace; all are now unconstitutional.
 
 See Harper,
 
 383 U.S. 663, 86 S.Ct. 1079;
 
 Guinn v. United States,
 
 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915);
 
 Smith v. Allwright,
 
 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). Just this past year, the Supreme Court severely curtailed Congress’ power to abrogate States’ sovereign immunity, despite years of permitting it virtually free rein in that area.
 
 Alden,
 
 119 S.Ct. 2240. And, of course, the literal application of the Bill of Rights to the States was not recognized until many years after adoption of the Fourteenth Amendment, and then only by a gradual process.
 
 Compare, e.g., Adamson v. California,
 
 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947)
 
 with Malloy v. Hogan,
 
 378 U.S. 1, 4-6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)
 
 and Gideon v. Wainwright,
 
 372 U.S. 335, 341-345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).
 

 For years, many voter apportionment issues never reached the courts because it was accepted doctrine that the apportionment of legislative districts involved a political question beyond the reach of the judiciary.
 
 See, e.g., Colegrove v. Green,
 
 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). It was not until the Court’s 1962 decision in
 
 Baker,
 
 369 U.S. 186, 82 S.Ct. 691, overruling
 
 Colegrove,
 
 that the courts began to address many long-suffered voting rights deprivations. Thus, as a practical matter, until
 
 Baker v. Carr,
 
 a suit like the plaintiffs would have been an exercise in futility.
 

 Ill
 

 EQUAL PROTECTION
 

 The
 
 Wesberry
 
 Court notably limited to Article I its analysis of “one person, one vote” in congressional elections, putting aside any consideration of other constitutional provisions as sources of the right to vote.
 
 Wesberry,
 
 376 U.S. at 9 n. 10, 84 S.Ct. 526. The principle of
 
 Wesberry,
 
 standing alone, requires that the people of the District, the political posterity of the pre-1801 voters, who were “people of the Several States,” be given the opportunity to vote for a Member of the House of Representatives. Even if
 
 Wesberry
 
 itself did not mandate this conclusion, the plaintiffs argue, and I am persuaded, that the Equal Protection Clause of the Fourteenth Amendment, made applicable to the United States and its officers by the Fifth Amendment, provides a strong additional ground for a declaration that the inhabitants of the District have a constitutional right to vote for voting representation in the House of Representatives and that the failure of the Secretary to include inhabitants of the District in the apportionment violates equal protection principles. Accordingly, the Secretary has a constitutional duty to include the people of the District in any future apportionment and to calculate and report to the President the representation commensurate with such apportionment.
 

 The Equal Protection Clause of the Fourteenth Amendment provides that “No State shall ... deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV. The Supreme Court has held that the principles embodied in this clause apply equally to the federal government, for the benefit of persons residing in the District of Columbia, by virtue of the due process clause of the Fifth Amendment.
 
 See Bolling v. Sharpe,
 
 347 U.S. 497, 500, 74 S.Ct. 693 (1954) (holding that the principles embodied by the equal protection clause of the Fourteenth Amendment that prohibited States from maintaining racially segregated schools were applicable in the District of Columbia by virtue of the Fifth Amendment due process clause);
 
 Weinberger v. Wiesenfeld,
 
 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (noting that “[t]his Court’s approach to the Fifth Amendment equal protection claims has ... been precisely the same as to equal protection claims under the Fourteenth
 
 *101
 
 Amendment”);
 
 Adarand Constructors, Inc. v. Pena,
 
 515 U.S. 200, 217-18, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (confirming continued vitality of
 
 Weinberger).
 

 Basic equal protection principles require government, state and national, to treat similarly situated persons equally, particularly with respect to constitutionally-based rights and privileges.
 
 See, e.g., Cleburne v. Cleburne Living Center,
 
 478 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985);
 
 Plyler v. Doe,
 
 457 U.S. 202, 216-217, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The equal protection clause embodies a three-tiered system of review. Generally, the classification at issue is subject to “ordinary scrutiny.” Under this test, the classification satisfies the requirements of equal protection as long as it is rationally related to a legitimate government end.
 
 Kadrmas v. Dickinson Public Schools,
 
 487 U.S. 450, 457-58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988);
 
 San Antonio Independent School Dist. v. Rodriguez,
 
 411 U.S. 1, 16-17, 93 S.Ct. 1278, 86 L.Ed.2d 16 (1973);
 
 Plyler,
 
 457 U.S. at 217-18, 102 S.Ct. 2382. At the other end of the spectrum are racial classifications and other governmental actions that impact on fundamental rights. These are subject to “strict scrutiny”; the government must demonstrate a compelling interest, and the classification must be narrowly tailored to meet that end.
 
 See, e.g., Austin v. Michigan Chamber of Commerce,
 
 494 U.S. 652, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990);
 
 Plyler,
 
 457 U.S. at 217, 102 S.Ct. 2382. In the middle are classifications involving, for example, gender, which are subject to “intermediate scrutiny” — the end must be important, the means substantially related to the end.
 
 See, e.g., Craig v. Boren,
 
 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Application of any of these tests to continued denial of the right of District inhabitants to vote for voting representation in the House of Representatives should yield the same result: the equal protection clause entitles them to such representation because the United States has no interest, compelling or otherwise, in denial of it.
 

 With respect to voting, the Supreme Court has held that the right to cast votes of equal weight in the selection of representatives to a legislature is a fundamental right whose denial must be subject to the strictest scrutiny.
 
 See Reynolds,
 
 377 U.S. at 562, 84 S.Ct. 1362 (“Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.”);
 
 Dunn v. Blumstein,
 
 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (“[I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.” (internal quotation marks omitted));
 
 Harper,
 
 383 U.S. at 665, 86 S.Ct. 1079 (“LO]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.”). As the Court explained in
 
 Reynolds v. Sims,
 
 in invalidating malapportioned state legislative districts:
 

 Diluting the weight of votes because of
 
 place of residence
 
 impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status.
 

 377 U.S. at 565, 84 S.Ct. 1362 (internal citations omitted) (emphasis added).
 

 The people of the District of Columbia are citizens of the United States, are subject to the laws passed by the Congress of the United States, and are the political posterity of the residents of the area which became the District in 1801, who voted for Congressional representation from 1790 until ceded to the United States in 1800. The population of the District has always been included in the decennial census. Yet, for the purpose of allocating seats in the House of Representatives, it is the practice and intention of the Secretary to
 
 *102
 
 exclude the District and the people there. Thus, the federal government treats the people of the District of Columbia differently from people residing in States, who are apportioned seats in the House of Representatives. In addition, the people of the District are treated differently from people residing in federal enclaves, over which Congress holds the same constitutional power of “exclusive legislation” that it holds over the people of the District. U.S. Const, art. I, § 8. Yet, the inhabitants of enclaves are included in apportionment and vote in Congressional elections in the state within which the federal enclave exists.
 
 Evans v. Cornman,
 
 398 U.S. 419, 426, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (people of enclave are also people of state surrounding enclave). The people of the District have no such apportionment or vote. Finally, the people of the District are treated differently from United States citizens who reside overseas, who, by virtue of the Uniformed and Overseas Citizens Absentee Voting Act, Pub.L. 99-410, 100 Stat. 924 (1986) (codified at 42 U.S.C. § 1973ff et seq.) (Overseas Voting Act), vote in Congressional elections in the state where they most recently lived.
 

 None of the defendants disputes the fundamental nature of the right to vote, or that, generally, classifications, including classifications according to place of residence, impacting on that right must be subject to strict scrutiny. Nor do they contend that the federal government has a compelling interest that could justify depriving the people of the District of their right to vote for congressional representation. For the most part, the defendants argue, on several different grounds, that principles of equal protection simply do not apply. The closest they come to addressing the equal protection issue head on is to argue that if the plaintiffs’ equal protection claim is accepted, then felons, minors and residents of territories must also be enfranchised.
 
 See
 
 House Officers’ Reply to
 
 Alexander
 
 Plaintiffs’ Consolidated Memorandum in Opposition to Defendants’ Motions To Dismiss, and Reply in Support of Ps’ Motion for Summary Judgment at 19 (filed Mar. 10, 1999) (“House Officers’ Reply”). I will address each argument in turn. I find none persuasive.
 

 First, the defendants argue that for equal protection to apply, the plaintiffs must have a preexisting constitutional right to vote. As Article I cannot be the source of that right, in their view, there is no cognizable equal protection claim.
 
 See
 
 Reply Memorandum of Secretary Daley and the United States in Support of Their Motion to Dismiss the Claims Brought by the
 
 Alexander
 
 Plaintiffs at 9-10 (filed Mar. 8, 1999). As I disagree with the defendants’ premise that the people of the District do not have a preexisting constitutional right to vote, I see no merit in this argument. As previously explained in detail, the people of the District are the political posterity of the people who lived in the District between 1790 and 1800. Those people had and exercised a constitutional right to vote for Congressional representation. Neither cession or any other event in the intervening years could have constitutionally taken away that right. Nor is the denial of that right mandated by the Constitution or reasonable negative inferences from it. Accordingly, the people of the District have a constitutional right to vote, albeit one that has been dormant since 1800; continued denial of that right where there is no compelling governmental interest violates equal protection principles.
 

 Next, the defendants argue that the equal protection claims are invalid on their face because any statutory restriction on the plaintiffs’ right to vote is merely reflective of the Constitution itself. If the Constitution precludes voting by DC, they argue, then there is no “constitutional” challenge that can be made to change that result. Secy’ Opp. at 17. Again, as I disagree with the defendants’ premise that the Constitution itself bars voting by the people of the District,
 
 see supra
 
 Part II, I see no merit in this argument either.
 

 
 *103
 
 The defendants also argue that the equal protection clause does not apply because “plaintiffs have not challenged any classification actually drawn by Congress.” House Officers’ Opp. at 28. The plaintiffs respond that they are challenging “statutes and House and Senate rules — and [] the conduct of defendants in enforcing those statutes and rules.” Alexander Plaintiffs Consolidated Memorandum in Opposition to Defendants’ Motions to Dismiss, and Reply in Support of Plaintiffs’ Motion for Summary Judgment at 4 (filed Feb. 8, 1999). The essence of the plaintiffs’ case, however, is a challenge to the apportionment statute, as applied by the Secretary, which is properly subject to equal protection scrutiny.
 
 Cf. Reynolds,
 
 377 U.S. at 568, 84 S.Ct. 1362 (sustaining equal protection challenge to state apportionment scheme).
 

 In addition, the defendants argue that equal protection principles cannot be applied because the people of the District are not “similarly situated” with respect to citizens of States, residents in federal enclaves, or overseas voters. The people of the District cannot be compared to citizens of States, they argue, because the Constitution itself, in Article I, Amendment XVII, and Amendment XIV, § 2, distinguishes between the two.
 
 See
 
 House Officers’ Opp. at 28-29. Even assuming
 
 ar-guendo
 
 that the defendants are correct in stating that the Constitution “distinguishes” between the citizens of the District and citizens of States, that does not resolve the issue. As discussed
 
 supra,
 
 there is nothing in the Constitution itself, or necessarily implied from it, that requires denying voting representation in Congress to the people of the District.
 
 [44]
 
 Moreover, the people of the District and citizens of States are similarly situated in that citizens of the States and the posterity of the pre-1801 District inhabitants are subject to the laws of the United States and, before the cession, both were inhabitants “of the several states.” Accordingly, the two groups are “similarly situated” for equal protection purposes.
 

 With respect to enclaves, the defendants argue that enclaves are significantly different from the District because residents of an enclave remain citizens of the State, enclaves do not change state boundaries, and states continue to exercise jurisdiction over enclaves. House Officers’ Opp. at 29-30. However, the same clause of the Constitution authorizes the establishment of the District and federal enclaves and provides that Congress shall have the same power to exercise exclusive jurisdiction in each case. The people living in the areas that became the District, just as the people living in the areas that have become federal enclaves, had a constitutional right to vote for representation in Congress. The Supreme Court has held, in
 
 Evans v. Cornman,
 
 398 U.S. at 426, 90 S.Ct. 1752, that residents of federal enclaves retain that right. The people of the District have the same interest as the people in federal enclaves, if not a greater interest, in having a voice in Congress, their ultimate legislature. At one time, when a presiden-tially-appointed three-person Board of Commissioners constituted the local legislative and executive authority in the District of Columbia (subject, of course, to Congress’ exclusive legislation) there may have been a material difference between the political status of enclave people and the people of the District. However, since 1973, when Congress created a local gov
 
 *104
 
 ernment consisting of an elected mayor and an elected council with legislative authority (subject, of course, to Congress’ exclusive legislation), and the equivalent of a state court system, the functional differences between the political status of District people and that of enclave people is more theoretical than real. Congress’ exclusive legislative authority is ultimate. It can preempt any ordinance of the District Council and, it seems obvious, could also pre-empt any state law which purported to bind the people of any federal enclave in any state.
 

 Defendants make much of the difference between Congress’ exercise of its power of “exclusive legislation” with respect to the District and its exercise of its identical power with respect to the enclaves. They concede the obvious — that Congress’ power with respect to the enclaves and with respect to the District is identical.
 
 [45]
 
 They disregard, however, the extent to which Congress’ relaxation of its latent power with respect to the District parallels the relaxation with respect to the enclaves. Just as Congress has passed statutes permitting States to- exercise their own authority in federal enclaves, so it has passed statutes permitting the District government to exercise its own authority within its enclave. For example, in federal enclaves, state criminal laws apply to “acts not punishable by any enactment of Congress,” 18 U.S.C. § 13, states -are permitted to levy and collect income, gasoline, sales and use taxes, 4 U.S.C. §§ 104-110, and state unemployment laws and workers’ compensation laws apply, 26 U.S.C. § 3305; 40 U.S.C. § 290. Moreover, at least at the National Institutes of Health (NIH), the federal enclave whose status was at issue in the
 
 Evans
 
 case, residents register their cars in Maryland, obtain drivers’ permits and license plates from Maryland, are subject to the process and jurisdiction of the Maryland state courts, and send their children to Maryland public schools.
 
 Evans,
 
 398 U.S. at 424, 90 S.Ct. 1752. „ Similarly, the District, not the federal government, exercises direct, hands-on authority over motor vehicle registration and has its own school system. The District also has its own court system, completely independent of the federal courts, except that, like state courts, the decisions of its highest court are reviewable by the Supreme Court. District residents pay income, sales and other taxes to the District. In view of the foregoing, to distinguish the right of District residents to the same protection of the laws from that enjoyed by enclave residents is to belabor a distinction without a material difference. Accordingly, the apportionment statute, as applied by the Secretary, deprives the people of the District of equal protection of the laws because for apportionment it includes the census population of federal enclaves in the population of the state within which the enclave exists while excluding the census population of the District from the apportionment process.
 

 The Overseas Voting Act, requires a State to “permit overseas voters” to participate (by absentee ballot) in “in general elections for Federal office.” 42 U.S.C. § 1973ff-l(3). An “overseas voter” includes “a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States.”
 
 Id.
 
 § 1973ff-6(5)(C). The Act does not require States to permit overseas voters to vote in local or state elections. Nor does an overseas voter under the Act need to be a citizen of the State where voting occurs.
 
 [46]
 
 As a result, an overseas voter, despite the lan
 
 *105
 
 guage of Article I, may vote in federal elections without having “the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.” U.S. Const, art. 1, § 2, cl. 1.
 

 The defendants argue that inhabitants of the District and overseas voters are not similarly situated for equal protection purposes because Congress has authorized voting by overseas voters.
 
 See
 
 House Officers’ Opp. at 27.
 
 [47]
 
 However, the critical fact for equal protection analysis is not that there is a statute giving overseas voters their voting rights, but that this Act permits voting in federal elections by persons who are not citizens of any State nor qualified under the literal terms of Article I to vote in federal elections,
 
 [48]
 
 while inhabitants of the District, who are similarly situated, are denied that right.
 

 The defendants’ suggestion that the Overseas Voting Act “extends” State citizenship to overseas voters in a manner that could not be applied equally to residents of the District is unsound. The Supreme Court has indicated that, at least with respect to elections of state officers, a State may limit participation to “bona fide residents” who live within its geographical boundary and have the intention to make the State their home indefinitely.
 
 See Carrington v. Rash,
 
 380 U.S. 89, 94, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). An “overseas voter,” however, does not reside within any State, and need not have any intention to make a particular State his or her home.
 
 See Attorney General of Guam,
 
 738 F.2d at 1020. If Congress can disregard an overseas voter’s failure to satisfy the two most basic traditional prerequisites for state citizenship, there is no reason why the fact that the overseas voter, unlike some residents of the District, was
 
 recently
 
 a bona fide resident of a State should be the distinction of ultimate constitutional dimension.
 

 As the plaintiffs point out, if there is no constitutional bar to voting by overseas voters who are not “citizens of a State,” there is no constitutional bar to voting by the people of the District. Accordingly, the inhabitants of the District and overseas voters are similarly situated and that the extension of voting rights to one group, but not the other, must be justified by a compelling government interest.
 
 [49]
 

 
 *106
 
 Given that inhabitants of the District and citizens of States, residents of enclaves and overseas voters are all similarly situated for equal protection purposes, and that the defendants do not argue that the government has any compelling interest in denying the right of District inhabitants to vote for voting representation in the House of Representatives, a right enjoyed by members of each of these other groups, the continued denial of that right violates equal protection principles. I have not overlooked that the defendants argue that the comparison to people in enclaves and overseas at most entitles the people of the District to vote for federal officers in State elections, not to elect their own Representatives. However, the fact that residents of enclaves and expatriates vote for federal officers in state elections does not necessarily imply that the only relief for the people of the District would be to vote in the elections of the state of Maryland. For residents of enclaves and overseas voters, voting in state elections can be seen as essentially a matter of convenience. As Marshall said about state ratifying conventions — where else should they vote? The pragmatic answer with respect to voting representation in the House of Representatives for the people of the District is that it is more convenient and logical that the political posterity of the pre-1801 voters for representation in the House should and could use the District apparatus for electing presidents, mayors and council members, available only in the last half of the Twentieth century.
 

 Finally, the defendants argue that if the people of the District have an equal protection right to vote in Congressional elections, so too must felons, minors and residents of territories. However, equal protection principles do not dictate such a conclusion. Felons, for example, forfeit certain constitutional rights, including the right to vote, because of their criminal conduct. The government’s. interests in depriving felons of their voting rights, presumably deterrence and punishment, arguably compelling interests for equal protection purposes, bear no relation to the government’s ephemeral interest, if any, in depriving the people of the District of voting rights merely because of the place where they five. Moreover, the Supreme Court has held that the Fourteenth Amendment, which provides that a State’s representation in Congress shall not be reduced if it disenfranchises citizens for “participation in rebellion, or other crime,” U.S. Const, amend. XIV, § 2, contemplates and approves of the disenfranchisement of convicted felons.
 
 See Richardson v. Ramirez,
 
 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). The explicit constitutional recognition that felons can be disenfranchised, and the fact that their loss of voting rights is directly attributable to their own misconduct, is a material difference which renders untenable any comparison of their nonvoting with recognizing the voting rights of the people of the District.
 

 Nor does the nonvoting of minors as a group preclude restoration of voting representation for the people of the District on equal protection grounds. First, there has been no showing that minors (however defined) as a class ever voted. In contrast, residents of the District voted for a Member of the House of Representatives until 1801. Second, minors have never been considered as having the same constitutional rights as adults.
 
 See Vernonia Sch.
 
 
 *107
 

 Dist. v. Acton,
 
 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding random urinalysis testing of minors in a public school);
 
 Hutchins v. District of Columbia,
 
 188 F.3d 531, 541 (D.C.Cir.1999) (“children’s rights are not coextensive with those of adults”). Finally, although this precise issue has never been addressed, 1 believe that the government has a compelling interest in foreclosing minors, who are presumptively not qualified by intelligence or experience to participate in its political process, from voting. If not compelling, the government’s interest is certainly important, arguably the applicable standard under the equal protection clause where it is the fundamental rights of minors being infringed.
 
 [50]
 

 Hutchins,
 
 188 F.3d at 541 (applying heightened scrutiny). Accordingly, denying their voting rights while enfranchising the people of the District does not violate equal protection principles.
 

 Finally, recognizing the voting rights of the people of the District would not necessitate enfranchising residents of United States territories.
 
 See supra
 
 Part II.C.4. To reiterate, people residing in territories, or their political predecessors, were never part of the “people of the several states” and they have never enjoyed a constitutionally protected right to vote. Absent any such right, the people of the territories have no claim that they would be denied equal protection of the laws if District inhabitants have voting representation while the status quo is continued in the territories. For this reason, recognizing voting rights for the people of the District would not necessitate a similar result with respect to the people in the territories.
 

 IY
 

 Accordingly, for the reasons set forth, the people of the District of Columbia are entitled to participate in the election of members of the United States House of Representatives. The apportionment statutes, as presently applied, interfere with the exercise of constitutional rights of residents of the District of Columbia. I would declare these statutes, as applied, unconstitutional and declare that the Secretary of Commerce has a constitutional duty to include the population of the District of Columbia in the apportionment of seats to the House of Representatives. Again, as the questions with respect to the Senate and the Control Board are not a challenge to apportionment — the basis for convening this three-judge district court — I agree that this Court should “decline to exercise any discretionary jurisdiction we may have over” those claims.
 
 Adams v. Clinton,
 
 40 F.Supp.2d 1, 5 (D.D.C.1999).
 

 [1]
 

 . The Control Board was established pursuant to the District of Columbia Financial Responsibility and Management Assistance Act, Pub. L. No. 104-8, 109 Stat. 97 (1995).
 

 [2]
 

 . The statute provides:
 

 The tabulation of total population by States ... as required for the apportionment of Representatives in Congress among the several States shall be ... reported by the rCommerce] Secretary to the President of the United States.
 

 13 U.S.C. § 141(b).
 

 [3]
 

 . U.S. CONST, art. I, § 2, cl. 3; 13 U.S.C. § 141(b);
 
 see supra
 
 note 2.
 

 [4]
 

 .
 
 See Franklin,
 
 505 U.S. at 802, 112 S.Ct. 2767 (plurality opinion of O’Connor, J.) (noting that "injunctive relief against executive officials like the Secretary of Commerce is within the courts' power”).
 

 [5]
 

 . U.S. CONST, art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place.”).
 

 [6]
 

 . Defendants do not shrink from the implications of their position. As noted at oral argument, their contention would apply with equal force to a President's decision to deny representation to a state that voted against him in the last election (at least if that decision were supported by a majority in Congress).
 
 See
 
 Tr. of Mot. Hr’g at 54. Indeed, the Executive Branch defendants concede that, on their theory, no one would have standing to challenge a presidential decision to
 
 grant
 
 the District the vote simply by apportioning it representatives in his transmission to the Clerk.
 
 See id.
 
 at 54-55.
 

 [7]
 

 .
 
 Franklin
 
 preceded
 
 Steel Co.,
 
 in which the Court expressly held that Article III courts must consider jurisdictional questions before deciding whether a plaintiff has stated a cause of adion.
 
 See Steel Co.,
 
 118 S.Ct. at 1012.
 

 [8]
 

 .
 
 See Franklin,
 
 505 U.S. at 813, 112 S.Ct. 2767 (Stevens, J., concurring in part) (“[T]he President has consistently and faithfully performed the ministerial duty [of relaying the Secretary’s figures to the Clerk without modification]. The Court’s suggestion today that the statute gives him discretion to do otherwise is plainly incorrect.”).
 

 [9]
 

 . In this case, for example, although the four Justices just cited found the President to have nothing more than a ministerial responsibility with respect to the Secretary’s report, a majority of the Court (including the four Justices who found standing) held that the Secretary’s decision did not constitute final agency action under the APA because "[the President] is not expressly required to adhere 1.o the policy decisions reflected in the Secretary's report. .. . [I]t is the President’s personal transmittal of the report to Congress that settles the apportionment ....”
 
 Franklin,
 
 505 U.S. at 799, 112 S.Ct. 2767. The same majority noted that Congress had intended to make the reapportionment process "virtually self-executing, so that the number of Representatives per State would be determined by the Secretary of Commerce and the President without any action by Congress.”
 
 Id.
 
 at 792, 112 S.Ct. 2767.
 

 [10]
 

 .
 
 See
 
 House Opp’n to Pis.’ Mot. for Summ. J. at 5-6 (“Were District residents determined to have the right to elect congressional representatives, there is no doubt that the District would be included in the apportionment process.”).
 

 [11]
 

 . An alternative ground for finding redressa-bility, again without resolving the question of the President’s amenability to suit, is contained in the D.C. Circuit’s opinion in
 
 Swan v. Clinton,
 
 100 F.3d 973 (D.C.Cir.1996). There, the court held that even if "the President has the power, if he so chose, to undercut ... relief” in the form of an injunction against a subordinate official, the "partial relief [plaintiff] can obtain against subordinate executive officials is sufficient for redressability.”
 
 Id.
 
 at 980-81. This, the court said, "simply recog-niz[es] that such partial relief is sufficient for standing purposes when determining whether we can order more complete relief would require us to delve into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch.”
 
 Id.
 
 at 981.
 

 [12]
 

 . Because the individual plaintiffs in
 
 Alexander
 
 and
 
 Adams,
 
 all adult residents of voting age, have standing to sue, we need not consider whether plaintiff District of Columbia has standing as well.
 
 See United States House of Representatives,
 
 119 S.Ct. at 773;
 
 Animal Legal Defense Fund, Inc. v. Glickman,
 
 154 F.3d 426, 429 (D.C.Cir.1998) (en banc) (citing
 
 Mountain States Legal Found, v. Glickman, 92
 
 F.3d 1228, 1232 (D.C.Cir.1996) (“For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the olher plaintiffs to raise that claim.”)).
 

 [13]
 

 .
 
 See De La Rosa v. United States,
 
 32 F.3d 8 (1st Cir.1994) (holding that United States citizens in Puerto Rico are not entitled to vote in presidential elections);
 
 Attorney Gen. of Territory of Guam v. United States,
 
 738 F.2d 1017 (9th Cir.1984) (holding that United States citizens in Guam are not entitled to vote in presidential and vice-presidential elections); Jon M. Van Dyke,
 
 The Evolving Legal Relationships Between the United States and Its U.S.-Flag Islands,
 
 U. HAW. L. REV. 445, 512 (1992);
 
 Alexander
 
 Pls.’ Opp’n at 5-6.
 

 [14]
 

 . Plaintiffs also note that Congress has passed numerous statutes that treat the District as though it were a state for various purposes.
 
 See Alexander
 
 Pls.’ Summ. J. Mem. at 48 n. 47 (citing,
 
 inter alia,
 
 18 U.S.C. § 1961 (RICO Act); 50 U.S.C. § 466 (Military Selective Service Act)). But these expressions of congressional intent, most of which were passed more than a century after the ratification of the Constitution, provide little insight into the intent of the Framers.
 

 [15]
 

 . We therefore reject the dissent's suggestion that if the District were not considered a state for purposes of Article I, District residents would also be deprived of the right to travel under Article IV.
 

 [16]
 

 . In
 
 Carter,
 
 the Court held that the District of Columbia is not a "State or Territory” within the meaning of 42 U.S.C. § 1983, but rather "is truly
 
 sui generis
 
 in our governmental structure.”
 
 Carter,
 
 409 U.S. at 432, 93 S.Ct. 602:
 
 accord Palmore v. United States,
 
 411 U.S. 389, 395, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (“The District of Columbia is constitutionally distinct from the States ....”) (citing
 
 Hepburn & Dundas,
 
 6 U.S. (2 Cranch) at 445).
 

 [17]
 

 .
 
 Sea, e.g., Callan,
 
 127 U.S. at
 
 550,
 
 8 S.Ct. 1301 (relying on language of Article III providing that jury trial, for “crimes ...
 
 not committed within any State, ...
 
 shall be at such place or places as the legislature may direct”; and noting that Article III was specifically amended “ ‘to provide for trial by jury of offenses committed
 
 out of any state’
 
 ”) (quoting James Madison) (emphasis added). Although in
 
 Loughran
 
 Justice Brandéis found the Full Faith and Credit Clause, U.S. CONST, art. IV, § 2, to bind
 
 “courts
 
 of the District . .. equally with courts of the States,” 292 U.S. at 228, 54 S.Ct. 684 (emphasis added), in
 
 Heald v. District of Columbia,
 
 he made clear that
 
 “\f]esidents
 
 of the District lack the suffrage and have politically no voice,” 259 U.S. 114, 124, 42 S.Ct. 434 (1922) (emphasis added).
 

 [18]
 

 . See
 
 also
 
 U.S. CONST, art. I, § 4, cl. 1 (“The Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof .... ”).
 

 [19]
 

 . For the first 70 years, there were separate local governmental structures for Washington, Georgetown, and — until the retrocession of the Virginia portion of the District in 1846 — Alexandria.
 
 See, e.g.,
 
 An Act to Incorporate the Inhabitants of the City of Washington, in the District of Columbia, 2 Stat. 195, ch. 53, § 2 (1802).
 
 See generally
 
 WILLIAM TINDALL, ORIGIN AND GOVERNMENT OF THE DISTRICT OF COLUMBIA 14-29 (1909). In 1871, Congress established a territorial form of government for the District,
 
 see
 
 An Act To Provide a Government for the District of Columbia, 16 Stat. 419, ch. 62 (1871), which was replaced by a commission system in 1874,
 
 see
 
 An Act for the Government of the District of Columbia, and for Other Purposes, 18 Stat. 116, ch. 337 (1874). As modified in 1878, the District’s governing body was a three-person commission appointed by the President.
 
 See id..;
 
 An Act Providing a Permanent Form of Government for the District of Columbia, 20 Stat. 102, ch. 180 (1878). The commission system was replaced in 1967 by a mayor-commissioner and council form of government, the members of which were appointed by the President.
 
 See
 
 Reorganization Plan No. 3 of 1967, Pub.L. No. 90-623, 81 Stat. 948 (1967). It was not until 1973 that the present “home rule” form of government was established, creating a mayor and council elected by the citizens of the District and granting them certain executive and legislative authority; the home rule statute reserved ultimate authority over District governance to Congress.
 
 See
 
 District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93-198, 87 Stat. 774 (1973).
 

 [20]
 

 .
 
 See Breakefield v. District of Columbia,
 
 442 F.2d 1227, 1229 (D.C.Cir.1970) (noting that Circuit has rejected “the claim that ... the members of ihe [then non-elected] City Coun
 
 *48
 
 cil were illegally appointed 'because the citizens of the District have not been given the opportunity by popular vote to elect persons to the positions held by' them") (quoting
 
 Carliner v. Commissioner,
 
 412 F.2d 1090, 1091 (D.C.Cir.1969));
 
 see also D.C. Fed’n v. Volpe,
 
 434 F.2d 436, 443 n. 28 (D.C.Cir.1970);
 
 Hobson v. Tobriner,
 
 255 F.Supp. 295 (D.D.C. 1966).
 

 [21]
 

 . Section 2 of the Fourteenth Amendment modified this provision by establishing that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons
 
 in each State
 
 U.S. CONST, amend. XIV, § 2 (emphasis added);
 
 see Montana,
 
 503 U.S. at 445, 112 S.Ct. 1415 n.1;
 
 see also Carter,
 
 409,U.S. at 424, 93 S.Ct. 602 ("[T]he District of Columbia is not a ‘State’ within the meaning of the Fourteenth Amendment .... ”).
 

 [22]
 

 .
 
 See
 
 U.S. CONST, art. I, § 8, cl. 17 (granting Congress power to exercise exclusive legislation in all cases whatsoever "over such District ... as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States”).
 

 [23]
 

 . The clause reads:
 

 The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to choose three, Massachusetts eight. Rhode Island and Providence Plantations one, Connecticut five, New York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.
 

 U.S. CONST, art. I, § 2, cl. 3.
 

 [24]
 

 . Plaintiffs suggest that the District may not have been included because the site of the seat of government had not yet been chosen when the Constitution was drafted, and because no one knew what its population would be. While it is true that the District did not exist at the time the Constitution was drafted, provision had been made for its creation,
 
 see
 
 U.S. CONST, art. I, § 8, cl. 17, and it was possible that it would be established prior to the first enumeration (i.e., the first census). It is also true that the original population of the District was small.
 
 Compare
 
 TINDALL,
 
 supra
 
 note 19, at 15 (estimating 1800 population at 14,093),
 
 with 2
 
 BUREAU OF THE CENSUS, U.S. DEP’T OF COMMERCE, HISTORICAL STATISTICS OF THE UNITED STATES 26 (bicentennial ed.1975) (listing 1800 census count at 8,000). The Framers, however, assumed that the population would grow substantially. L'Enfant’s original plan provided for a city of 800,000, which at the time was the size of Paris.
 
 See Home Rule: Hearings Before Subcomrn No. 6 of the Comm, on the District of Columbia,
 
 88th Cong. 347 (1963) (statement of Robert F. Kennedy, Attorney General).
 

 [25]
 

 . There is general agreement that the District Clause was adopted in response to an incident in Philadelphia in 1783, in which a crowd of disbanded Revolutionary War soldiers, angiy at not having been paid, gathered to protest in front of the building in which the Continental Congress was meeting under the Articles of Confederation.
 
 See, e.g.,
 
 KENNETH R. BOWLING, THE CREATION OF WASHINGTON, D.C. 30-34 (1991); THE FEDERALIST NO. 43,
 
 supra,
 
 at 289; JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION §§ 1213 (1833). Despite requests from the Congress, the Pennsylvania state government declined to call out its militia to respond to the threat, and the Congress had to adjourn abruptly to New Jersey. The episode, viewed as an affront to the weak
 
 *51
 
 national government, led to the widespread belief that exclusive federal control over the national capital was necessary. "Without it,” Madison wrote, "not only the public authority might be insulted and its proceedings be interrupted, with impunity; but a dependence of the members of the general Government, on the State comprehending the seat of the Government for protection in the exercise of their duty, might bring on the national councils an imputation of awe or influence, equally dishonorable to the Government, and dissatisfactory to the other members of the confederacy.” THE FEDERALIST NO. 43,
 
 supra,
 
 at 289;
 
 see also 4
 
 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, at 220 (Jonathan Elliot ed., 2d ed. 1888),
 
 reprinted in
 
 3 THE FOUNDERS’ CONSTITUTION 225 (Philip B. Kur-land & Ralph Lerner eds., 1987) ("Do we not all remember that, in the year 1783, a band of soldiers went and insulted Congress? .... It is to be hoped that such a disgraceful scene will never happen again; but that, for the future, the national government will be able to protect itself.”) (North Carolina ratifying convention, remarks of Mr. Iredell).
 

 Although this self-protection rationale has little relevance for the question of congressional representation, other statements by Madison concerning the rationale for the District Clause suggest he did not view the District as the constitutional equivalent of a state.
 
 See, e.g.,
 
 THE FEDERALIST NO. 43,
 
 supra,
 
 at 289 (arguing that “the gradual accumulation of public improvements at the stationary residence of the Government, would be ... too great a public pledge to be left in the hands of a single State”);
 
 see also
 
 JAMES MADISON, THE DEBATES IN THE FEDERAL CONVENTION OF 1787, WHICH FRAMED THE CONSTITUTION OF THE UNITED STATES OF AMERICA 332 (Gaillard Hunt & James Brown Scott eds., 1970) (noting George Mason’s objection that having national capital and a state capital at the same place would give "a provincial tincture to your national deliberations”).
 

 [26]
 

 .
 
 Cf. U.S. Term Limits, Inc. v. Thornton,
 
 514 U.S. 779, 791-92, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (noting that Court has used ratification debates to confirm Framers’ understanding of Article I) (citing
 
 Powell v. McCormack,
 
 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)).
 

 [27]
 

 .
 
 See also
 
 BOWLING,
 
 supra
 
 note 25, at 82 (noting that opponents of Constitution charged that District residents "would be subject to a government with absolute authority over them but in which they were unrepresented”).
 

 In FEDERALIST NO. 43, Madison expressed the view that inhabitants of the District will have acquiesced in cession, “as they will have had their voice in the election of the Government which is to exercise authority over them ....” THE FEDERALIST NO. 43,
 
 supra,
 
 at 289. As plaintiffs concede, this is generally understood as a reference to the fact that before cession the residents would "have had” a voice in that decision, not a suggestion that, they would have a voice in Congress thereafter.
 
 See
 
 Mem. Amici Curiae for Professors James D.A. Boyle et al. at 21 n. 13; Raven-Hansen,
 
 supra,
 
 at 172 n. 24.
 

 [28]
 

 .
 
 Cf. U.S. Term Limits, Inc.,
 
 514 U.S. at 816, 115 S.Ct. 1842 (examining 1807 congressional debates as "further evidence of the general consensus” regarding meaning of Article I, section 2, clause 2).
 

 [29]
 

 . Paralleling our analysis in the previous section, the author of this letter to Congress wrote that “we cannot hope to have our situation ameliorated” by the Constitution for two reasons. ENQUIRIES INTO THE NECESSITY,
 
 supra,
 
 at 16. First, he noted:
 

 In the 2d Section of the 1st article, the rule of representation is settled. "The House of Representatives shall be composed- of members, chosen every second year, by the people of the several states,” but if we cease to be of any state, we can derive no benefit from that clause.
 

 Id.
 
 Second, he noted that the same section also "excludes us from the privilege of voting for members of congress” because
 

 [T]he provision is, that 'the electors in each state shall have the qualification requisite for electors of the most numerous branch of the state legislature,’ and if we are not qualified to vote for the state legislature, we are not qualified to vote for members of congress.
 

 Id.
 
 at 18-19.
 

 [30]
 

 . Other debates concerning the District also reflected the understanding that District residents would lack a vote in the national Congress.
 
 See
 
 FEDERAL GAZETTE & BALTIMORE DAILY ADVERTISER, Feb. 21, 1801, at 2 (remarks of Rep. Gallatin) (“[T]his was not the fault of the present congress: if any fault, it laid with the [constitutional] convention, who expressly provided that exclusive jurisdiction should be assumed, and therefore the people [of the District] could not be represented in the general government.”); FEDERAL GAZETTE & BALTIMORE DAILY ADVERTISER, Feb. 26, 1801, at 2 (reporting that "Mr. Nicholson, as a representative of the state of Maryland could not avoid expressing his opinion, upon a subject so highly interesting to a part of the people of that state, who were divested, by the assumption of jurisdiction, ... of the right of voting for ... the house of representatives to the general government. There ought to be, in his opinion, some weighty reasons urged why they should not be possessed with other rights as great, in the election of their local legislature.”); WASHINGTON FEDERALIST, Mar. 3, 1801, at 2 (reporting same statement by Rep. Nicholson) [all sources available in Newspaper and Current Periodical Reading Room, Library of Congress].
 

 [31]
 

 . Woodward was a friend and protege of Thomas Jefferson, who appointed him judge of the Supreme Court of the Michigan Territory in 1805.
 
 See
 
 Richard P. Cole,
 
 Law and Community in the New Nation: Three Visions for Michigan, 1788-1831, 4 S.
 
 CAL. INTER-DISC, L.J. 161, 196-98 (1995).
 

 [32]
 

 . In another pamphlet, written under the pseudonym Epaminondas, Woodward opposed the suggestion that “it is better for Congress never to assume the jurisdiction." 5 EPAMINONDAS ON THE GOVERNMENT OF THE TERRITORY OF COLUMBIA 9 (1801) (available in Rare Book/Special Collections Reading Room, Library of Congress). Constitutional amendment was to be preferred, he said, and was “the
 
 exclusive
 
 and
 
 only
 
 remedy.”
 
 Id.
 
 (emphasis in original).
 

 [33]
 

 . In 1818, President Monroe, who had been a delegate to the Virginia ratifying convention, noted that the people of (he District of Columbia “have no participation” in Congress' exercise ofpower over them, and asked Congress to consider "whether an arrangement better adapted to the principles of our Government” might be possible. 33 ANNALS OF CONG. 18 (1818). No specific arrangement was proposed.
 
 See generally
 
 3 STORY,
 
 supra
 
 note 25, § 1218 (1833) (noting that inhabitants of the District "are not indeed citizens of any state, entitled to the privileges of such, but are citizens of ihe United States” and that “[tjhey have no immediate representatives in congress”).
 

 [34]
 

 .
 
 See e.g.,
 
 COLUMBIAN MIRROR & ALEXANDRIA GAZETTE (Alexandria, Va.), Apr. 13, 1799 through Dec. 6, 1800 (further dates unavailable); FEDERAL GAZETTE & BALTIMORE DAILY ADVERTISER (Baltimore, Md.), July 1, 1800 through Dec. 31, 1801
 
 *54
 
 (further dates unavailable); WASHINGTON FEDERALIST (Georgetown, D.C.), Sept. 25, 1800 through Dec. 29, 1802 [all sources available in Newspaper and Current Periodical Reading Room, Library of Congress]. To the contrary, the newspapers extensively reported the congressional debates on the Organic Act, which frequently expressed the understanding that District residents would not have a vote in Congress.
 
 See, e.g.,
 
 FEDERAL GAZETTE, Feb. 19, 1801, at 2 (remarks of Rep. Smilie); WASHINGTON FEDERALIST, Feb. 24, 1801, at 2 (same);
 
 see also
 
 FEDERAL GAZETTE, Feb. 19, 1801, at 2 (remarks of Rep. Dennis); FEDERAL GAZETTE, Feb. 21, 1801, at 2 (remarks of Rep. Gallatin); FEDERAL GAZETTE, Feb. 26, 1801, at 2 (remarks of Rep. Nicholson).
 

 A resident of the former Virginia territory did sue for the right to vote in Virginia state elections.
 
 See Custis v. Lane,
 
 17 Va. (3 Munf.) 579 (1813). The Virginia Supreme Court, however, rejected the claim on the ground that plaintiff was no longer a citizen of that state. Reflecting the same understanding as that in the congressional debates, the court held: “That he is no longer within the jurisdiction of the commonwealth of Virginia, is manifest from this consideration, that congress are vested, by the constitution, with exclusive power of legislation over the territory in question
 
 .Id.
 
 at 591.
 

 [35]
 

 . As we discuss below, this conclusion is not inconsistent with the fact that the right to vote for federal officers is a right of national citizenship.
 
 See infra
 
 Part V.B and note 69.
 

 [36]
 

 . The jurisdictional statement attacked the lower court opinion for failing to accept the significance of the fact that, through the effective date of the 1801 Organic Act, Maryland continued to designate its District lands as part of the state’s federal congressional districts.
 
 See
 
 Jurisdictional Statement at 4-5,
 
 Albaugh v. Tawes,
 
 379 U.S. 27, 85 S.Ct. 194, 13 L.Ed.2d 173 (1964) (No. 481) [hereinafter
 
 Albaugh
 
 Jurisdictional Statement];
 
 cf. infra
 
 Part IV.B.2. It further argued that since "[t]he District of Columbia territory, like the rest of the State of Maryland, was a charter member of the United States,” its citizens "have always been citizens of the State of Maryland and under the perpetual protection of the ... ‘equal privileges' clause.”
 
 Albaugh
 
 Jurisdictional Statement at 7 (citing U.S. CONST, art. IV, § 2, cl. 1). This meant, plaintiff said, that the right of District citizens to vote could not constitutionally be denied.
 
 See id..; cf. infra
 
 Part IV.B.3;
 
 infra
 
 Part V.B. The jurisdictional statement also raised the claim, made by ami-cus here, that the Organic Act. was not intended to “repeal[] the existing Maryland Congressional election regulations which defined the District of Columbia as a part of the State of Maryland,” since it provided “that the laws of the State of Maryland, as they now exist, shall be and continue in force.”
 
 Albaugh
 
 Jurisdictional Statement at 6 (quoting 2 Stat. 103, § 1);
 
 cf. infra
 
 note 46.
 

 [37]
 

 .
 
 See Howard v. State Admin. Bd.,
 
 122 F.3d 1061, 1997 WL 561200 (4th Cir.1997) (unpublished opinion),
 
 aff’g
 
 976 F.Supp. 350 (D.Md. 1996) (holding that plaintiff's argument, that as “a resident of the District of Columbia . .. he has the right to participate in congressional elections in the Stale of Maryland,” is "foreclosed by” Albaugh). The Committee for the Capital City, amicus curiae here, was also amicus in
 
 Howard.
 

 [38]
 

 .
 
 See
 
 An Act to Cede to Congress a District of Ten Miles Square in This State for the Seat of Government of the United States, 2 Kilty Laws of Md., ch. 46 (1788);
 
 see also
 
 An Act for the Cession of Ten Miles Square, or Any Lesser Quantity of Territory Within This State, to the United States, in Congress Assembled, for the Permanent Seat of the Gen
 
 *58
 
 eral Government, 13 Va. Stat. at Large, ch. 32, at 43 (Hening 1823) (enacted 1789).
 

 [39]
 

 .
 
 See generally
 
 BOWLING,
 
 supra
 
 note 25, at 127-207.
 

 [40]
 

 .
 
 See
 
 An Act for Establishing the Temporary and Permanent Seat of the Government of the United States, 1 Stat. 130 (1790). The Act stated:
 

 SECTION 1.... That a district of territory, not exceeding ten miles square, to be located as hereafter directed on the river Potomac, at some place between the mouths of the Eastern Branch and Connogochegue, be, and the same is hereby accepted for the permanent seat of the government of the United States.
 
 Provided nevertheless.
 
 That the operation of the laws of the state within such district shall not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide.
 

 SEC. 6.... That on the said first Monday in December, in the year one thousand eight hundred, the seat of the government of the United States shall, by virtue of this act, be transferred to the district and place aforesaid.
 

 Id.
 

 [41]
 

 . An Act Concerning the Territory of Columbia and the City of Washington, 1791 Md. Acts ch. 45, § 2. As noted above, Congress
 
 *59
 
 rctroceded the Virginia portion of the District in 1846.
 

 [42]
 

 . In addition to the District Clause and the Act of 1790, the court relied on the proviso in the Virginia cession act, which stated that “the jurisdiction of the laws of this commonwealth over the persons and property of individuals residing within the limits of the cession aforesaid, shall not. cease or determine, until congress, having accepted the said cession, shall by law provide for the government thereof, under their jurisdiction, in manner provided by the [District Clause].”
 
 Hammond,
 
 26 F. Cas. at 97 (quoting 13 Va. Stat. at Large, ch. 32, at 43);
 
 see also
 
 1791 Md. Acts ch. 45, § 2 (parallel proviso in Maryland’s ratification of its cession).
 

 [43]
 

 . The three-judge court in
 
 Albaugh
 
 held that "[s]ince the 'Organic Act of 1801,’ it has been uniformly recognized ... that residents of the District of Columbia are no longer citizens of the State of Maryland.” 233 F.Supp. at 578.
 

 [44]
 

 . In
 
 Hammond,
 
 26 F.Cas. at 99, the court held that "[b]y the constitution, congress could not exercise exclusive legislation over the district until it had become the seat of government.” Even if we were to assume to the contrary that Congress acquired the authority to exercise exclusive control over the District in 1790, that would not change the analysis. Whatever Congress'
 
 authority
 
 may have been during the interim period, it left control of the area to Maryland and Virginia. Since 1801, however, Congress has continuously exercised exclusive authority over the District. It is thus unnecessary for us to consider whether District residents would be able to vote had Congress never exercised its authority, or had it subsequently ceded partial authority back to the state.
 
 See
 
 discussion of
 
 Evans v. Cornman,
 
 398 U.S. 419, 90 S.Ct.
 
 *60
 
 1752, 26 L.Ed.2d 370 (1970),
 
 infra
 
 Part IV. B.4.
 

 [45]
 

 . In 1801, Maryland law provided that "[t]he election of representatives for the state to serve in congress, shall be made by the citizens of this state, qualified to vote for members of the house of delegates.” A DIGEST OF THE LAWS OF MARYLAND 227 (Herty 1799). Maryland's Constitution, in turn, imposed,
 
 inter alia,
 
 a 12-month residency requirement on voting for members of the House of Delegates.
 
 See
 
 MD. CONST, of 1776, art. II,
 
 reproduced in 4
 
 SOURCES AND DOCUMENTS OF UNITED STATES CONSTITUTIONS 376 (William F. Swindler ed., 1975). The current Maryland Constitution provides that only those "resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote.” MD. CONST, art. 1, § 1.
 

 [46]
 

 . The Committee for the Capital City, appearing as amicus curiae, contends that District residents retain their right to vote in Maryland because Maryland's laws were never effectively terminated in the District.
 
 See
 
 Br. of the Committee for the Capital City at 1-2. It notes that in accepting the ceded territory in 1790, Congress stated that "the laws of the state within such district shall not be affected ... until Congress shall otherwise by law provide.”
 
 Id.
 
 at 11 (quoting 1 Stat. 130, § 1). Congress never did "otherwise provide,” the Committee argues, because the Organic Act of 1801 merely stated that "the laws of the state of Maryland, as they now exist, shall be and continue in force.”
 
 Id.
 
 at 10 (quoting 2 Stat. 195, § 1). Hence, it contends, "Congress has never enacted legislation that repealed or superseded those Maryland laws, and therefore they still apply — by the express terms of the Act of 1801 establishing the District's local governance — to those persons living in that portion of the State of Maryland that was ceded to the federal government.”
 
 Id.
 
 at 11-12.
 

 This is simply a misinterpretation of the 1801 statute. By continuing the authority of Maryland's laws "as they now exist,” Congress did nothing more than fix them (as they stood as of that date) as a part of the common law
 
 of the District;
 
 without such a provision the new District would have had no laws upon which to build. It did not, however, provide any continuing governmental or regulatory authority to Maryland.
 
 See generally Brooks v. Laws,
 
 208 F.2d 18, 25 (D.C.Cir.1953);
 
 Hammond,
 
 26 F. Cas. at 98;
 
 see also Reily,
 
 6 U.S. (2 Cranch) at 356-57. Indeed, Maryland had renounced any such authority.
 
 See
 
 1791 Md. Acts ch. 45, § 2. In any event, in 19Q1 Congress expressly repealed the applicability to the District of acts of the Maryland Assembly, retaining only the common law and the British statutes in force in Maryland on February 27, 1801 (where consistent with provisions of the D.C.Code).
 
 See
 
 Act of March 3, 1901, ch. 854, 31 Stat. 1189, 1434.
 
 See generally Brooks,
 
 208 F.2d at 25;
 
 Williams v. United States,
 
 569 A.2d 97, 99 (D.C.1989).
 

 [47]
 

 . One important piece of evidence of an understanding that District residents would not continue to vote in those states is contained in Article I, section 2, clause 2, which provides that no person may be a representative unless "an Inhabitant of that State in which he shall be chosen.” U.S. CONST. art. I, § 2. cl. 2;
 
 see also id.
 
 art. I, § 3, cl, 3 (imposing same restriction on senators). Even if the residents of the District could be characterized as "residual citizens” of their former states, they surely are not "inhabitants” thereof. Plaintiffs' theory would make the District the only area where all of the-voters are constitutionally unqualified to serve as their own representatives.
 

 [48]
 

 .
 
 See supra
 
 Part IV.A.2;
 
 see also
 
 ENQUI-RIES INTO THE NECESSITY,
 
 supra,
 
 at 15-16 (warning that effect of assumption of jurisdiction by Congress would be that "the Territory of Columbia [would] cease[] to be component parts of the states respectively, to which it formerly belonged,” and that residents would thereby lose their “share in electing the members of congress”).
 

 [49]
 

 . Although the Equal Protection Clause “restrains the States from fixing voter qualifications which invidiously discriminate.”.
 
 Harper v. Virginia Bd. of Elections,
 
 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (declaring Virginia poll tax unconstitutional), the Court has not questioned "the power of a State to impose reasonable residence restrictions on the availability of the ballot,”
 
 id.
 
 at 666, 86 S.Ct. 1079.
 
 See Carrington v. Rash,
 
 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (emphasizing that states are "free to take reasonable and adequate steps ... to see that all applicants for the vote actually fulfill the requirements of bona fide residence");
 
 see also Saenz v. Roe,
 
 526 U.S. 489, 119 S.Ct. 1518, 1528 (1999) (noting that "Citizenship Clause of the Fourteenth Amendment expressly equates citizenship with residence”).
 

 [50]
 

 . Nor did any of those statutes purport to disenfranchise District residents: none addressed the issue of voting rights at all.
 

 [51]
 

 . Plaintiffs also contend that the Overseas Citizens Voting Rights Act (OCVRA) of 1975, 42 U.S.C. § 1973ff-l, by which Congress required the states to permit overseas Americans to vote absentee in the last state in which they were domiciled, shows that Americans retain a residual citizenship in their former states where necessary to vindicate the right to vote in congressional elections.
 
 See Alexander Pl
 
 s.’ Summ. J. Mem. at 51-53. Congress premised the OCVRA on a "reasonable extension of the bona fide residence concept.”
 
 Attorney Gen. of Guam,
 
 738 F.2d at 1019 (quoting H.R. REP. NO. 94-649, at 7 (1975)). There is a significant distinction between extending the right to vote to individuals who themselves once lived in a specific state, and extending it to other individuals who never have, based on the fact that still others were residents of Maryland 200 years ago.
 

 [52]
 

 . Although the constitutional text indicates that Congress has "like Authority” over both the District and the enclaves, the text does refer to them differently. The District is described as being created by "Cession” of particular states, a word which indicates tha1 thereafter the District would no longer be part of those states. Enclaves, on the other hand, are areas purchased with the consent of the legislature of the state "in which the
 
 *64
 
 Same shall be,” which may explain why
 
 Evans
 
 viewed enclaves as remaining parts of the states from which they were created. We need not resolve the significance of this difference in constitutional language, however, because the difference in the way in which Congress has exercised its authority over enclaves and the District distinguishes this case from
 
 Evans
 
 in any event.
 
 See
 
 discussion
 
 infra
 
 pp. 63-64.
 

 [53]
 

 . Indeed, the three-judge district court whose decision the Supreme Court affirmed expressly distinguished that case from a hypothetical in which the federal government did assert exclusive jurisdiction over an enclave.
 
 See Cornman v. Dawson,
 
 295 F.Supp. 654, 656 (D.Md.1969). For the same reason, the fact that Maryland’s initial statute ceding NIH, like the statute ceding the District, gave the federal government the ability to exercise exclusive authority over NIH is not decisive, since Congress plainly did not do so.
 

 [54]
 

 . We disagree with the dissent’s'suggestion that Congress' delegation of authority to the District government puts the District’s situation on a par with that of the NIH enclave in
 
 Evans.
 
 In the latter circumstances, Congress delegated authority to another sovereign (Maryland), and the Court held that sovereign could not treat two classes of residents (those within and without the enclave) differently. Here, by contrast, Congress has merely delegated some of its power to its own creature, the District government. The governmental structure through which Congress chooses to exercise its authority over the District — provided it does not delegate that authority to another sovereign — cannot be determinative of the voting rights of District residents.
 

 [55]
 

 . There appear to have been two steps to the
 
 Evans
 
 analysis. First, in rejecting the "fiction of a state within a state,” the court rejected the suggestion that the NIH grounds ceased to be part of Maryland when the enclave was created.
 
 See Evans,
 
 398 U.S. at 421, 90 S.Ct. 1752. The rationale for this declaration was unstated, other than by reference to the Court’s prior similar statement in
 
 Howard.
 
 Standing alone, this declaration would appear' to be in tension with the affirmance in
 
 Al-
 
 
 *65
 

 baugh,
 
 although a difference in the constitutional language describing the District and the enclaves could explain it.
 
 See supra
 
 note 52. As discussed above, however, the Court did not rest its decision on this first step, but instead went on to consider whether enclave residents had a stake in the elections equal to that of other Maryland residents.
 
 See Evans,
 
 398 U.S. at 426, 90 S.Ct. 1752.
 

 [56]
 

 .
 
 See O’Donoghue,
 
 289 U.S. at 541, 53 S.Ct. 740 (holding that judges of District of Columbia are Article III judges whose salaries cannot be decreased).
 
 But see id.
 
 at 539-40, 53 S.Ct. 740 ("The object of the grant of exclusive legislation over the district was, therefore, national in the highest sense, and the city organized under the grant became the city,
 
 not of a state,
 
 not of a district, but of a nation.”) (internal quotation omitted) (emphasis added).
 

 [57]
 

 . The
 
 Adams
 
 plaintiffs, but not the
 
 Alexander
 
 plaintiffs, also allege that their lack of representation renders them unequal to the residents of Alexandria County, Virginia (formerly a part of the District) as well as to the residents of the states "which started their organized political lives as territories of the Unites States.”
 
 Adams
 
 Mot. for Summ. J. at 51.
 

 [58]
 

 . Plaintiffs do not, however, contend that the Equal Protection Clause bars states from imposing state residency as a qualification for voting.
 
 See supra
 
 note 49.
 

 [59]
 

 . As noted above, the principal rationale noted by Madison for exclusive congressional control over the District — ensuring that Congress would not have to depend upon another sovereign for its protection — does not appear to be relevant to the issue of voting rights.
 
 See supra
 
 note 25.
 

 [60]
 

 . “The inclusion of the electoral college in the Constitution, as the result of specific historical concerns,” the Court said, "validated the collegiate principle despite its inherent numerical inequality
 
 ...Gray,
 
 372 U.S. at 378, 83 S.Ct.. 801.
 

 [61]
 

 . The Court noted that "Lt]he first and second requirements are set forth explicitly in Article 1, § 2, of the Constitution,” and that "[t]he requirement that districts not cross state borders appears to be implicit in the text and has been recognized by continuous historical practice."
 
 Montana,
 
 503 U.S. at 448 n. 14, 112 S.Ct. 1415.
 

 [62]
 

 . The dissent contends that the Equal Protection Clause is also violated by the disparity in treatment between District residents and overseas voters. As discussed
 
 supra
 
 note 51, in the Overseas Citizens Voting Rights Act. (OCVRA), 42 U.S.C. § 1973ff-l. Congress required the states to permit Americans living overseas to vote absentee in the last state in which they were domiciled. Allhough the constitutionality of the OCVRA has not been tested, it depends upon the validity of Congress' premise that the Act. is a “reasonable extension of the bona fide residence concept” for individuals who once lived in a specific state.
 
 Attorney Gen. of Guam,
 
 738 F.2d at 1019 (quoting H.R. REP. NO. 94-649, at 7 (1975)). The instant lawsuits, brought on behalf of all District residents regardless whether they have ever lived in a state, cannot rely on such a premise.
 

 [63]
 

 . One of the claims in the
 
 Adams
 
 complaint does challenge a species of legislative action: Congress’ continued exercise of exclusive federal authority over the District — or at least over the private residential portions of the District outside of the National Capital Service Area (the part of the District containing the principal federal buildings and offices). The
 
 Adams
 
 plaintiffs contend that Congress' decision to exercise exclusive authority over the District in local matters, yet to cede similar authority to the states in the federal enclaves, violates equal protection. This claim, however, challenges Congress’ continuing authority over the District
 
 regardless
 
 of whether District residents may vote for Congress.
 
 See Adams
 
 Pls.’ Opp’n at 72 n. 41 (stating that even if District residents had representatives in Congress, Congress’ exercise of authority over local District matters would be unconstitutional as long as representatives from places other than District are members of that body). It thus does not come within our jurisdictional mandate to decide apportionment challenges, and we therefore remand it to the single-judge district court.
 
 See
 
 discussion
 
 supra
 
 Part II.
 

 [64]
 

 . "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States .... ” U.S. CONST, amend. XIV, § 1.
 

 [65]
 

 . Plaintiffs do not rely on the "Privileges and Immunities” Clause of Article IV.
 
 See
 
 U.S. CONST, art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.”).
 

 [66]
 

 . Although the House defendants dispute this proposition,
 
 see
 
 House Opp’n to Pis.’ Mot. for Summ. J. at 34, our disposition of plaintiffs’ claim makes it unnecessary to decide the issue.
 

 [67]
 

 .
 
 See also U.S. Term Limits, Inc.,
 
 514 U.S. at 805, 115 S.Ct.. 1842 (noting that " '[w]hile, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states,’ ” in fact it “was a new right, arising from the Constitution itself”) (quoting
 
 United States v. Classic,
 
 313 U.S. 299, 314-15, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941));
 
 id.
 
 at 820-21, 115 S.Ct. 1842 (noting “that the right to choose representatives belongs not to the States, but to the people”).
 

 [68]
 

 . While our dissenting colleague does not dispute the national citizenship of territorial residents, he does distinguish them from District residents on two grounds. First, he argues that the territories were never part of the "several States,” and hence that their current residents are not the political posterity of individuals who at one time were “people of the several States.” Whether or not this distinction is constitutionally significant, a point addressed
 
 supra
 
 Part IV.B, it proceeds from the premise that it is Article I (from which the quoted phrases are taken) that gives content to the "national" right to vote. But Article I, as we explain below, is precisely what withholds that right from District residents. The dissent also contends that the territories may be distinguished from the District on the ground that they were expected eventually to become states, thus rendering their condition temporary. Although it may be possible to distinguish the territories in this way, the Supreme Court relied on just that distinction to hold that although territorial residents came within the protection of (the then-existing version of) 42 U.S.C. § 1983, District residents did not.
 
 See District of Columbia v. Carter,
 
 409 U.S. 418, 431-32, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) ("[I]n light of the transitory nalure of the territorial condition, Congress could reasonably treat the Territories as inchoate States, quite similar in many respects to the States themselves, to whose status they would inevitably ascend. The District of Columbia, on the other hand, is an exceptional community ... established under the Constitution as the seat of the National Government.”) (internal quotation omitted).
 

 [69]
 

 . This does not, as both Justice Kennedy’s concurrence and prior opinions of the Court make clear, mean that “electors for members of Congress owe their right to vote to the State law.”
 
 U.S. Term Limits, Inc.,
 
 514 U.S. at 842, 115 S.Ct. 1842 (Kennedy, J., concurring) (quoting
 
 Ex parte Yarbrough,
 
 110 U.S. at 663-64, 4 S.Ct. 152). Ralher, "even though the Constitution uses the qualifications for voters of the most numerous branch of the States’ own legislatures to set the qualifications of federal electors, Art.. I, § 2, cl. 1, when these electors vote, we have recognized that they act in a federal capacity and exercise a federal right.”
 
 Id.
 
 at 842, 115 S.Ct. 1842. In short, the Constitution incorporates, or "adopts the qualification thus furnished as the qualification of its own electors for members of Congress.”
 
 Ex parte Yar-brough,
 
 110 U.S. at 663, 4 S.Ct. 152.
 

 [70]
 

 .
 
 See also U.S. Term Limits, Inc.,
 
 514 U.S. at 840, 115 S.Ct. 1842 (Kennedy, J., concurring) ("[T]he Constitution takes care both to preserve the States and to make use of their identities and structures at various points in organizing the federal union.”).
 

 [71]
 

 . The Qualifications Clause for the House of Representatives reads: "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.” U.S. CONST, art. I, §'2, cl. 2. The analogous clause for the Senate reads: “No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.”
 
 Id.
 
 art. I, § 3. cl. 3.
 

 [72]
 

 . The Supreme Court has also held that the "procedural component of the Due Process Clause does not 'impose a constitutional limitation on the Llegislalive] power of Congress ...."’
 
 Atkins
 
 v.
 
 Parker,
 
 472 U.S. 115, 129, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (quoting
 
 Richardson v. Belcher,
 
 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971)).
 

 [73]
 

 .
 
 Cf. New York,
 
 505 U.S. at 185, 112 S.Ct. 2408 (suggesting, without deciding, that “perhaps not all claims under the Guarantee Clause present nonjusticiable political questions”).
 

 [74]
 

 .
 
 Cf. Carliner,
 
 412 F.2d at 1091 (holding insubstantial the claim that then-existing city council was unlawful because not elected by District residents);
 
 Breakefield,
 
 442 F.2d at 1229.
 
 See generally Shook v. District of Columbia Fin. Responsibility & Management Assistance Auth.,
 
 132 F.3d 775, 781 (D.C.Cir. 1998) (holding that "Congress’ authorization to the Control Board to reduce, even drastically, the powers of the [elected] Board of Education does not raise an independent constitutional issue”).
 

 [75]
 

 .
 
 See
 
 cases cited
 
 supra
 
 Part IV.A.3;
 
 see also United States v. Thompson,
 
 452 F.2d 1333, 1341 (D.C.Cir.1971) ("[F]or residents of the District, the right to vote in congressional elections is ... totally denied. This regrettable situation is a product of historical and legal forces over which this court has no control.”);
 
 cf. Representation for the District of Columbia: Hearings Before the Subcomm. on Civil and Constitutional Rights of the Comm, on the Judiciary,
 
 95th Cong. 131 (1978) (statement of Patricia M. Wald, Assistant Attorney General) (explaining that "constitutional amendment is necessary” to provide District with voting representation because "we do not believe that the word 'state' as used in Article I can fairly be construed to include the District”).
 

 [1]
 

 . I agree with the majority that the plaintiffs have standing to pursue their claims for representation in the House of Representatives.
 
 See
 
 Maj. Op. Part III. I also agree that the claims against the Senate defendants and the District of Columbia Financial Responsibility and Management Assistance Authority (the Control Board) do not involve apportionment, the sole business of this three-judge court.
 
 See
 
 Maj. Op. Part II. Accordingly, those claims are addressed in a separate memorandum and order, also filed today.
 
 See Adams v. Clinton,
 
 Nos. 98-1665, 98-2187 (D.D.C. Mar. 20, 2000).
 

 [2]
 

 . In 1846, those portions of Virginia which had been ceded to the United States to form the District were retroceded to Virginia.
 
 See infra
 
 note 23.
 

 [3]
 

 .
 
 See Heald v. District of Columbia,
 
 259 U.S. 114, 124, 42 S.Ct. 434, 66 L.Ed. 852 (1922) (dictum stating that "[r]esidents of the District lack the [right of] suffrage”);
 
 see also Loughborough v. Blake,
 
 18 U.S. 317, 324, 5 Wheat. 317, 5 L.Ed. 98 (1820) (dictum stating that inhabitants of the District are "a part of the society ... which has voluntarily relinquished the right of representation, and has adopted the whole body of Congress for its legitimate government ....”) (Marshall, C.j,); infra Part II.B, II.C,2.c.vi; Maj. Op. at notes 29, 30, 32, 34 and accompanying text (summarizing statements of various Congressmen and commentators around time of adoption of Organic Act of 1801).
 

 [4]
 

 .
 
 See Adarand Constructors, Inc. v. Pena,
 
 515 U.S. 200, 217-18, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995);
 
 Weinberger v. Wiesenfeld,
 
 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975);
 
 Bolling v. Sharpe,
 
 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
 

 [5]
 

 .
 
 Evans v. Cornman,
 
 398 U.S. 419, 426, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970).
 

 [6]
 

 . Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff.
 

 [7]
 

 . According to the 1990 Decennial Census, the population of the District of Columbia as of April 1, 1990, was approximately 607,000. U.S. Census Bureau, The Official Statistics, Statistical Abstract of the United States (1998). As of 1990, there were three States with populations less than the District, each of which were each allocated one Representative: Alaska, population: 551,947; Vermont, population: 564,964; Wyoming, population: 455,975.
 
 Alexander
 
 Plaintiffs' Statement of Undisputed Facts, Tab 3. There were three States with populations under 700,000 which were also each allocated one Representative: Delaware, population: 668,696; North Dakota, population: 641,364; South Dakota, population: 699,999.
 
 Id..
 

 [8]
 

 . From 1774 through the end of the Revolutionary War in 1783, Congress met in Philadelphia, Baltimore, and York, Pennsylvania. From 1783 through 1789, it met primarily in Philadelphia, but also in Princeton, New Jersey, Annapolis, Maryland, Trenton, New Jersey, and New York City.
 
 See
 
 Kenneth R. Bowling, The Creation of Washington, D.C. 15-19, 43-73 (1991); Walter Fairleigh Dodd, The Government of the District of Columbia
 
 Ill'S
 
 (1909); William Tindall, Origin and Government of the District of Columbia 13, 30-57 (1909).
 

 [9]
 

 .
 
 See
 
 Dodd,
 
 supra
 
 note 8, at 12-13; 2 Joseph Story, Commentaries on the Constitution § 1219 (Melville M. Bigelow, 5th ed.1905); Bowling,
 
 supra
 
 note 8, at 29-34.
 

 [10]
 

 .
 
 See
 
 2 Story,
 
 supra
 
 note 9, § 1219; Bowling,
 
 supra
 
 note 8, at 29-34; Dodd,
 
 supra
 
 note 8, at 13; Roy P. Franchino,
 
 The Constitutionality of Home Rule and National Representation for the District of Columbia,
 
 46 Georgetown L.J. 207, 209 (1957-58).
 

 [11]
 

 . On February 21, 1787, Congress had called for "a convention of delegates ... appointed by the several states” to meet in Philadelphia to propose revisions to the 1781 Articles of Confederation. Documents Illustrative of the Formation of the Union of American States (Charles C. Tansill ed.1927).
 

 [12]
 

 . 2 Story,
 
 supra
 
 note 9, § 1219; Dodd,
 
 supra
 
 note 8, at 19; Bowling,
 
 supra
 
 note 8, at 84. Some delegates also objected to the imper-manency of the site of Congress’ meetings. As Rufus King of Massachusetts stated, ’’[t]he mutability of the place had dishonored the federal [Government] and would require as strong a cure as we could devise.” 3 Philip B. Kurland & Ralph Lerner, The Founders’ Constitution 218 (1987);
 
 see
 
 Bowling,
 
 supra
 
 note 8, at 75-76; Dodd,
 
 supra
 
 note 8, at 19.
 

 [13]
 

 .
 
 See 2
 
 Story,
 
 supra
 
 note 9, § 1219; Franchino,
 
 supra
 
 note 10, at 209.
 

 [14]
 

 . Indeed, George Mason withdrew his proposal that would have prohibited the Seat of Government from occupying the same location as any State’s seat of government, which he made because he thought that joint capitals would lead to jurisdictional disputes and lower the tone of the national legislature’s deliberations, in the face of concerns that such prohibition "might make enemies of [Philadelphia and New York] which had expectations of becoming the Seat of the [General Government].” 3 Kurland & Lerner,
 
 supra
 
 note 12, at 218; Bowling,
 
 supra
 
 note 8, at 75; Dodd,
 
 supra
 
 note 8, at 19-20
 

 [15]
 

 .
 
 See
 
 Dodd,
 
 supra
 
 note 8, at 20.
 

 [16]
 

 .
 
 See
 
 Bowling,
 
 supra
 
 note 8, at 75. The only references to voting by the inhabitants by the yet-to-be-selected Seat of Government occurred during the ratification process. These references, by James Miadison, Alexander Hamilton and Thomas Tredwell, are discussed in detail
 
 infra
 
 § Part II.C.2.b.
 

 [17]
 

 .
 
 See
 
 Bowling,
 
 supra
 
 note 8, at 129.
 

 [18]
 

 .
 
 See
 
 Tindall,
 
 supra
 
 note 8, at 94.
 

 [19]
 

 . U.S. Department of Commerce, Bureau of the Census, Historical Statistics of the United States: Colonial Times to 1970, Bicentennial Edition, Part 2, at 26 (1975).
 

 [20]
 

 .
 
 See
 
 Memorandum Amici Curiae at 17 (filed Feb. 26, 1999); Tindall,
 
 supra
 
 note 8, at 17; Peter Raven-Hansen, Congresssional Representation for the District of Columbia: A Constitutional Analysis, 12 Harv. J. on Legis. 167, 174 (1975). In addition, there is direct evidence that residents of the District between 1790 and 1800 were eligible to vote for Congressional representatives through the ceding state. For example, Thomas Beall, a resident of Georgetown during those years, an area encompassed by the newly-drawn District boundaries, was a representative in the Maryland House of Delegates in 1800. Archive of Maryland, new series I, An Historical List of Public Officials of Maryland, Vol. 1, at 229 (Maryland State Archives, 1990). The Maryland Constitution then in effect required that representatives to its house of delegates be eligible to vote in the county which they represented. Maryland Constitution (1776). The United States Constitution provides that those persons eligible to vote for representatives to the "most numerous branch of the State Legislature” are also eligible to vote for the House of Representatives. U.S. Const, art. I, § 2. Accordingly, Thomas Beall, a resident of the District, was eligible to vote in Maryland’s state and federal elections in 1800 (and almost surely voted for himself!). A Biographical Dictionary of the Maryland Legislature, 1635-1789, Vol. 1: A-H, at 124 (Edward C. Papneluse, Alan F. Day, David W. Jordan, Gregory A. Stiverson eds.).
 

 [21]
 

 . Tindall,
 
 supra
 
 note 8, at 17; Raven-Hansen,
 
 supra
 
 note 20, at 174-76.
 

 [22]
 

 .
 
 See
 
 Maj. Op. at notes 29, 30, 32, 34 and accompanying text.
 

 [23]
 

 . On July 9, 1846, Congress authorized the retrocession to Virginia of the County of Alexandria, contingent on the assent of its residents. An Act to Retrocede the County of Alexandria, in the District of Columbia, to the State of Virginia, 9 Stat. 35 (1846). In a submission to Congress, a "committee appointed by the common council of Alexandria” described some of the motives for seeking retrocession:
 

 We are deprived of the elective franchise, a privilege so dear and sacred that, we would present its deprivation in the strongest light before your honorable body. Side by side with trial by jury and the writ of habeas corpus may be placed the rights of the ballot box. It is not unworthy to remark that while the principles of free government are yearly extending wilh the rapid march of civilization, and thrones and dynasties are yielding to their influence, here alone in the 10 miles square in and about the capital of this great country is there no improvement, no advance in popular rights.
 

 Tindall,
 
 supra
 
 note 8, at. 110. The committee also mentioned the failure of Congress to regularly update the laws of Virginia, which, absent congressional revision, had remained in effect throughout Alexandria County in their 1801 form.
 
 Id.
 
 at 109-110. After the retrocession took effect, the District of Columbia consisted entirely of only the territory ceded by Maryland.
 

 [24]
 

 .
 
 See
 
 Dodd,
 
 supra
 
 note 8, at 30.
 

 [25]
 

 . As distinguished from the municipalities of Washington, Georgetown and (from 1790 to 1846) Alexandria. Congress incorporated the City of Washington in 1802, providing for a council elected annually "by the free white male inhabitants of full age, who have resided twelve months in the city, and paid taxes therein the year preceding the election’s being held.” An Act to Incorporate the Inhabitants of the City of Washington, in the District of Columbia, 2 Stat. 195, ch. 53, § 2 (1802). The County of Washington was governed by a "levy court” the members of which were ap- , pointed by the President.
 
 See
 
 Dodd,
 
 supra
 
 note 8, at 27-38. In 1805, Congress provided Georgetown with a council elected along the lines of the City of Washington’s.
 
 Id.
 

 [26]
 

 .
 
 See also
 
 Tindall,
 
 supra
 
 note 8, at 141;
 
 see generally
 
 Franchino,
 
 supra
 
 note 10, at 214-223.
 

 [27]
 

 . The Twenty-Third Amendment provides:
 

 Section 1. The District constituting the seat of Government of the United States shall appoint in such manner as Congress may direct:
 

 A number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.
 

 U.S. Const, amend. XXIII.
 

 [28]
 

 . Over the years, Congress has similarly relaxed its exclusive jurisdiction in enclaves.
 

 See infra
 
 Part III.
 

 [29]
 

 . The judges of these courts are appointed by the President, and they displace the general jurisdiction formerly exercised by the fedeial District Court and Court of Appeals for the District of Columbia.
 

 [30]
 

 . Delaware's population in 1800 was approximately 64,000; the District’s was approximately 8,000. U.S. Department of Commerce, Bureau of the Census, Historical Statistics of the United States: Colonial Timcs to 1970, Bicentennial Edition, Part. 2, at 25 (1975).
 

 [31]
 

 . The Northwest Ordinance of 1787, ratified by the Eirst Congress in 1789, provided that new states created from the lands of the Northwest Territories needed a minimum population of 50,000 before they could be admitted to the Union.
 
 See
 
 I Stat. 50-52.
 

 [32]
 

 . Section 2 of the Fourteenth Amendment provides (emphasis added):
 

 But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the
 
 male inhabitants
 
 of such State, being trwenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis for representation therein shall be reduced in the proportion which the number of such
 
 male citizens
 
 shall bear to the whole number of
 
 male citizens
 
 twenty-one years of age in such State.
 

 U.S. Const, amend. XIV.
 

 [33]
 

 . Sections 9 and 10 of Article I are a cata-logue of express prohibitions.
 
 See, e.g.,
 
 U.S. Const, art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall
 
 not
 
 be suspended ----”) (emphasis added);
 
 id.
 
 art. I, § 9, cl. 3
 
 (“No
 
 Bill of Attainder or ex post facto Law shall be passed.”) (emphasis added);
 
 id.
 
 art. I., § 10, cl. 1
 
 (“No
 
 State shall enter into any Treaty, Alliance, or Confederation ....”) (emphasis added). Article III provides that
 
 “No
 
 Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.”
 
 Id.
 
 art. Ill, § 3, cl. 1 (emphasis added). Article IV specifies that
 
 “no
 
 new State shall be formed or erected within the Jurisdiction of any other State;
 
 nor
 
 any State formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.”
 
 Id.
 
 art. IV, § 3, cl. 1 (emphasis added). The Bill of Rights also says "no” repeatedly.
 
 See, e.g., Id.
 
 amend. I ("Congress shall make
 
 no
 
 law respecting an establishment of religion, or prohibiting the free exercise thereof (emphasis added);
 
 id.
 
 amend. Ill ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner ....”) (emphasis added).
 

 [34]
 

 . The defendants rely on the following language in Article I:(l) that members of the House of Representatives are chosen by "the People of the several States"; (2) that the "Electors in each State shall have the Qualifications requisite for Electors in the most numerous Branch of the State Legislature”; (3) that Representatives are to be "apportioned among the several States”; (4) that a Representative must "be an Inhabitant of that State in which he shall be chosen”; and (5) that the "Times, Places and Manner of holding Elections for ... Representatives, shall be prescribed in each State by the Legislature thereof.” U.S. Const, art. I, §§ 2, 4; Memorandum on Behalf of Secretary Daley and the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support [of] Their Motion To Dismiss Plaintiffs’ Claims at 8-10 (filed Dec. 18, 1998) ("Sec’y Opp”).
 

 [35]
 

 . In this analysis of the role of the
 
 exclusio unius
 
 maxim to the circumstances of this case, I do not overlook the several occasions in which the Supreme Court, and the Framers themselves invoked or discussed the maxim. For example, Alexander Hamilton argued that the enumeration of certain cases over which the federal courts have jurisdiction,
 
 see
 
 U.S. Const, art. Ill, § 2, cl. 1, "marks the precise limils beyond which the federal courts cannot extend their jurisdiction,” because “the specification would be nugatory if it did not exclude all ideas of more extensive authority.” The Federalist No. 83, at 497 (Alexander Hamilton). He explained that "an affirmative grant of special powers would be absurd, as well as useless, if a general authority were intended.”
 
 Id.
 
 In
 
 Marbury v. Madison,
 
 Chief Justice Marshall echoed Hamilton's reasoning in concluding that Congress could not augment, ihe original jurisdiction of the Supreme Court as described in Article III,
 
 *88
 
 § 2, clause 2. 5 U.S. 137, 174, 1 Cranch 137, 2 L.Ed. 60 (1803).
 

 The Supreme Court has also treated the Constitution’s enumeration of particular exceptions as barring the recognition of other exceptions. In
 
 INS v. Chadha,
 
 in considering the constitutionality of the legislative veto, the Court identified four "carefully delineated exceptions from presentment and bicameralism,” which generally served as prerequisites for the exercise of legislative authority. 462 U.S. 919, 956, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Court concluded that the legislative veto was unconstitutional in part because the veto "was not within any of the express constitutional exceptions authorizing one House to act alone.”
 
 Id.
 

 None of the foregoing applications of negative inference necessitates the use of negative inference to read Article I as denying congressional representation to the people of the District. The provisions of Article I at issue here do not fall into the category of affirmative grants of specific powers such as were discussed by Hamilton in The Federalist No. 83 or at issue in
 
 Marbury;
 
 nor do they involve enumerated exceptions, as in
 
 Chada.
 
 Moreover, unlike the provisions construed in
 
 Mar-bury
 
 and
 
 Chadha,
 
 the defendants’ proposed interpretation of Article I is not necessary to avoid an "absurd” or "nugatory” meaning.
 

 [36]
 

 . With respect to the House of Representatives, the Constitution provides: "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.” U.S. Const, art. I, § 2, cl. 2.
 

 [37]
 

 . In reaching this conclusion, I do not overlook footnote 9 in the
 
 Term Limits
 
 majority opinion which acknowledges that the same result could be reached through application of the maxim. However, the majority was merely responding to the dissent’s argument that the application of the maxim had no place in the analysis, rejecting the argument that "it had no merit.” The majority’s decision, however, clearly was not controlled by the maxim, as shown by the fact that its only mention appears in a footnote. Even Justice Story, whom the
 
 Term Limits
 
 court cites as supporting the application of the maxim in the interpretation of the Qualifications Clause, cautioned that this maxim was "susceptible of being applied, and indeed [is] often ingeniously applied, to the subversion of the text and the objects of the instrument.” 1 Joseph Story, Commentaries on the Constitution § 448, at 342 (Melville M. Bigelow, 5th ed.1905). In his view, therefore, ”[t]he truth is, that, in order to ascertain how far an affirmative or negative provision excludes or implies others, we must look to the nature of the provision, the subject-matter, the objects, and the scope of the instrument.”
 
 Id.
 
 at 343.
 

 [38]
 

 . Indeed, the ultimate test might well be: would voting for representation in the House
 
 *91
 
 of Representatives interfere with the special authority of the federal government in respect to the federal enclave that is the Seat of Government. It seems obvious that a voting representative in the House of Representatives for District residents would no more "interfere[] with the jurisdiction asserted by the Federal Government,” than did Kentucky's imposition of a license tax on residents of a federal enclave, approved by the Supreme Court in
 
 Howard v. Commissioners of Sinking Fund,
 
 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953).
 

 [39]
 

 . Indeed, in other instances where the Framers were particularly concerned about the influence of States, the denial of voting representation in
 
 Congress
 
 was never part of the solution. For example, to ensure the independence of Representatives and Senators, the Constitution provides that the National Treasury, not the States, pays their salaries. U.S. Const, art. I, § 6;
 
 Term Limits,
 
 514 U.S. at 809-10, 115 S.Ct. 1842. Similarly, to ensure the independence of Article III Justices and judges, Article III guarantees life tenure during good behavior, and proscribes diminution of judges’ compensation while in office.
 
 See
 
 The Federalist No. 79 (Alexander Hamilton). If the Framers thought that denial of voting representation in Congress was necessary to assure independence from the States, they should have also denied it to Representatives, Senators and, particularly, Article III judges.
 

 [40]
 

 .
 
 See
 
 Maj. Op. at notes
 
 29,
 
 30, 32, 34 and accompanying text.
 

 [41]
 

 . For example, the Declaration stated that the King: "has refused to pass other Laws for the Accommodation of large Districts of People, unless those People would relinquish the Right of Representation in the Legislature, a Right inestimable to them, and formidable to Tyrants only.” The Declaration of Independence ¶ 5 (U.S.1776).
 

 [42]
 

 . In 1978, Congress approved and submitted to the states for ratification an amendment to the Constitution providing that "for purposes of representation in Congress ... the District ... shall be treated as though it were a State.” H.R.J. Res. 554, 95th Cong., 2d Sess. (1978). Only sixteen states approved it.
 
 D.C. Vote Amendment Dies,
 
 Cong. Q. 404, 404-05 (1985 Almanac). History records that, over the years between 1801 and 1978, Congress entertained up to 150 resolutions to amend the Constitution "to provide the District with some measure of voting to enfranchise District residents.”
 
 District of Columbia Representation in Congress: Hearings Before the Subcomm. on the Constitution of the Senate Comm, on the Judiciary,
 
 95th Cong., at 353-54 (1978) (Issue Brief, Congressional Research Service). After the failure of the 1978 amendment, a principal sponsor observed: "We all know what’s going on here. Opponents of statehood have felt in the past that the District of Columbia is too urban, too liberal, too Democratic, too black.” 124 Cong Rec. 26345 (1978) (statement of Sen. Kennedy).
 

 [43]
 

 . From the perspective of an 80 year old, 200 years is not all that long a time.
 

 [44]
 

 . It is noteworthy (hat. the
 
 Loughborough
 
 Court approved direct taxation of District residents despite the fact that the tax apportionment requirement of Article I, like its voting apportionment requirement, referred only to apportionment among the several States. U.S. Const, art. I, § 2. The Court found that the negative inference, here invoked by defendants with respect to voting apportionment, was trumped by another provision of the Constitution: the taxing power vested in Congress by Article I.
 
 Loughborough,
 
 18 U.S. at 322-23, 5 Wheat. 317. So here, any such negative inference is trumped by other provisions of the Constitution, adopted in the wake of the Civil War and imported thereafter into the original Due Process clause of the Filth Amendment: the Equal Protection clause.
 

 [45]
 

 . For example, the National Institutes of Health became a federal enclave in 1953 when Maryland ceded jurisdiction over the property to the United States.
 
 Evans,
 
 398 U.S. at 420-21, 90 S.Ct. 1752 (citing Md.Code Ann. art. 96, § 34).
 

 [46]
 

 . The Act expressly specifies that "[t]he exercise of any right under this subchapter shall not affect, for purposes of any Federal, State or local tax, the residence or domicile of a person exercising such right.” 42 U.S.C. § 1973ff-5.
 

 [47]
 

 . There is one difference — except for members of the Armed Forces living abroad, Uniled States citizens overseas are there voluntarily. The political forebears of District inhabitants were ceded there without their consent.
 

 [48]
 

 . In fact, under the Overseas Voting Act, a United States citizen residing outside the United States may be eligible to participate in federal elections, even though he or she had never been eligible to participate in any election while a citizen of a State. For example, the Act applies to an overseas voter who was too young to vote while a citizen of a State.
 

 [49]
 

 . It is true that the First Circuit has asserted that, because the Overseas Voting Act "does not infringe [the right to vote] but rather limils a state’s ability to restrict it,” the Act "need only have a
 
 rational basis
 
 to pass constitutional muster.”
 
 De La Rosa,
 
 32 F.3d at 10 & n. 2 (emphasis added). However, the Act goes beyond checking States’ restrictions on the franchise; it permits voting by electors who are not eligible to vote for the most numerous branch of a State's legislature. Thus, it affirmatively extends the right to vote 1.Q United States citizens who are not literally qualified to vote under Article I, § 2, clause 1.
 

 In applying the principles of equal protection in the context of State elections, the Supreme Court has made it clear that strict scrutiny is applied to State "statutes distributing the franchise” which have the effect that "some resident citizens are permitted to participate and some are not.”
 
 Kramer v. Union Free Sch. Dist. No. 15,
 
 395 U.S. 621, 628-29, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969);
 
 see also Harper,
 
 383 U.S. at 665, 86 S.Ct. 1079. These same principles apply to the federal government through the due process clause of the Fifth Amendment — not as a formality, but because essentially the same justification for strict scrutiny of
 
 statutes
 
 governing the right to vote applies to both federal and state laws:
 

 The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the as
 
 *106
 
 sumption can no longer serve as the basis for presuming constitutionality.
 

 Kramer,
 
 395 U.S. at 628, 89 S.Ct. 1886. The Overseas Voting Act is therefore squarely within the class of voting laws subject to strict scrutiny under the equal protection clause.
 

 The majority also suggests that, in any event, citizens of the District who have never lived in any of the fifty states could not have an equal protection claim. The majority fails to suggest any compelling governmental interest in distinguishing between overseas voters and those District residents who have never lived in a State. Moreover, the majority apparently recognizes the violation of equal protection principles with respect to those District residents who previously have lived in a State.
 

 [50]
 

 . The Supreme Court recently reaffirmed that classifications based simply on age arc not suspect under the equal protection clause and are evaluated only to determine whether they bear a rational relationship to a legitimate' governmental interest.
 
 Kimel v. Florida Bd. of Regents,
 
 -U.S. -, 120 S.Ct. 631, 645, 145 L.Ed.2d 522 (2000);
 
 see also Gregory
 
 v.
 
 Ashcroft,
 
 501 U.S. 452, 473, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991);
 
 Vance v. Bradley,
 
 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979);
 
 Massachusetts Bd. of Retirement v. Murgia,
 
 427 U.S. 307, 316-17, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). That analysis docs not dispose of the issue here, however, because a denial of the right to vote also infringes on a fundamental right which merits either strict or intermediate scrutiny.